West Reporter Image (PDF)

853 A.2d 28, 189 Ed. Law Rep. 784

Briefs and Other Related Documents

Supreme Court of Rhode Island.
Russell GORMAN, Jr. et al.
v.
ST. RAPHAEL ACADEMY.
No. 2003-371-Appeal.
July 15, 2004.

**Background:** Student filed amended complaint for breach of contract against private four-year secondary school, seeking injunctive relief prohibiting school from enforcing hair-length regulation. The Superior Court, Providence County, Stephen J. Fortunato, J., granted relief, and school appealed.

**Holdings:** The Supreme Court, Suttell, J., held that:
(1) as matter of first impression, adoption of hair-length regulation was not subject to judicial review for rational basis or according to arbitrary or capricious standard;
(2) trial court improperly placed burden of proof on school to justify challenged regulation;
(3) challenged regulation did not amount to state action;
(4) as matter of first impression, contractual rule or regulation of a private school is lawful and enforceable as long as it is not against public policy or law; and
(5) challenged regulation did not violate public policy and was enforceable provision of school's educational contract with students.

Reversed.

West Headnotes

[1] KeyCite Notes

30 Appeal and Error
30XVI Review
30XVI(F) Trial De Novo
30k892 Trial De Novo
30k893 Cases Triable in Appellate Court
30k893(1) k. In General. Most Cited Cases

Supreme Court reviews questions of law de novo.

[2] KeyCite Notes

345 Schools
345I Private Schools and Academies
345k8 k. Pupils, Tuition, and Discipline. Most Cited Cases

Letter of acceptance from private four-year secondary school to student, together with any signed documents relative to student's first year, did not create enforceable contract of four years' duration.

[3] KeyCite Notes

30 Appeal and Error
30XVI Review
30XVI(A) Scope, Standards, and Extent, in General
30k838 Questions Considered
30k843 Matters Not Necessary to Decision on Review
30k843(2) k. Review of Specific Questions in General. Most Cited Cases

Issue of existence of enforceable contract between student and private four-year secondary school for student's second year was rendered moot by student's completion of second year; whether valid contract existed for student's second year was justiciable question only during second year.

[4] KeyCite Notes

81 Colleges and Universities
81k9 Students
81k9.10 k. In General. Most Cited Cases

Relationship between a student and a private university is essentially contractual in nature, but the relationship has unique qualities, and thus does not require strict adherence to contract law.

[5] KeyCite Notes

345 Schools
345I Private Schools and Academies
345k8 k. Pupils, Tuition, and Discipline. Most Cited Cases

Because contracts for private education have unique qualities, courts must construe them in a manner that leaves the school administration broad discretion to meet its educational and doctrinal responsibilities.

[6] KeyCite Notes

345 Schools
345I Private Schools and Academies
345k8 k. Pupils, Tuition, and Discipline. Most Cited Cases

Implicit in an educational contract is the right to modify disciplinary and academic rules and regulations.

[7] KeyCite Notes

345 Schools
345I Private Schools and Academies
345k8 k. Pupils, Tuition, and Discipline. Most Cited Cases

Student handbook can be a source of the terms defining the reciprocal rights and obligations of a school and its students, for the purposes of an action in contract.

[8] KeyCite Notes

345 Schools

345I Private Schools and Academies
345k8 k. Pupils, Tuition, and Discipline. Most Cited Cases

Courts normally construe educational contracts to allow the school administration flexibility in meeting its educational responsibilities.

[9] KeyCite Notes

345 Schools
345I Private Schools and Academies
345k8 k. Pupils, Tuition, and Discipline. Most Cited Cases

For purposes of determining enforceability of hair-length regulation promulgated by private four-year secondary school, relationship between school and its students was contractual in nature; each student's parents or guardians were required to sign tuition contract for each specific academic year, along with student handbook published for such year, and students and parents agreed to abide by rules and regulations promulgated by administration.

[10] KeyCite Notes

92 Constitutional Law
92XXVI Equal Protection
92XXVI(A) In General
92XXVI(A)4 Applicability to Governmental or Private Action; State Action
92k3027 k. Private Persons and Entities. Most Cited Cases
(Formerly 92k213(4))

92 Constitutional Law KeyCite Notes
92XXVII Due Process
92XXVII(D) Applicability to Governmental or Private Conduct; State Action
92k3941 k. Non-Government Entities and Individuals, Actions Of. Most Cited Cases
(Formerly 92k254(4))

Adoption of hair-length regulation by private four-year secondary school was not subject to judicial review under Fourteenth Amendment for rational basis or according to arbitrary or capricious standard, absent any allegation or evidence that school was state actor, where relationship between school and students was contractual in nature. U.S.C.A. Const.Amend. 14.

[11] KeyCite Notes

345 Schools
345I Private Schools and Academies
345k8 k. Pupils, Tuition, and Discipline. Most Cited Cases

Hair-length regulation adopted by private four-year secondary school was not arbitrary or capricious, and had rational basis with respect to school's mission statement; regulation was adopted as part of overall tightening up and stricter enforcement of school rules concerning deportment to facilitate common culture, and was based upon school principal's experience at other schools and regulations promulgated at other, similar schools.

[12] KeyCite Notes

345 Schools
345I Private Schools and Academies
345k8 k. Pupils, Tuition, and Discipline. Most Cited Cases

In student's breach of contract action against private four-year secondary school, trial court improperly placed burden of proof on school to justify its challenged hair-length regulation and to produce evidence that such regulation rationally related to its mission statement.

[13] KeyCite Notes

95 Contracts
95V Performance or Breach
95k322 Evidence
95k322(1) k. Presumptions and Burden of Proof. Most Cited Cases

Burden of proof in a breach of contract action rests with a plaintiff to show that a defendant breached the contract.

[14] KeyCite Notes

92 Constitutional Law
92XXVII Due Process
92XXVII(D) Applicability to Governmental or Private Conduct; State Action
92k3941 k. Non-Government Entities and Individuals, Actions Of. Most Cited Cases
(Formerly 92k254(4))

Private school regulation of student conduct did not amount to "state action" subject to judicial review under Fourteenth Amendment "arbitrary or capricious" standard, absent any allegation, showing, or finding of substantial or significant involvement of state in school's decision-making process, or that school was state actor. U.S.C.A. Const.Amend. 14 .

[15] KeyCite Notes

92 Constitutional Law
92VII Constitutional Rights in General
92VII(A) In General
92k1061 k. Applicability to Governmental or Private Action; State Action. Most Cited Cases
(Formerly 92k82(5))

Private school is not a state actor, for purposes of the constitutional analysis of private school rules and regulations, and thus no governmental intrusion is implicated in the promulgation and enforcement of a private school's rules and regulations.

[16] KeyCite Notes

92 Constitutional Law
92XXVI Equal Protection
92XXVI(E) Particular Issues and Applications
92XXVI(E)11 Contracts
92k3676 k. Private Contracts. Most Cited Cases
(Formerly 92k209)

92 Constitutional Law KeyCite Notes
92XXVII Due Process
92XXVII(G) Particular Issues and Applications
92XXVII(G)11 Contracts
92k4255 k. In General. Most Cited Cases
(Formerly 92k251)

Constitutional due process and equal protection rights are intended to protect citizens against unwarranted interference and oppression by the government, not to afford protections against one's own voluntary contractual agreements. U.S.C.A. Const.Amend. 14.

[17] KeyCite Notes

345 Schools
345I Private Schools and Academies
345k4 k. Regulation and Supervision. Most Cited Cases

Private schools must have considerable latitude to formulate and enforce their own rules to accomplish their academic and educational objectives.

[18] KeyCite Notes

345 Schools
345I Private Schools and Academies
345k8 k. Pupils, Tuition, and Discipline. Most Cited Cases

Rules and regulations of a private school generally are binding on those who wish to remain members, provided however, that said rules do not conflict with public policy.

[19] KeyCite Notes

95 Contracts
95I Requisites and Validity
95I(F) Legality of Object and of Consideration
95k108 Public Policy in General
95k108(1) k. In General. Most Cited Cases

Contract term is unenforceable only if it violates public policy.

[20] KeyCite Notes

345 Schools
345I Private Schools and Academies
345k4 k. Regulation and Supervision. Most Cited Cases

Contractual rule or regulation of a private school is lawful and enforceable as long as it is not against public policy or law.

[21] KeyCite Notes

345 Schools
345I Private Schools and Academies
345k4 k. Regulation and Supervision. Most Cited Cases

Contractual rule or regulation of a private school violates public policy only if it: (1) is injurious to the interests of the public; (2) interferes with the public welfare or safety; (3) is unconscionable; or (4) tends to injustice or oppression.

[22] KeyCite Notes

345 Schools
345I Private Schools and Academies
345k8 k. Pupils, Tuition, and Discipline. Most Cited Cases

Private school's adoption of regulation concerning length of hair of male students did not violate public policy and was thus enforceable provision of school's educational contract with students, absent any evidence that regulation violated any constitutional right, was injurious to interests of public, or interfered with public welfare or safety, where regulation was not unconscionable and did not tend to injustice or oppression.

***30** James P. Howe, Esq., Providence, for Plaintiff.

Joseph V. Cavanagh, Jr., Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, and SUTTELL, JJ.

**OPINION**

SUTTELL, Justice.
By all accounts, Russell Gorman III is an exemplary student at Saint Raphael Academy. During his freshman year, he was an honors student, incurred no disciplinary infractions, played freshman basketball, and was a member of the Ambassador's Club, in which he would help out with open house and visit middle schools, literally, as an ambassador for Saint Raphael. Yet, in his second or third week of school, he faced expulsion-his only offense being the length of his hair. FN1

FN1. Russell Gorman wears his hair in a mullet style, where his hair is closely cropped on the top and sides of his head, but six to eight inches below his shirt collar in the back.

Unwilling to trim his locks and unable to untangle the disciplinary snarl with school officials, Russell and his parents filed a breach of contract action against Saint Raphael. The Superior Court granted a preliminary injunction, and eventually a permanent injunction, restraining and enjoining the school from suspending, expelling, or otherwise disciplining Russell from wearing his hair so that it falls below the bottom of his shirt collar. The trial justice found the school's hair-length rule to be arbitrary on its face because it bore no rational relationship with the mission statement of Saint Raphael's. We reverse the judgment of the Superior Court. Because Saint Raphael is a private school and accorded by law wide latitude in promulgating its own rules, regulations and codes of conduct and, further, because there has been no showing that the hair-length regulation is against any law or public policy, we hold that the regulation is a lawful and enforceable term of the school's educational contract with its students and their parents.

**Facts and Travel**

Saint Raphael Academy (Saint Raphael) is a Catholic, coeducational, college preparatory ***31** school for grades 9-12 in Pawtucket, Rhode Island. Saint Raphael has almost 500 students and is operated by the Brothers of the Christian Schools with almost sixty lay faculty and staff members. It traces its educational tradition and mission to 1679, when John Baptist de La Salle opened his first school in Reims, France. As described in the student handbook, the Lasallian heritage is to address the educational needs of an economically diverse student body in a manner that is imbued with Christian spiritual values.

In the fall of 2000, plaintiff, Russell Gorman III (Russell), applied for admission to Saint Raphael. As part of the application process, Russell had an interview with school officials and visited the school several times with his parents. At the time, Russell's hair was six to eight inches below his shirt collar. No school official ever informed Russell or his parents that his hairstyle was unacceptable, or indeed commented on his hair at all. In January 2001, he received a letter of acceptance from the school principal, Brother Daniel Aubin, welcoming him to the Class of 2005.

Russell's freshman year at Saint Raphael began in August 2001. Shortly thereafter, school officials demanded that he cut his hair, and advised both Russell and his parents that he would be expelled if he failed to do so. After unsuccessfully attempting to resolve the matter, Russell and his parents, Kimberly Gorman and Russell Gorman, Jr., filed a complaint alleging breach of contract. On September 25, 2001, the trial justice granted a temporary restraining order enjoining Saint Raphael from interfering with Russell's normal matriculation and participation at Saint Raphael based on the length of his hair.[FN2]

FN2. After Saint Raphael filed two objections to the form of the order, an amended order was filed on April 23, 2002.

Near the end of Russell's freshman year, in May 2002, Brother Aubin revised the student handbook to include a hair-length regulation for boys. The 2002-2003 handbook provided in pertinent part:

"All students must keep their hair clean and well groomed. Outlandish hair styles (ex. Any designs, lettering, mohawks, ponytails, etc. engraved/cut into their hair; spiked; hair dye can only be of natural colors, [reds, blues, greens, etc. are not natural colors] are not in keeping with the school's educational mission and will not be tolerated. *A boy's hair may not be longer than the bottom of his shirt collar.* Hair should be neat and not flamboyant for all students. Students who do not conform to these regulations are subject to disciplinary action and possible dismissal if the problem persists." (Emphasis added.)

Brother Aubin testified that he relied on the handbook from Xaverian Brothers High School in Westwood, Massachusetts, where he had been Dean of Students from 1995 to 2000, as well as the 1999-2000 handbook for LaSalle Academy, in developing the rule for Saint Raphael. He further testified that he believed the existence of this regulation would promote a culture of calmness and order, thereby facilitating the school's mission. The school's mission statement found in the handbook said:

"Saint Raphael Academy is a Catholic coeducational, college preparatory school founded in the tradition of Saint John Baptist de La Salle and rooted in the gospel of Jesus Christ. The Academy welcomes a student body that is academically, ***32** economically and culturally diverse. Through its commitment to Christian values, the Academy strives for excellence in all programs for the spiritual, academic, cultural and physical development of each student. Saint Raphael Academy seeks to provide a safe environment that places priority on mutual respect as well as self-discipline. The Academy prepares each student for a life dedicated to learning, leadership and service to the Church and community."

Saint Raphael asserts that Russell's attorney was notified in May 2002 of the pending change to the hair-length rule; the Gormans maintain, however, that they did not become aware of the revisions until June or July 2002 and did not receive the new handbook detailing the change until August 2002.

The Gormans filed an amended complaint on August 21, 2002, alleging breach of contract, and seeking injunctive relief allowing Russell:

"to attend the school within the compliance and dictates of the 2001-2002 Student Handbook, or in the alternative, within all the dictates of the 2002-2003 Student Handbook (or further editions of the Student Handbook), excepting the provision with regard to the length of the hair of male students, until he graduates from St. Raphael Academy."

Before Russell's sophomore year began, the parties reached a verbal agreement permitting Russell to remain at Saint Raphael pending a final determination of the complaint, provided that he tucked his long, pony-tailed hair into his shirt collar.

In late 2002, hearings were held in which the trial justice entered judgment granting the permanent injunction. Additionally, the trial justice granted plaintiff's motion for attorney's fees of $1,505 for litigating the temporary restraining order heard on September 14, 2002, and denied the motion for attorney's fees for the hearings held in late 2002 on the permanent restraining order. The order for costs was stayed pending this appeal.

Saint Raphael timely appealed, asserting that the trial justice erred multiple times: (1) by failing to apply contract law in reaching his decision; (2) by applying a rational relationship test and requiring defendant to prove that the hair-length policy was related to the educational process; (3) by improperly ascribing the burden of proof to defendant; (4) by finding that the rule was arbitrary and capricious without supporting evidence; (5) by improperly substituting his judgment for that of the administration of Saint Raphael; and (6) by erroneously disregarding the constitutional rights of parents who choose to educate their children at Saint Raphael. For the reasons stated in this opinion, we reverse the judgment of the trial justice.

## Standard of Review

[1] KC "When reviewing a trial justice's issuance of a permanent injunction, this Court will overturn the justice's findings of fact only when they are clearly wrong or when the justice has overlooked or misconceived material evidence." *Board of Governors for Higher Education v. Infinity Construction Services, Inc.*, 795 A.2d 1127, 1129 (R.I.2002) (per curiam) (citing *Retirement Board of the Employees' Retirement System of Providence v. City Council of Providence*, 660 A.2d 721, 724 (R.I.1995)). We review questions of law *de novo. Id.* (citing *Rhode Island Depositors Economic Protection Corp. v. Bowen Court Associates*, 763 A.2d 1005, 1007 (R.I.2001) ).

## The Contract Claim

Saint Raphael first argues that the trial justice erred by failing to properly analyze this case within Russell's single count for ***33** breach of contract. The complaint did not specify what constituted the alleged contract or its alleged terms or what constituted the alleged breach. None of these details was clarified at trial. Saint Raphael asserts that the Gormans, to prevail, should have been required to prove the existence of a valid contract and that Saint Raphael breached one or more of its terms.

We first note that the trial justice made no findings with respect to the existence of a contract, but rather proceeded to evaluate the claim under principles of equity. Here, Saint Raphael denies the formation of a contract pertaining to Russell's sophomore year in 2002-2003. In May 2002, Mrs. Gorman paid the $250 enrollment fee and signed a tuition contract in which she agreed to its terms and acknowledged that the tuition contract, along with the contract in the student handbook, contained the entire agreement and understanding between the parties. Russell's parents later tendered a $3,000 tuition check, but they never signed the contract in the student handbook. Thus, defendant asserts, no valid contractual relationship ever was created between the Gormans and Saint Raphael for Russell's sophomore year.

[2] Further, Saint Raphael argues that plaintiffs produced no evidence of a breach and, specifically, no evidence that Saint Raphael had agreed or was in any way contractually bound not to adopt, revise or enforce a hair code during Russell's matriculation. The trial justice commented:

"The contract questions, such as they are, surrounding this controversy are not complex, and the controlling law is well established. The application forms and school handbook, as well as the acceptance letter [ ] forwarded by Brother Aubin to the Gorman family, are all in evidence. It is clear from the acceptance letter that the parties at the time intended that Russell Gorman, III would enter the 9th grade class and graduate with his fellow admittees four years later as the Class of 2005 of St. Raphael Academy."

We reject, however, any suggestion that the acceptance letter, together with any signed documents relative to Russell's freshman year, created an enforceable contract of a four-year duration. What is clear from the record is that Saint Raphael offered its students a one-year contract that was subject to renewal annually until the student graduated.

[3] Here, the Superior Court failed to make the predicate findings of offer, acceptance, consideration and breach requisite to determining a breach of contract claim. We see no need, however, to remand the case so that the appropriate factual findings can be supplied. The existence of a valid contract for Russell's sophomore school year at the time of the hearings is now a moot issue. We have established that a case is moot "if the original complaint raised a justiciable controversy, but events occurring after the filing have deprived the litigant of a continuing stake in the controversy." *In re New England Gas Co.,* 842 A.2d 545, 553 (R.I.2004) (quoting *Cicilline v. Almond,* 809 A.2d 1101, 1105 (R.I.2002) (per curiam)). Russell recently completed his junior year and will start his senior year this fall. Therefore, whether a valid contract existed for Russell's sophomore year was only a justiciable question at the time of his sophomore year.

Further, we agree with the trial justice that "the contract questions * * * are not complex." We also assume that, but for the hair-length provision, the Gormans are willing to enter into and abide by the terms and conditions of a contract with Saint Raphael for Russell's senior year in 2004-2005. The question now before us is ***34** whether the trial justice erroneously granted the permanent injunction. Our review, therefore, must focus on the issue of whether a hair-length rule at a private school is permissible in the context of the educational contract that students enter into each year. This is a question of first impression in our jurisdiction. In fact, we have found no other published case from any other jurisdiction that examines the validity of a hair-length rule in a private educational institution.

**Private School Rules and Regulations**

[4] Numerous jurisdictions have held that a student and private university relationship is essentially contractual in nature, but recognize that the relationship has unique qualities, and thus does not require strict adherence to contract law. *See, e.g., Runyon v. McCrary,* 427 U.S. 160, 172, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) ; *Mangla v. Brown University,* 135 F.3d 80, 83 (1st Cir.1998) ; *Doherty v. Southern College of Optometry,* 862 F.2d 570, 577 (6th Cir.1988) ; *Corso v. Creighton University,* 731 F.2d 529, 531 (8th Cir.1984) ; *Lyons v. Salve Regina College,* 565 F.2d 200, 202 (1st Cir.1977), *cert. denied,* 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978) (the student-school relationship is unique and rigid application of contract law not appropriate); *Mahavongsanan v. Hall,* 529 F.2d 448, 450 (5th Cir.1976) ; *Dinu v. President & Fellows of Harvard College,* 56 F.Supp.2d 129, 130 (D.Mass.1999) (the relationship between students and university has a "strong, albeit flexible contractual flavor"); *University of Mississippi Medical Center v. Hughes,* 765 So.2d 528, 534-35 (Miss.2000).

[5] [6] [7] [8] Because contracts for private education have unique qualities, we must construe them in a manner that leaves the school administration broad discretion to meet its educational and doctrinal responsibilities. Courts have recognized that implicit in an educational contract is the right to modify disciplinary and academic rules and regulations. *See, e.g.,* *Mahavongsanan,* 529 F.2d at 450 ("[i]mplicit in the student's contract * * * is the student's agreement to comply with the university's rules and regulations, which the university clearly is entitled to modify so as to properly exercise its educational responsibility"). That a student handbook can be a source of the terms defining the reciprocal rights and obligations of a school and its students is also an idea fairly well established in modern case law. *See, e.g.,* *Dinu,* 56 F.Supp.2d at 130 (citing *Corso,* 731 F.2d at 532-33). Courts normally construe educational contracts to allow the school administration flexibility in meeting its educational responsibilities. *See, e.g.,* *Jones v. Howe Military School,* 604 F.Supp. 122, 125 (N.D.Ind.1984) ( "contracts for education have unique qualities" and must "be construed in a manner which leaves the school sufficient discretion 'to properly exercise its educational responsibilities' ", quoting *Jansen v. Emory University,* 440 F.Supp. 1060, 1062 (N.D.Ga.1977)).

[9] In the case before us, the contractual relationship between a student, his or her parents and Saint Raphael is renewable annually by entering into a distinct and express contract for each academic year. As part of the educational contract, the student and parents agree to abide by the rules and regulations promulgated by the administration. The parents or guardians of the student are required to sign a tuition contract for the specific academic year, along with the student handbook each year. For example, the 2002-2003 tuition contract FN3 stated in part:

> FN3. The 2002-2003 student handbook contained the following contract, which must be signed by the student and his or her parents:
>
> "In consideration of the acceptance of the below named student by Saint Raphael Academy, we the undersigned parents and student, hereby acknowledge that we have read, and are in accord with, the contents of the PARENTS and STUDENT HANDBOOK.
>
> "It is our understanding that attending Saint Raphael Academy is a privilege which may be revoked at any time. By sending our son/daughter to the Academy, we agree that the Administrators of Saint Raphael Academy have the right to expect our child to comply with the rules and regulations as set forth in the PARENTS and STUDENT HANDBOOK. We also understand that such Administrators have the right to set policies and make decisions as they, in their exclusive discretion, find not only to be in the best interest of our child, but also in the best interests of the whole student body.
>
> "We do hereby contract with Saint Raphael Academy that we, the undersigned parents, will pay tuition and fees charged by the school for the 2001/02 [ *sic* ] school year on a timely basis.
>
> " * * *
>
> "We do hereby contract with Saint Raphael Academy that we, the undersigned parents and our son/daughter, will comply with the school rules and regulations, and that we, the parents as well as our child, will accept those decisions made by the school and the Administration."

***35** "This contract, *along with the Student Handbook,* contains the entire agreement and understanding between the parent(s) guardian(s) of the above-named student and Saint Raphael Academy with respect to the enrollment of said student. No representations, promises, agreements or understandings, written or oral, not contained herein shall be of any force or effect. No change or modification of this tuition contract shall be valid or binding unless it is in writing and signed by the

party(s) intending to be bound." (Emphasis added.)

Clearly, therefore, the relationship between Saint Raphael and its students is contractual in nature.

**Rational Basis Test**

[10] We now turn to the issue of a private school's authority to adopt, revise, and enforce rules and regulations as part of the educational contract. Saint Raphael argues that the trial justice erred in applying a rational basis test to evaluate the lawfulness of the hair-length rule. The amicus curiae brief submitted by the Rhode Island Catholic School Parents Federation asserts that the trial justice implicitly, if not explicitly, premised his decision upon the conclusion that a secondary school student has a liberty interest in choosing his own personal appearance that warrants constitutional protection. We note that the Gormans did not make any constitutional claim, nor did they cite any cases recognizing the right of a student to wear long hair in a *private school* setting. The federal circuit courts are split on the issue of whether a hair-length policy even violates the constitutional rights of *public school* students. *See* *Massie v. Henry,* 455 F.2d 779, 783 (4th Cir.1972) (striking down hair-length regulation in public high school); *Bishop v. Colaw,* 450 F.2d 1069, 1077 (8th Cir.1971) (same); *Richards v. Thurston,* 424 F.2d 1281, 1286 (1st Cir.1970) (same); *Breen v. Kahl,* 419 F.2d 1034, 1038 (7th Cir.1969) (same), *cert. denied,* 398 U.S. 937, 90 S.Ct. 1836, 26 L.Ed.2d 268 (1970); *cf.* *Freeman v. Flake,* 448 F.2d 258, 262 (10th Cir.1971), *cert. denied,* 405 U.S. 1032, 92 S.Ct. 1292, 31 L.Ed.2d 489 (1972) (upholding hair-length regulations in public school); *King v. Saddleback Junior College District,* 445 F.2d 932, 940 (9th Cir.1971) (same), *cert. denied,* 404 U.S. 979, 92 S.Ct. 342, 30 L.Ed.2d 294 (1972); *Jackson v. Dorrier,* 424 F.2d 213, 215 (6th Cir.) (per curiam) (same), *cert. denied,* ****36*** 400 U.S. 850, 91 S.Ct. 55, 27 L.Ed.2d 88 (1970); *Ferrell v. Dallas Independent School District,* 392 F.2d 697, 703 (5th Cir.) (same), *cert. denied,* 393 U.S. 856, 89 S.Ct. 98, 21 L.Ed.2d 125 (1968).

The trial justice acknowledged in his decision that it was "beyond cavil that private schools can change their rules as they see fit from time to time, even during the period between the admission of a freshman class and its graduation four years later." He held that changes made to controlling rules and regulations, however, "should be enacted in good faith and not bespeak the arbitrary or capricious." Repeatedly noting that Saint Raphael had failed to produce evidence tending to prove that long hair worn by male students affects the educational process, discipline or decorum of the school, or that it has anything to do with the dogma or rules of the Roman Catholic Church, he ruled that the hair-length regulation was arbitrary and capricious because it bore no rational relation to the school's mission statement. We conclude, however, that the determination of what rules or policies comply with the school's mission statement is an exercise more appropriately and properly left to the school administration.

At the hearing, Brother Aubin testified that he became principal of Saint Raphael in August 2000. He has been involved at various educational institutions since 1973. He testified that when he arrived in 2000, he found the school lacking in discipline. He identified the biggest problems as lack of respect for teachers and a "tough element" of older students who were very cliquish. He said that the school had become very lax in enforcing disciplinary rules, including its dress code. All of which, Brother Aubin felt, was inimical to a common culture or sense of community.

Brother Aubin further testified that he set out to change the culture of Saint Raphael and create a sense of community and shared values that would provide a level playing field for all students, prevent distractions, promote a team spirit, and create a common value-based culture of calmness and order. We note that these goals are consistent not only with the school's mission statement, but also with the Lasallian heritage of Christian Brothers' schools. The Saint Raphael student handbook states "De La Salle regarded a school as a community of believers working cooperatively to achieve a shared vision."

Each year Saint Raphael publishes a student handbook that delineates its academic standards and policies that it deems not only to be in the best interest of the student, but also in the best interests of the whole student body. In a section entitled, "Regulations to Foster the Saint Raphael Academy

Community," it sets forth various rules relating to attendance, conduct, discipline, appearance and its dress code. Students are expected to be "well-groomed," wear properly fitted uniforms, and refrain from the use of "vulgar, obscene or offensive language."

According to Brother Aubin, the adoption and enforcement of the hair-length regulation was part and parcel of the overall tightening up and stricter enforcement of rules concerning deportment to facilitate a common culture. He said that there had been hair-length regulations for male students at the schools where he previously served, and he consulted student handbooks at other Catholic schools. After Brother Aubin met with other school officials, the Saint Raphael student handbook for 2002-2003 was revised to include the provision that "a boy's hair may not be longer than the bottom of his shirt collar."

[11] After reviewing the record and the evidence adduced at trial, we are unable to conclude that the hair-length regulation ***37** was arbitrary or capricious or that it lacked a rational basis vis-à-vis the school's mission statement. More significantly, we hold that, absent a violation of law or public policy, it is not within the province of the court to inject itself in the rule-making authority of a private school.

[12] [13] Moreover, the trial justice improperly placed the burden of proof on defendant, Saint Raphael, to justify its hair-code policy and to produce evidence that its policy rationally related to its mission statement. Even if the arbitrary and capricious inquiry were the correct standard, the burden of proof in a breach of contract action rests with a plaintiff to show that a defendant breached the contract.

[14] We hold, however, that the arbitrary or capricious standard is not the proper test with which to evaluate the lawfulness of a rule or regulation in the private school context. Recognizing that private schools are voluntary associations, the trial justice applied the general principle articulated in *Hebert v. Ventetuolo,* 480 A.2d 403, 407 (R.I.1984), that there should be "no judicial interference with the internal affairs, rules and by-laws of a voluntary association unless their enforcement would be arbitrary, capricious or constitute an abuse of discretion." In *Hebert,* 480 A.2d at 407, this Court examined a rule promulgated by the Rhode Island Interscholastic League, a voluntary association of public school principals, and upheld the league's ability to enact a rule governing the eligibility of public school transfer students to participate in interscholastic sports. This Court determined that the transfer rule that the league adopted was not arbitrary or capricious because it was designed to prevent the problems of school-jumping by athletes and the rule was related reasonably to that purpose. *Id.* In a later decision, this Court explicitly clarified that "the existence of state action was implicit in our consideration of the constitutional issues raised in [ *Hebert* ]." *Kleczek v. Rhode Island Interscholastic League, Inc.,* 612 A.2d 734, 736 (R.I.1992) (per curiam).

[15] *Hebert,* however, is not controlling in an analysis of private school rules and regulations. A private school is not a state actor, and thus no governmental intrusion is implicated in the promulgation and enforcement of a private school's rules and regulations. *See Wisch v. Sanford School, Inc.,* 420 F.Supp. 1310, 1314 (D.Del.1976) (private high school that expelled student was not considered state actor even though school partially funded and regulated by the state); *Stock v. Texas Catholic Interscholastic League,* 364 F.Supp. 362, 364-65 (N.D.Tex.1973) (decision of private school accredited by state to terminate plaintiff student's participation in sports was not under color of state law, when state accreditation not connected with the challenged activity); *Morgan v. St. Francis Preparatory School,* 326 F.Supp. 1152, 1154 (M.D.Pa.1971) (private school's expulsion of student not considered state action); *Bright v. Isenbarger,* 314 F.Supp. 1382, 1398 (N.D.Ind.1970), *aff'd,* 445 F.2d 412, 413 (7th Cir.1971) (per curiam) (same).

Without specifically finding that Saint Raphael is a state actor, the trial justice noted that it, "like all private schools in Rhode Island, could not exist without the license and approval of the State of

Rhode Island Department of Education," and that "there are a number of state imposed strictures to which a private school must adhere." He also said, "It is apparent, then, that private schools in Rhode Island share with public schools the important mandate of educating students to participate appropriately as citizens in a democracy. ***38** In short, private schools discharge a crucial public responsibility."

Arguably, one of the most important functions of state government is "to secure to the people the advantages and opportunities of education * * *." R.I. Const., art. 12, sec. 1. To the extent that Saint Raphael, or any other private school, contributes to this effort, it indeed discharges a public duty. Nevertheless, absent a showing of substantial or significant involvement in the decision-making process of the private entity, state action is not implicated. *See, e.g., Wisch,* 420 F.Supp. at 1313 (citing *Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967) and *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) ).

[16] Moreover, the Gormans never alleged in their complaint that Saint Raphael was a state actor, nor did the trial justice make such a finding. In the case of a private high school, the state nexus requirement that triggers the application of the Fourteenth Amendment is not readily met. The constitutional due process and equal protection rights are intended to protect citizens against unwarranted interference and oppression by the government, not to afford protections against one's own voluntary contractual agreements. *See North Dakota v. North Central Ass'n of Colleges and Secondary Schools,* 23 F.Supp. 694, 700 (E.D.Ill.), *decree aff'd by,* 99 F.2d 697, 700 (7th Cir.1938). We conclude, therefore, that the trial justice improperly applied the arbitrary/capricious standard.

**Public Policy Considerations**

We hold, rather, that the appropriate inquiry is whether the term at issue in a contract involving a private educational institution is contrary to law or public policy. It is a general rule of contract law that " 'competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts [ ] unless a violation of the law or public policy is clear and certain.' " *Wechsler v. Hunt Health Systems, Ltd.,* 216 F.Supp.2d 347, 354-55 (S.D.N.Y.2002) (quoting *Wheelabrator Environmental Systems, Inc. v. Galante,* 136 F.Supp.2d 21, 30 (D.Conn.2001) ).

"A voluntary association may, without direction and interference by the courts, for its government, adopt a constitution, by-laws, rules and regulations which will control as to all questions of discipline, or internal policy and management, and its right to interpret and administer the same is as sacred as the right to make them." *Edwards v. Indiana State Teachers Association,* 749 N.E.2d 1220, 1225 (Ind.Ct.App.2001) (quoting *State ex rel. Givens v. Superior Court of Marion County,* 233 Ind. 235, 117 N.E.2d 553, 555 (1954) ). This "rule of non-interference reflects an appreciation for the 'contractual' nature of membership in voluntary associations." *Id.* at 1226.

The relationship between a private educational institution, such as Saint Raphael, and its students and their parents is a voluntary contractual relationship. The activities of the individual members of the educational community are directed and influenced by the institution's educational policies and educational goals. Generally, private schools, as do most schools, strive to provide an education beyond academic scholarship. In Saint Raphael's case, it expresses its mission as preparing "each student for a life dedicated to learning, leadership and service to the Church and community." It further proclaims as a goal "the education of the whole person."

***39** [17] [18] Private schools must have considerable latitude to formulate and enforce their own rules to accomplish their academic and educational objectives. These rules and regulations generally are binding on those who wish to remain members, provided however, that said rules do not conflict with public policy. *See, e.g., Schoppelrei v. Franklin University,* 11 Ohio App.2d 60, 228 N.E.2d 334, 336 (Ohio Ct.App.1967) (absent a clear abuse of discretion by the school in the establishment and enforcement of its policies and regulations, courts will not interfere in these

matters).

[19] In Rhode Island, it is firmly established that a contract term is unenforceable only if it violates public policy. *City of Warwick v. Boeng Corp.,* 472 A.2d 1214, 1218 (R.I.1984) . As discussed above, the student/school relationship is a contractual one, and thus we find this rule applicable.

[20] [21] We extend this rule to hold that a contractual rule or regulation of a private school is lawful and enforceable as long as it is not against public policy or law. It is well established that in Rhode Island a contract violates public policy only if it is: "[1] injurious to the interests of the public, [2] interferes with the public welfare or safety, [3] is unconscionable; or [4] tends to injustice or oppression." *Id.* We adopt the same standard to private school contracts to determine whether a promulgated rule or regulation is lawful.

[22] The Gormans did not offer any evidence that a private school rule regulating the length of a student's hair is injurious to the interests of the public, nor that it interferes with the public welfare or safety. This rule clearly does not rise to the level of "unconscionable," nor does it tend to injustice or oppression. The Gormans failed to adduce evidence of a violated contractual right or evidence that the hair-length rule is contrary to public policy of the State of Rhode Island. We hold, therefore, that Saint Raphael's adoption of a regulation concerning the length of hair of male students was a valid exercise of its discretionary authority and an enforceable provision of its educational contract with students.

## Freedom of Association

Saint Raphael also asserts that the parents of the other students have a First Amendment right of association to send their children to an educational institution that imposes strict rules to further a belief in community and teamwork and to discourage displays of individuality. In light of our conclusion in this case, however, it is unnecessary to examine the constitutional argument. We "will refrain from passing on a constitutional question when it is clear that the case before us can be decided on another point and that a determination of such a question is not indispensably necessary for a disposition of the case." *Rock Ridge Limited v. Assessor of Taxes,* 667 A.2d 778, 780 (R.I.1995) (per curiam) (quoting *McGee v. Stone,* 522 A.2d 211, 215 (R.I.1987) ); *see also* *NAACP v. Alabama,* 357 U.S. 449, 459, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) .

For the reasons stated herein, we reverse the judgment of the Superior Court, to which we return the papers in this case. We are mindful that Russell Gorman is a good student with a promising future, and we encourage him to complete his senior year at Saint Raphael.

Justice FLAHERTY did not participate.

R.I.,2004.
Gorman v. St. Raphael Academy
853 A.2d 28, 189 Ed. Law Rep. 784

Briefs and Other Related Documents (Back to top)

• 2004 WL 3466219 (Appellate Brief) Brief of Appellee Russell Gorman, III (Mar. 28, 2004) Original Image of this Document (PDF)
• 2004 WL 3466220 (Appellate Brief) Brief of Amicus Curiae Rhode Island Catholic School Parents Federation in Support of Appellant (Feb. 23, 2004) Original Image of this Document (PDF)

• 2004 WL 3466235 (Appellate Brief) Appellant's Brief (Feb. 23, 2004) Original Image of this Document (PDF)
END OF DOCUMENT

West Reporter Image (PDF)

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

West Reporter Image (PDF)

467 F.Supp. 272

United States District Court, W. D. North Carolina,
Charlotte Division.
George M. CLEMMER, Patricia Clemmer and Robert M. Burroughs, Trustee, Plaintiffs,
v.
LIBERTY FINANCIAL PLANNING, INC., Defendant.
No. C-C-77-178.
Feb. 12, 1979.

Borrowers brought action under Truth in Lending Act for rescission of loan transaction. The District Court, McMillan, J., held that: (1) enactment of three-year statute of limitations on suits to rescind did not foreclose right to rescind of those already owning such right when statute was enacted; (2) lender violated Truth in Lending Act by failing to include in finance charge those amounts charged for credit life insurance and by failing to separate inconsistent disclosures required under state law from federal disclosures, and (3) lender was required to return to borrowers sum of all monies received by lender in excess of those sums disbursed to borrowers plus reasonable attorney fees.
Order accordingly.

West Headnotes

[1] KeyCite Notes

241 Limitation of Actions
  241I Statutes of Limitation
    241I(A) Nature, Validity, and Construction in General
      241k6 Retroactive Operation
        241k6(1) k. In General. Most Cited Cases

Enactment of three-year statute of limitation on suits to rescind loans because of violations of Truth in Lending Act does not foreclose right to rescind of those already owning such right when statute was enacted. Truth in Lending Act, § 125(f), 15 U.S.C.A. § 1635(f).

[2] KeyCite Notes

92B Consumer Credit
  92BII Federal Regulation
    92BII(A) In General
      92Bk32 k. Truth in Lending, in General. Most Cited Cases

Lender violated Truth in Lending Act by not obtaining authorizations for credit life insurance from three of four persons to whom credit was extended and by failing to include in finance charge those amounts charged for credit life insurance. Truth in Lending Act, § 106(b), 15 U.S.C.A. § 1605(b); Truth in Lending Regulations, Regulation Z, § 226.4(a)(5), 15 U.S.C.A. following section 1700.

[3] KeyCite Notes

92B Consumer Credit
  92BII Federal Regulation
    92BII(B) Disclosure Requirements
      92Bk51 k. Form and Sufficiency of Disclosure in General. Most Cited Cases

Lender violated Truth in Lending Act by failing to separate inconsistent disclosures required under state law from federal disclosures. Truth in Lending Regulations, Regulation Z, § 226.6(c), 15 U.S.C.A. following section 1700.

[4] KeyCite Notes

92B Consumer Credit
92BII Federal Regulation
92BII(B) Disclosure Requirements
92Bk51 k. Form and Sufficiency of Disclosure in General. Most Cited Cases

Whether or not a description can fit within spaces allowed on disclosure statement is a matter of judgment in each individual loan and lender does not violate Truth in Lending Act by referring to another document for description of property to which security interest attaches. Truth in Lending Act Regulations, Regulation Z, § 226.8(b)(5), 15 U.S.C.A. following section 1700.

[5] KeyCite Notes

92B Consumer Credit
92BII Federal Regulation
92BII(C) Effect of Violation of Regulations
92Bk60 k. In General; Validity of Transactions. Most Cited Cases

Effective rescission under Truth in Lending Act requires borrower to make restitution of amounts expended by lender. Truth in Lending Act, § 125(b), 15 U.S.C.A. § 1635(b).

[6] KeyCite Notes

92B Consumer Credit
92BII Federal Regulation
92BII(C) Effect of Violation of Regulations
92Bk61 Civil Liabilities and Penalties for Violations
92Bk61.1 k. In General. Most Cited Cases
(Formerly 92Bk61)

Following effective rescission of loan transaction under Truth in Lending Act, lender was required to return to borrowers the sum of moneys received by lender in excess of those sums disbursed to borrowers, or to other persons for borrowers' benefit, on account of loan transaction. Truth in Lending Act, § 125(b), 15 U.S.C.A. § 1635(b).

[7] KeyCite Notes

92B Consumer Credit
92BII Federal Regulation
92BII(C) Effect of Violation of Regulations
92Bk64 Actions for Violations
92Bk66 k. Pleading and Evidence. Most Cited Cases

Borrowers may properly request reasonable attorney fees in suit for rescission of loan transaction under Truth in Lending Act. Truth in Lending Act, §§ 125, 130(a)(3), 15 U.S.C.A. §§ 1635, 1640(a)(3).

***272** Richard M. Mitchell, Edmund Pickup, Mitchell & Matus, Charlotte, N. C., for plaintiffs.

***273** Richard M. Pearman, Jr., Greensboro, N. C., for defendant.

MEMORANDUM OF DECISION AND ORDER

McMILLAN, District Judge.
This action was brought under the Truth-in-Lending Act, 15 U.S.C. s 1601 Et seq. (and Regulation Z, 12 C.F.R. s 226, promulgated pursuant to 15 U.S.C. s 1604) for rescission of a loan transaction. The parties stipulated to the authenticity of the documents involved and informed the court that there were no questions of fact which needed to be decided by a jury, and that the remaining questions of law could be decided by the court. Arguments by counsel on all issues were heard on December 11, 1978.

On October 9, 1973, the defendant Liberty Financial Planning, Inc. made a loan to plaintiffs George and Patricia Clemmer. A copy of the loan contract, entitled "COMBINED STATEMENT, NOTE, SECURITY AGREEMENT, DISBURSEMENT SCHEDULE AND ELECTION AS TO INSURANCE PERTAINING TO A LOAN," is attached as Exhibit "A" to this order. The defendant obtained security interests in the Clemmer house, in all household furnishings and appliances, and in two cars. The security interest in the Clemmer's house was evidenced by a second deed of trust, but the loan proceeds were not used to purchase the house. The defendant also obtained a security interest in the home of Frank and Martha Watson, parents of Patricia Clemmer.

In 1974 the Clemmers filed a wage-earner proceeding under Chapter XIII of the Bankruptcy Act in the Western District of North Carolina. For reasons unimportant to this case, the proceeding was refiled on March 3, 1977. On or about October 3, 1977, the wage-earner proceeding was converted to a straight bankruptcy.

The Clemmers were apparently dissatisfied with the loan transaction, and on May 13, 1977, wrote a letter to defendant rescinding the loan. The rescission letter was received by defendant on May 17, 1977. Defendant failed to return to the Clemmers all sums paid by them, and did not cancel all deeds of trust obtained by defendant. Plaintiffs filed this action on July 8, 1977. The defendant answered denying liability and alleging that the statute of limitations barred the claims.

*Statute of Limitations*

The loan was made on October 9, 1973. At that time there was no statute of limitations on actions to rescind loans because of violations of the Truth-in-Lending Act. See Littlefield v. Flanagan, 498 F.2d 1133 (10th Cir. 1974).

Effective October 28, 1974, Congress enacted 15 U.S.C. s 1635(f), a three-year statute of limitation on suits to rescind. That statute reads as follows:

"(f) An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs earlier, notwithstanding the fact that the disclosures required under this section or any other material disclosures required under this part have not been delivered to the obligor."

On May 13, 1977, the plaintiffs wrote their rescission letter. It was received on May 17, 1977.

This suit to rescind was filed July 8, 1977.

The suit to rescind was thus filed More than three years after the Sale, but Less than three years after the effective date of the statute.

The question is whether s 1635(f) is to be applied retroactively, in which case plaintiffs' action would be barred, or prospectively from its effective date, in which case plaintiffs' action is not barred.

The court is aware of only two cases which have decided this question. In Jamerson v. Miles, 421 F.Supp. 107, 111 (N.D.Tex.1976), the court concluded that Congress, by enacting s 1635(f), "actually limited to three years the existence of the right (of rescission)." In James v. Home Construction Company of Mobile, 458 F.Supp. 54 (S.D.Ala.1977), Judge Hand held that ***274** s 1635(f) applied prospectively and that the period of limitation did not begin to run until its effective date, October 28, 1974.

[1] KC This court agrees with Judge Hand that Congress did not intend to foreclose the right to rescind of those already owning such a right when s 1635(f) was enacted. Therefore, plaintiffs' action is not barred by the three-year limitation period of s 1635(f).

*Alleged Violations of the Truth- in-Lending Act*

The plaintiffs allege that during the course of the loan transaction, defendant violated the Act as follows:

1. By failing to include in the finance charge those amounts charged for credit life insurance, in violation of 15 U.S.C. s 1605(b), and Regulation Z, 12 C.F.R. s 226.4(a)(5).

2. By failing to make the disclosures required by 15 U.S.C. s 1639(a) and by Regulation Z, 12 C.F.R. s 226.8(b) and (d), clearly and conspicuously in a meaningful sequence, in violation of 15 U.S.C. s 1631(a), and Regulation Z, 12 C.F.R. s 226.6(a).

3. By failing to separate inconsistent disclosures required under state law from federal disclosures, or alternatively, by placing, utilizing, and stating additional information so as to confuse or mislead the consumer or to contradict, obscure or detract attention from the information required to be disclosed by Regulation Z, in violation of 15 U.S.C. ss 1631 and 1632, and Regulation Z, 12 C.F.R. s 226.6(b) and (c).

4. By failing properly to disclose a description of any security interest held or to be retained or acquired by the creditor in connection with the extension of credit, and a clear identification of the property to which the security interest relates, in violation of 15 U.S.C. s 1639(a)(8), and Regulation Z, 12 C.F.R. s 226.8(b)(5).

The four claims will be discussed in order.

[2] KC 1. Failure to include credit life insurance charges in the finance charge. In this case credit was extended to four persons, Mr. and Mrs. Clemmer and Mr. and Mrs. Watson. Section 1605(b) provides as follows:

"(b) Charges or premiums for credit life, accident, or health insurance written in connection with any consumer credit transaction shall be included in the finance charge unless

"(1) the coverage of the debtor by the insurance is not a factor in the approval by the creditor of the extension of credit, and this fact is clearly disclosed in writing to the person applying for or obtaining the extension of credit; and

"(2) in order to obtain the insurance in connection with the extension of credit, the person to whom the credit is extended must give specific affirmative written indication of his desire to do so after written disclosure to him of the cost thereof."

Only one authorization was obtained in this transaction, that of Mr. Clemmer. The Act requires

specific authorization from parties to whom credit was extended. Since this was not accomplished in this case, defendant could not lawfully exclude these amounts from the finance charge. Defendant violated the Act by not obtaining authorizations for credit life insurance from the other persons to whom credit was extended. See Rivers v. Southern Discount Company Atlanta II, CCH Consumer Credit Guide P 98,796 (N.D.Ga.1973).

2. Failure to make disclosures clearly and conspicuously in a meaningful sequence. At the hearing on December 11, 1978, plaintiffs elected not to pursue this claim; it will be deemed waived.

3. Failure to separate inconsistent state disclosures from federal disclosures. The loan in question is regulated both by state and federal law. North Carolina General Statutes, Chapter 24, Article 2, on security instruments covering loans secured by secondary mortgages, requires certain truth-in-lending disclosures concurrent with the disclosures required under federal law. It requires other disclosures which are inconsistent (as defined in Regulation Z, 12 C.F.R. s 226.6(b)(i)) with federally required ***275** disclosures in arrangement and "(in) form, content, terminology, or time of delivery."

N.C.G.S. s 24-16 requires "a complete and itemized closing statement which shall show all disbursements of the loan proceeds and which shall total the principal amount of the loan . . ." This "principal amount," as defined in N.C.G.S. s 24-13, is the aggregate of the amount or value actually received at the time of the loan, plus a stated rate of charge, plus the sum of all existing indebtedness of the borrower paid on his behalf by the lender. This state law "rate of charge," which is included in the "principal amount," includes all charges for application fees, title searches, credit reports, etc. N.C.G.S. s 24-14(b).

The "principal amount" under state law is inconsistent with its counterpart under federal law, the "amount financed." It includes the "rate of charge," N.C.G.S. s 24-13, which is in contrast to the federal law, where the rate of charge is a part of the finance charge, not a part of the amount financed. This principal amount under state law includes Some items which would be included in the federal law amount financed, but also includes some other items which would be included in the federal law finance charge. Regulation Z, 12 C.F.R. s 226.4.

The state law requires disclosures such as the defendant has made in Part II of the disclosure statement (attached as Exhibit "A"), and those disclosures are different from the requirements of Regulation Z with respect to both content and terminology. Mason v. General Finance Corp. of Virginia, 542 F.2d 1226 (4th Cir. 1976).

Regulation Z, 12 C.F.R. s 226.6(c), allows such inconsistent disclosures to be made on the same statement as the truth-in-lending disclosures provided

"(i) All disclosures required . . . appear separately and above any other disclosures,

"(ii) Disclosures required . . . are identified by a clear and conspicuous heading indicating that they are made in compliance with Federal law, and

"(iii) All inconsistent disclosures appear separately and below a conspicuous demarcation line, and are identified by a clear and conspicuous heading indicating that the statements made thereafter are inconsistent with the disclosure requirements of the Federal Truth in Lending Act."

Regulation Z, 12 C.F.R. s 226.6(c)(2).

[3] Here the federal disclosures are clearly and conspicuously identified. Nevertheless, not all the truth-in-lending disclosures such as security identification, default charge disclosures and rebate disclosures appear above the state disclosures. The state disclosures are not identified as inconsistent with the truth-in-lending disclosures. The defendant has violated Regulation Z, 12 C.F.R. s 226.6(c).

4. Failing to make clear identification of property listed as security. The plaintiff alleges that the failure to identify on the disclosure statement the Watsons' property, in which a deed of trust was

acquired, was a violation of Regulation Z, 12 C.F.R. s 226.8(b)(5).

The disclosure statement identifies the property as "See Exhibit 'B', too long for inclosure here." Exhibit "B" was a copy of the deed of trust on the Watsons' property.

[4] Regulation Z, 12 C.F.R. s 226.8(b)(5), allows reference to a deed of trust where the security cannot be identified on the disclosure statement because of the length of the identification. Whether or not a description can fit within the spaces allowed on the disclosure statement is a matter of judgment in each individual loan. The lender did not violate the law in this case by referring to another document for the description of the property to which the security interest attached.

*Plaintiff's Recovery Where Valid Recission Has Occurred*

The rescission provisions of the Act is 15 U.S.C. s 1635(b), which provides as follows:

"(b) When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance ***276** or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within ten days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within ten days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it."

[5] [6] The plaintiffs executed and delivered a rescission letter. The defendant did not terminate its security interest within ten days as required by s 1635(b). After receipt of the rescission letter, and while this case was pending, the defendant began foreclosure proceedings on part of the security, and apparently has received complete payment of the obligation. Effective rescission under the Truth-in-Lending Act requires the borrower to make restitution of the amounts expended by the lender. Powers v. Sims & Levin, 542 F.2d 1216 (4th Cir. 1976). Therefore the amount defendant is required to return to the plaintiffs is the sum of all moneys received by the defendant in excess of those sums disbursed to the plaintiffs, or to other persons for the plaintiffs' benefit, on account of this loan transaction. The defendant should also take all steps necessary to void the security interests obtained on the property of the Clemmers and the Watsons.

*Attorneys' Fees*

[7] The plaintiffs have requested reasonable attorneys' fees in this case. This is a proper request. Burley v. Bastrop Loan Co., Inc., 407 F.Supp. 773, 779 (W.D.La.1976) (court allowed attorneys' fees, interpreting the Congressional authorization in 15 U.S.C. s 1640(a)(3) In pari materia with 15 U.S.C. s 1635). See Powers v. Sims & Levin, 542 F.2d 1216, 1222 (4th Cir. 1976).

IT IS THEREFORE ORDERED:

1. That the defendant make an accounting and return to the plaintiffs all sums received by the defendant in excess of those sums disbursed to the plaintiffs or to other persons for the plaintiffs' benefit as a part of this loan transaction.

2. That the defendant take all steps necessary to void or cancel the security interests obtained on the property of the Clemmers and the Watsons.

3. That counsel for plaintiffs file affidavits for attorneys' fees with attention to the considerations set forth by the Fourth Circuit in Barber v. Kimbrell's, Inc., 577 F.2d 216 (4th Cir. 1978) .

***277** EXHIBIT "A"

[Click to View ]

Image 1 (4.97" X 8.14") Available for Offline Print

EXHIBIT "B"
IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

| | | |
|---|---|---|
| ROSCOE JAMES, etc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 77-324-H |
| | ) | |
| HOME CONSTRUCTION COMPANY OF MOBILE, INC., | ) | |
| | ) | |
| | ) | |
| Defendant, | ) | |

ORDER

On June 20, 1977 defendant filed with this Court a motion to dismiss the above-styled claim, alleging as grounds that this Court had no jurisdiction over the subject matter of this action due to the fact that it was not timely filed. This motion was based on Title 15, U.S.C.A., s 1635(f), which provides that an obligor's right of rescission shall expire three years after the date of consummation of the transaction upon which a Truth-In-Lending Act claim rests. There is no question in this case but that the right to rescind relied upon by plaintiff was over three years old at the time this action was filed, but plaintiff alleges that October 28, 1974, the date of the amendment to Title 15, U.S.C.A., s 1635(f), should be the date from which the limitation on the right to rescind is measured, rather than June 11, 1973, the date on which the contract in this case was actually signed.

This Court is of the opinion that Congress, in enacting Title 15, U.S.C.A., s 1635(f), did not intend to foreclose the right to rescind to those already owning such right. It is therefore the opinion of this Court that, under Title 15, U.S.C.A., s 1635(f), plaintiff had a right to rescind this contract at any time prior to October 28, 1977. Therefore, plaintiff's claim for rescission is properly before this Court and defendant's motion to dismiss is due to be and the same is hereby DENIED.

DONE this 21st day of June, 1977.

s) W. B. Hand

S) UNITED STATES DISTRICT JUDGE

D.C.N.C., 1979.
Clemmer v. Liberty Financial Planning, Inc.

467 F.Supp. 272

END OF DOCUMENT

West Reporter Image (PDF)

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

West Reporter Image (PDF)

537 F.2d 871

United States Court of Appeals,
Seventh Circuit.
John MIRABAL and Sharon Mirabal, Plaintiffs-Appellees and Cross Appellants,
v.
GENERAL MOTORS ACCEPTANCE CORPORATION, a corporation, and Ed Murphy Buick-Opel, Inc., a corporation, Defendants-Appellants and Cross Appellees.
Nos. 75-1048 to 75-1050.
Argued June 4, 1975.
Decided March 26, 1976.
Rehearing Denied April 19, 1976.

Installment purchasers of an automobile brought an action against the automobile dealer and finance company, claiming violation of the Truth in Lending Act, the Illinois Motor Vehicle Retail Installment Sales Act and the Illinois Sales Finance Agency Act. The United States District Court for the Northern District of Illinois, Eastern Division, J. Sam Perry, J., entered judgment for plaintiffs in which it found seven specific violations of truth in lending requirements in the transaction, and the parties cross-appealed. The Court of Appeals, Sprecher, Circuit Judge, held, inter alia, that defendants had misstated the annual percentage rate in the contract; that they were not exempt from liability on the ground that the statement was a 'bona fide error'; and that they could not be held liable for multiple penalties under the federal act.
Judgment affirmed as modified and cause remanded for further proceedings.
Stevens, Circuit Justice, concurred and filed opinion.
Moore, Senior Circuit Judge, dissented and filed opinion.

West Headnotes

[1] KeyCite Notes

92B Consumer Credit
92BI In General
92Bk2 k. Constitutional and Statutory Provisions; Ordinances. Most Cited Cases
(Formerly 293k2 Pawnbrokers and Money Lenders)

Amendments to Truth in Lending Act enacted in 1974 were applicable to action as to which appeal was pending when amendments were adopted. Truth in Lending Act, § 102 et seq. as amended 15 U.S.C.A. § 1601 et seq.; Act Oct. 28, 1974, § 408(e), 15 U.S.C.A. § 1640 note; Fair Labor Standards Act of 1938, § 1 et seq., 29 U.S.C.A. § 201 et seq.

[2] KeyCite Notes

92B Consumer Credit
92BII Federal Regulation
92BII(B) Disclosure Requirements
92Bk52 k. Price, Balance, Rate, and Charges in General. Most Cited Cases
(Formerly 293k6.8 Pawnbrokers and Money Lenders)

In preparing statement disclosing annual percentage rate applicable to automobile installment sale, automobile dealer was not required to use charts or tables devised by Federal Reserve Board, but dealer could use any charts and tables which conformed to requirements of Board's regulations, or no tables at all. Truth in Lending Regulations, Regulation Z, § 226.5(c), 15 U.S.C.A. following section 1700.

[3] KeyCite Notes

92B Consumer Credit
92BII Federal Regulation
92BII(C) Effect of Violation of Regulations
92Bk61 Civil Liabilities and Penalties for Violations
92Bk63 k. Persons Liable; Assignees. Most Cited Cases
(Formerly 293k6.8 Pawnbrokers and Money Lenders)

Even though it followed procedures prescribed by automobile finance company when it prepared disclosure statement under Truth in Lending Act, automobile dealer was required to accept responsibility for such procedures since it was creditor under Act and since it performed them; finance company was also required to accept responsibility for procedures, since dealer was acting under its direction in complying with Act. Truth in Lending Act, §§ 102 et seq., 130(c) as amended 15 U.S.C.A. §§ 1601 et seq., 1640(c).

[4] KeyCite Notes

92B Consumer Credit
92BII Federal Regulation
92BII(C) Effect of Violation of Regulations
92Bk64 Actions for Violations
92Bk66 k. Pleading and Evidence. Most Cited Cases
(Formerly 293k9 Pawnbrokers and Money Lenders)

Where, in action by automobile installment buyers against automobile dealer and finance company for alleged violation of Truth in Lending Act, dealer contended that misstatement of annual percentage rate was bona fide error, buyers were not required to prove exactly what happened with regard to error in transaction, but burden was on dealer to show by preponderance of evidence that it maintained procedures that were reasonably adapted to avoid errors and that such procedures were in effect and consistently followed during time in question. Truth in Lending Act, § 130(c) as amended 15 U.S.C.A. § 1640(c).

[5] KeyCite Notes

92B Consumer Credit
92BII Federal Regulation
92BII(C) Effect of Violation of Regulations
92Bk61 Civil Liabilities and Penalties for Violations
92Bk62 k. Unintentional Violations and Bona Fide Errors. Most Cited Cases
(Formerly 293k6.9 Pawnbrokers and Money Lenders)

Within meaning of Truth in Lending Act's exemption from liability for bona fide errors, "bona fide error" is error made in course of good-faith attempt at compliance with Act's requirements. Truth in Lending Act, § 130(c) as amended 15 U.S.C.A. § 1640(c).

[6] KeyCite Notes

92B Consumer Credit
92BII Federal Regulation
92BII(C) Effect of Violation of Regulations

92Bk61 Civil Liabilities and Penalties for Violations
92Bk62 k. Unintentional Violations and Bona Fide Errors. Most Cited Cases
(Formerly 293k6.9 Pawnbrokers and Money Lenders)

In Truth in Lending Act's exemption from liability in cases of bona fide error, more is required than just maintenance of procedures which are designed to provide proper disclosure calculations; rather, procedures are required which are designed to avoid and prevent errors which might slip through procedures aimed at good-faith compliance; this means that such procedures must contain extra preventative step, safety catch or rechecking mechanism; creditor must show that such procedures were not only established but also maintained and followed time in and time out. Truth in Lending Act, § 130(c) as amended 15 U.S.C.A. § 1640(c).

[7] KeyCite Notes

92B Consumer Credit
92BII Federal Regulation
92BII(C) Effect of Violation of Regulations
92Bk61 Civil Liabilities and Penalties for Violations
92Bk62 k. Unintentional Violations and Bona Fide Errors. Most Cited Cases
(Formerly 293k9 Pawnbrokers and Money Lenders)

Where, in action by installment purchasers of automobile against dealer and finance company for violation of Truth in Lending Act, dealer did not show that procedures to provide correct disclosures contained preventative mechanism for catching disclosure errors or that such procedures were maintained consistently, it failed to meet burden of establishing right to exemption under section of Act relating to bona fide errors in disclosures. Truth in Lending Act, § 130(c) as amended 15 U.S.C.A. § 1640(c).

[8] KeyCite Notes

92B Consumer Credit
92BII Federal Regulation
92BII(C) Effect of Violation of Regulations
92Bk61 Civil Liabilities and Penalties for Violations
92Bk61.1 k. In General. Most Cited Cases
(Formerly 92Bk61, 293k6.8 Pawnbrokers and Money Lenders)

Liability of automobile dealer and finance company for error in disclosure of annual percentage rate applicable to installment sale of automobile was not avoided by finance company's mere notification of installment purchasers of such error; instead, finance company was required to bear burden of mistake and adjust terms of contract downward so that disclosed rate was correct. Truth in Lending Act, § 130(b, c) as amended 15 U.S.C.A. § 1640(b, c).

[9] KeyCite Notes

92B Consumer Credit
92BII Federal Regulation
92BII(C) Effect of Violation of Regulations
92Bk61 Civil Liabilities and Penalties for Violations
92Bk61.1 k. In General. Most Cited Cases
(Formerly 92Bk61, 293k10 Pawnbrokers and Money Lenders)

Automobile installment purchasers were not entitled to separate statutory penalties under Truth in Lending Act for multiple errors committed in disclosure statement. Truth in Lending Act, § 130(a),

(a)(1), (g) as amended 15 U.S.C.A. § 1640(a), (a)(1), (g).

[10] KeyCite Notes

92B Consumer Credit
92BII Federal Regulation
92BII(C) Effect of Violation of Regulations
92Bk61 Civil Liabilities and Penalties for Violations
92Bk63 k. Persons Liable; Assignees. Most Cited Cases
(Formerly 293k10 Pawnbrokers and Money Lenders)

Automobile dealer and finance company were not separately liable under Truth in Lending Act for single error in disclosing annual percentage rate applicable to transaction; such creditors, having acted jointly, were jointly liable for only single $1,000 penalty plus attorney fees. Truth in Lending Act, § 130(a) as amended 15 U.S.C.A. § 1640(a).

[11] KeyCite Notes

92B Consumer Credit
92BII Federal Regulation
92BII(C) Effect of Violation of Regulations
92Bk61 Civil Liabilities and Penalties for Violations
92Bk61.1 k. In General. Most Cited Cases
(Formerly 92Bk61, 293k10 Pawnbrokers and Money Lenders)

Where both husband and wife became obligors on automobile installment purchase contract as to which automobile dealer and finance company made erroneous disclosures under Truth in Lending Act, they could each recover separate penalty under Truth in Lending Act for such erroneous disclosure. Truth in Lending Act, § 130(a) as amended 15 U.S.C.A. § 1640(a).

[12] KeyCite Notes

92B Consumer Credit
92BI In General
92Bk17 k. Effect of Violation of Regulations or Lack of License. Most Cited Cases
(Formerly 293k6.8 Pawnbrokers and Money Lenders)

Automobile dealer and finance company were not liable for violation of Illinois Motor Vehicle Installment Sales Act where erroneous disclosure of annual percentage rate was result of bona fide error. S.H.A.Ill. ch. 121 1/2, § 584(b).

[13] KeyCite Notes

92B Consumer Credit
92BI In General
92Bk10 Interest and Charges
92Bk14 k. Collection Fees and Costs. Most Cited Cases
(Formerly 293k6.8 Pawnbrokers and Money Lenders)

Charges for attorney fees, costs of repossession and sale of repossessed property, not being charges which became automatically due and payable in event of late payment, were not "default, delinquency, and similar charges" within meaning of Illinois Motor Vehicle Retail Installment Sales Act and therefore

were not subject to disclosure under that Act. S.H.A.Ill. ch. 121 1/2, §§ 561 et seq., 565(12); Truth in Lending Act, § 128(a)(9) as amended 15 U.S.C.A. § 1638(a)(9); Truth in Lending Regulations, Regulation Z, § 226.8(b)(4), 15 U.S.C.A. following section 1700.

[14] KeyCite Notes

92B Consumer Credit
92BI In General
92Bk17 k. Effect of Violation of Regulations or Lack of License. Most Cited Cases
(Formerly 293k6.8 Pawnbrokers and Money Lenders)

Automobile finance company did not violate Illinois Sales Finance Agency Act in purchasing automobile installment contracts which disclosed incorrect annual percentage rate where such incorrect disclosure was result of honest mistake. S.H.A.Ill. ch. 74, § 4b; ch. 121 1/2, §§ 401 et seq., 408.4, 416.

***873** Martin M. Ruken, Robert D. Hughes, Gary M. Elden, Chicago, Ill., for General Motors.

Albert Koretzky, Chicago, Ill., for Mirabal.

Before STEVENS, Circuit Justice,FN* MOORE, Senior Circuit Judge, FN** and SPRECHER, Circuit Judge.

FN* Mr. Justice Stevens participated initially as Circuit Judge, and on and after December 19, 1975 as Circuit Justice.

FN** Senior Circuit Judge Leonard P. Moore of the United States Court of Appeals for the Second Circuit is sitting by designation.

SPRECHER, Circuit Judge.
This appeal primarily concerns interpretations of certain provisions of the Truth in Lending Act, 15 U.S.C. § 1601 et seq., and regulations promulgated thereunder by the ***874** Federal Reserve Board, 12 C.F.R. § 226.1 et seq. (Regulation Z).

I

The plaintiffs in this action, John and Sharon Mirabal, bought a new 1971 Buick Skylark from one of the defendants, Ed Murphy Buick-Opel, Inc., in July of 1971. The cash price for the car including service, accessories and taxes totalled $4,497.65. The Mirabals financed their purchase through General Motors Acceptance Corporation (GMAC), the other defendant to this action.FN1 The Mirabals made a down payment of $2,296.65 including $600.00 in trade for their 1964 Rambler. The retail installment contract which the defendants provided the Mirabals required that they buy $259.00 of physical damage insurance for a total amount financed after deduction of the down payment of $2,460.00. A $511.80 finance charge was imposed on this and the total deferred payment price of $2,971.80 was to be paid in 36 monthly installments of $82.55 each. The installment contract disclosed the annual percentage rate on this transaction as 11.08 percent and contained a voluminous quantity of detailed requirements on its back, including provisions detailing the seller's rights upon default.

FN1. The Mirabals had no direct dealings with GMAC. In its findings of fact the district court found that GMAC arranged for the extension of credit in requiring the dealer to follow GMAC's procedure and forms in approving credit for the Mirabals. However, under the technical meaning of the Act, the dealer 'arranged for the extension of credit' and GMAC extended the credit to the Mirabals. See 15 U.S.C. § 1602(f) explained at 12 C.F.R. § 226.2(f). This latter section reads in part as follows:

'Arrange for the extension of credit' means to provide or offer to provide consumer credit which is or will be extended by another person under a business or other relationship pursuant to which the person arranging such credit receives or will receive a fee, compensation, or other consideration for such service or has knowledge of the credit terms and participates in the preparation of the contract documents required in connection with the extension of credit.

The Act, 15 U.S.C. § 1602(f), provides that those who 'regularly extend, or arrange for the extension of, credit' are creditors. Therefore, both GMAC and the dealer are creditors under court made no finding of fact on this issue.

About one week after the transaction was consummated, GMAC sent a letter to the plaintiffs informing them that the annual percentage rate disclosed in the transaction had been understated by 1.75 percent and stating that the contract be corrected to provide for an annual percentage rate of 12.83 percent. The plaintiffs denied that they received any such letter. The trial court made no finding of fact on this issue

In late 1971, the Mirabals filed this action charging numerous violations of the Truth in Lending Act, the Illinois Motor Vehicle Retail Installment Sales Act, Ill.Rev.Stat., ch. 121 1/2, § 561 et seq. (1967) and the Illinois Sales Finance Agency Act, Ill.Rev.Stat., ch. 121 1/2, § 401 et seq. (1967) in connection with the transaction. The district court in a trial without a jury found that the defendants had violated the Truth in Lending Act in a number of ways, and had also violated both Illinois acts.

The district court found seven specific violations of Truth in Lending requirements in the transaction. For each violation of the Truth in Lending Act the court assessed damages of $1,000 against the defendants. Along with the damages under both Illinois acts, the plaintiffs won a judgment of more than $8,000. From this judgment, the defendants appealed and the plaintiffs cross-appealed.

II

The Truth in Lending Act, enacted in 1968, was designed to provide the consumer with the information needed to compare the cost of different types of consumer credit and to enable the consumer to make the best informed decision in regard to his use of credit. The Act focused not on regulating consumer credit, but on requiring uniform disclosure of credit terms. To accomplish this, the Act required creditors to make certain disclosures of the terms and conditions of credit before consummating any transaction. Among the most important of these disclosures, the Act required ***875** disclosure of the dollar cost of credit as a finance charge and the relative cost of credit as an annual percentage rate. The disclosure requirements were to be enforced two ways, through administrative regulation and through private suits for civil penalties for violation of these requirements.

[1] In 1974, Congress passed what it termed 'largely technical' amendments to the Truth in Lending Act.FN2 Some of these amendments, as shall be seen later in this opinion, affect this suit. The amendments were enacted between the lower court judgment in the case and this appeal. A preliminary question which we face concerns whether these amendments are applicable in deciding this appeal.

FN2. For instance the amendments were spoken of in this manner in the congressional debates during their consideration. See e.g., 119 Cong.Rec. 25398 (1973) (remarks of Senator Sparkman).

Congress obviously wanted the amendments applicable to all suits pending in the courts whether on appeal or otherwise. Congress provided that certain provisions of the amendments, including all those provisions relevant to the present suit, 'shall apply in determining the liability of any person under . . . the Truth in Lending Act, unless prior to the date of enactment of this Act (Oct. 28, 1974) such liability has been determined by final judgment of a court of competent jurisdiction and no further review of

such judgment may be had by appeal or otherwise.' Pub.L. No. 93-495, § 408(e), 88 Stat. 1518 (Oct. 28, 1974). However, the plaintiffs claim that such an application in this case would be unconstitutional.

Although the law in this area is not particularly clear,[FN3] what appears to this court dispositive of our question is the treatment of trial court judgments under the Fair Labor Standards Act with respect to the Portal to Portal Act, 29 U.S.C. §§ 251 et seq. This latter act was passed to bar enormous claims pending in the courts for overtime pay under what Congress believed to be an erroneous construction of the Fair Labor Standards Act. Although the effect of this act was to divest in the appellate courts many judgments for overtime wages already obtained in the trial courts, no court held this result impermissible.[FN4] The Supreme Court twice remanded labor cases to the district court for consideration in ***876** light of the Portal to Portal Act, after having in one already issued an opinion and in the other denied certiorari. See 149 Madison Avenue Corp. v. Asselta, 331 U.S. 795, 67 S.Ct. 1178, 91 L.Ed. 1432 (1947); Alaska Juneau Gold Mining Co. v. Robertson, 331 U.S. 793, 67 S.Ct. 1314, 91 L.Ed. 1839 (1947).[FN5] In the courts of appeals judgments for overtime wages which had been rendered in the trial courts prior to passage of the act were reversed on numerous occasions. E.g., McCloskey & Co. v. Eckart, 164 F.2d 257 (5th Cir. 1947). For a full list of these cases see 3 A.L.R.2d 1097, 1162 (annotation on the Portal to Portal Act). In one of the most lucid opinions on the question, a district court held that reversal on appeal because of subsequent legislation was constitutional:

FN3. The plaintiffs in this cation contend that any application of these amendments to actions which have reached final judgment in a trial court is unconstitutional. They support their position by citing a number of cases including McCullough v. Virginia, 172 U.S. 102, 19 S.Ct. 134, 43 L.Ed. 382 (1898) and Hodges v. Snyder, 261 U.S. 600, 43 S.Ct. 435, 67 L.Ed. 819 (1923). In McCullough, the Court held that the repeal of a statute under which a judgment had been obtained between trial of the action and appeal did not affect the validity of the judgment. It wrote, 'It is not within the power of a legislature to take away rights which have been once vested by a judgment.' 172 U.S. at 123, 19 S.Ct. at 142, 43 L.Ed. at 390. In Hodges the Court refined this position slightly, writing:

It is true that . . . the private rights of parties which have been vested by the judgment of a court cannot be taken away by subsequent legislation, but must be thereafter enforced by the court regardless of such legislation. . . . This rule, however, . . . does not apply to a suit brought for the enforcement of a public right, which, even after it has been established by the judgment of the court, may be annulled by subsequent legislation and should not be thereafter enforced. 261 U.S. at 603, 43 S.Ct. at 436, 67 L.Ed. at 822.

This distinction, however, although never overruled, does not appear to have current vitality, as the latest restatement of it occurred in the Hodges case.

The most recent pronouncement on the question appears in Thorpe v. Housing Authority, 393 U.S. 267, 282, 89 S.Ct. 518, 528, 21 L.Ed.2d 474, 484 (1969), where the Court wrote:

The general rule . . . is that an appellate court must apply the law in effect at the time it renders its decision.

This, however, does not appear particularly dispositive of our question as it neither overruled the Hodges distinction, nor did the case itself concern a predominantly private judgment. Thus, it is not clear whether the Hodges distinction remains viable law, nor what exactly the Hodges case means by a private judgment.

FN4. The only type judgment not affected by the Portal to Portal Act was a judgment that had been entered before the effective date of the Act and upon which no appeal had been timely taken. See Kemp v. Day & Zimmerman, 239 Iowa 829, 33 N.W.2d 569 (1948).

FN5. However, the Supreme Court never addressed the question of the effect that these actions allowing basically 'private' judgments to be overturned by subsequent legislation

had on the Hodges distinction and the inviolability of private judgments.

Rights under the Fair Labor Standards Act came into existence only by virtue of an act of Congress. These rights did not exist at common law, nor were they established by the Constitution. Therefore, since these rights were created by the Congress, they may be taken away in whole or in part, or altered, by Congress which established them at any time before they have ripened into final judgment (meaning a judgment upon which no further appeal can be taken).

Ferrer v. Waterman S.S. Corp., 76 F.Supp. 601, 603 (D.P.R.1948).

This reasoning seems persuasive in the present situation. Civil actions under the Truth in Lending Act are rights created by Congress. Congress can repeal, amend or modify these rights in any way it sees fit. Under the reasoning that what Congress giveth, Congress can taketh away, we hold that the amendments must be applied in deciding this appeal.

III

[2] The facts are not in question in regard to the plaintiffs' major claim concerning a disclosure error under the Truth in Lending Act. The annual percentage rate disclosed in the contract was 11.08 percent. As all parties agree, this understated by 1.75 percent the annual percentage rate properly applicable to the finance charge, amount financed, and term of the Mirabals' contract. Thus, the defendants disclosed an erroneous annual percentage rate. FN6

FN6. Although the trial court made a finding that 'the defendants did not make use of proper charts or tables to determine the annual percentage rate,' because they used 'GMAC charts or tables to determine the annual percentage rate . . . rather than Federal Reserve Regulation Z Annual Percentage Rate Tables,' this does not dispose of the issue. By this finding the trial court seems to have indicated that it felt that the only charts and tables properly used were those devised by the Federal Reserve Board. Nothing in the statute or regulations, however, requires a creditor to use any specific charts or tables. Regulation Z, 12 C.F.R. § 226.5(c), provides that any charts and tables can be used so long as they conform to the requirements of the regulation including being devised so that they permit determination of the annual percentage rate to the nearest one-quarter of one percent. No one contends that GMAC's tables were not so devised. Moreover, it is also permissible to use no tables at all, but to independently calculate the rate.

[3] [4] The defendants contend that the error resulted from a bona fide mistake and claim exemption from liability under 15 U.S.C. § 1640(c). FN7 This section provides:

FN7. The defendant dealer followed procedures prescribed by the defendant GMAC in complying with the disclosure requirements of the Truth in Lending Act. The trial court found this to be the case in its findings of fact and GMAC does not dispute this on appeal. The dealer, of course, must accept responsibility for these procedures since it was a creditor under the Act and since it performed them. GMAC must also accept responsibility for the procedures since the dealer was acting under its direction in complying with the Act.

A creditor may not be held liable in any action brought under this section for violation of this part if the creditor shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding ***877** the maintenance of procedures reasonably adapted to avoid any such error.

Thus, we must determine whether the defendants have met the burden of section 1640(c).FN8

FN8. The section does not require proof as to exactly what happened with regard to the error in the transaction in question. This, however, does not mean as the defendants seem to suggest that the plaintiffs must prove exactly what happened either. The defendants contended in their reply brief that the 'plaintiffs submitted no evidence . . . that the defendants failed to use proper charts and tables.' They went on to assert that 'no witness identified what particular chart or table was used in preparing the instant Contract.' They blandly concluded by suggesting that the 'plaintiffs . . . had the burden of proof on the issue.'

Nothing could be further from the truth. The statute, 15 U.S.C. § 1640(c), specifically requires the creditor to show by a preponderance of the evidence that he maintained procedures that were reasonably adapted to avoid errors. This means that the creditor has the burden of proof not only to show that the procedures existed, but also to show that they were in effect and consistently followed during the time in question. It bodes ill for the defendants that they can assert in their brief that '(t)he witnesses were not sure which particular chart was used. But they were sure that some chart had been used.' Certainly, as noted above, the witnesses do not have to testify to or remember the particular events in question. However, they must testify that during the period in which the transaction took place, they always used particular tables, or they always followed certain procedures which included reference to particular tables or particular computations. In other words, if the defendants were to meet this burden of proof, their witnesses should have been able to testify that during the period in question they always followed a certain procedure which included taking the annual rate from a certain chart, and thus that that chart must have been used.

Under that provision, the creditors must prove first, that the error was an unintentional, bona fide error and second, that they maintained procedures reasonably adapted to avoid any such error. The first part of the test is met. Even the plaintiffs admit that the error was unintentional and that the defendants had no motive to understate the annual percentage rate. Clearly, the defendants' good faith is not in question.

In regard to the second part of the test, we will take the defendants' contentions on brief before this court as true. The defendants laid out their procedures in this manner:

Defendant dealer had specially trained office personnel to assist salesmen in determining annual percentage rates for instalment contracts. Those office personnel had been trained in the preparation of Truth in Lending disclosure statements at educational meetings that defendant GMAC held with each GM dealer before the Act went into effect. At these meetings, GMAC used a chart easel presentation to explain full disclosure, the new type of contracts, the establishment of rates, and how to arrive at rates. GMAC held classes at the premises of every one of the 48 GM dealers in the area in June 1969 to prepare the dealers to work under the Act. In addition, GMAC sent to all General Motors dealers materials and a form of contract designed to aid compliance under the Truth in Lending Act. These materials included rate charts and tables which were less awkward to use than those provided by the Federal Reserve Board. GMAC prepared these materials after extensive consultation with the Federal Reserve Board and Federal Trade Commission. A manual sent by GMAC to all GM dealers emphasized the need for the accurate statement of annual percentage rates:

These terms (including annual percentage rate) have been called the 'common denominators' of consumer credit. If comparison shopping for credit terms is to become a feature of the consumer credit business, federal authorities believe that these two disclosures will make it possible regardless of the type of credit extended. The federal effort is to make such disclosures clearly visible in every consumer transaction.

The defendants concluded by suggesting that the error in the disclosure statement arose in copying numbers from an interest conversion table.FN9

FN9. The defendants point out that on the proper table the correct percentage rate 12.83 percent is just one column above the percentage rate disclosed, 11.08 percent. Thus, they suggest that going across this table to find the correct rate, the slip of only a single line could have resulted in the error.

***878** These efforts, as outlined by the defendants, are impressive. Clearly, they indicate that the defendants established procedures designed to correctly calculate the figures required. However, this does not answer the question. We must decide whether this showing meets the requirements of § 1640(c), whether the defendants have shown that they maintained procedures reasonably adapted to avoid bona fide errors.

Congress had no intention of having the consumer bear the burden of a creditor's negligence. As was noted in the Senate hearings on the Act, the philosophy behind its passage was not 'let the buyer beware' but 'let the seller make full disclosure.'[FN10] In a similar vein, the fifth circuit has noted that the policy in the area of consumer credit has shifted from one of caveat emptor to one of caveat vendor.[FN11] Moreover, as courts have noted on numerous occasions, the Act should be interpreted liberally in favor of the consumer to effectuate its broad remedial purpose.[FN12] With this in mind we can examine the provision.

FN10. Statement of Leslie V. Dis, Acting Ex. Dir. of the President's Commission on Consumer Interests, Hearings on S. 5 Before the Subcommittee on Financial Institutions of the Senate Comm. on Banking and Currency, 90th Cong., 1st Sess., 104 (1967). See also Chief Justice Burger's statement to the same effect in Mourning v. Family Publications Service, Inc., 411 U.S. 356, 377, 93 S.Ct. 1652, 1664, 36 L.Ed.2d 318, 334 (1973).

FN11. In Thomas v. Meyers-Dickson Furniture Co., 479 F.2d 740, 748 (5th Cir. 1973), the fifth circuit wrote:

The result we reach today is consistent with the statute's goal of creating a system of 'private attorney generals' who will be able to aid the effective enforcement of the Act. Section 1640 is intended to allow aggrieved consumers to participate in policing the Act, . . . and its language should be construed liberally in light of its broadly remedial purpose. . . . The domain of consumer credit with its allied commercial practices is no longer in the laissez faire era of caveat emptor. That doctrine is increasingly relegated to its proper place as a historical relic without modern application. The regulatory scheme forcefully expounds an emerging ethic of 'caveat vendor,' and we will not strain to avoid giving effect to the Federal Consumer Credit Protection Act (italics in original).

FN12. Sellers v. Woolman, 510 F.2d 119, 122 (5th Cir. 1975); Eby v. Reb Realty, Inc., 495 F.2d 646, 650 (9th Cir. 1974); Thomas v. Meyers-Dickson Furniture Co., 479 F.2d 740, 748 (5th Cir. 1973); N.C. Freed Co. v. Board of Governors of The Federal Reserve System, 473 F.2d 1210, 1214 (2d Cir. 1973); Gardner & North Roofing and Siding Corp. v. Board of Governors of The Federal Reserve System, 150 U.S.App.D.C. 329, 464 F.2d 838, 841 (1972).

[5] KC [6] KC As we have already noted, the provision for our purposes has basically two requirements, that the error be a bona fide error and that the creditor maintain procedures reasonably adapted to avoid such errors. A bona fide error is an error made in the course of a good faith attempt at compliance.[FN13] The statute says that these errors are the precise errors which must be avoided. Therefore, the statute requires a higher burden than merely good faith compliance. In other words, Congress required more than just the maintenance of procedures which were designed to provide

proper disclosure calculations. Rather, it required procedures designed to avoid and prevent the errors which might slip through procedures aimed at good faith compliance. This means that the procedures which Congress had in mind were to contain an extra preventative step, a safety catch or a rechecking mechanism. Congress left the exact nature of the preventative mechanism undefined. It is clear, however, that Congress required more than just a showing that a well-trained and careful clerk made a mistake. On the other hand, a showing that the first well-trained clerk's figuring was checked by a second well-trained clerk or that one clerk made the calculations on an adding machine and then checked this by looking up the figures on a table would ***879** satisfy Congress' requirements. We save for future determination what procedures, other than rechecking, might also satisfy this requirement.FN14

FN13. Clearly, an error could not be made in good faith when no good faith attempt to comply with the statute was made. Thus, when no procedures are set up to provide correct disclosure calculations, or when untrained employees are left to calculate disclosure figures, errors made do not even rise to the level of bona fide errors.

FN14. The defendant admits on brief that the error 'would (not) be obvious when it occurred.' Certainly, if this is true, and it is true whenever the rates differ by only small amounts, rechecking is the only way to avoid mistakes. Even the most highly trained person makes mistakes. The only way to catch such mistakes is by rechecking, in some way, the computation. This is not a great burden on a creditor, as checking a chart takes only seconds and doing the computations on an adding machine cannot take more than a minute.

It is clear from this case that rechecking does bring errors to light. GMAC when it received the contract recalculated the annual percentage rate and immediately found the error.

Congress required not only that procedures designed to avoid bona fide errors be established by creditors if they seek exemption under this section but also, that these procedures be maintained. This means that the creditor must show that the proper procedures were followed time in and time out. As we noted in an earlier opinion, the exemption was provided to avoid imposing 'strict liability' for unavoidable clerical errors upon creditors. Haynes v. Logan Furniture Mart, Inc., 503 F.2d 1161, 1167 (7th Cir. 1974). In the face of a showing that procedures containing a rechecking mechanism or other preventative device existed and were maintained consistently by a creditor, a court could conclude that whatever error occurred was unavoidable and that the congressional policy of requiring creditors to do everything reasonably possible to avoid disclosure errors was fulfilled.

[7] KC [8] KC In the present case the defendants made neither of these showings. Their procedures, although probably designed to provide correct disclosures, did not contain any type of preventative mechanism for catching disclosure errors. Moreover, the defendants did not show that these procedures were maintained consistently. Indeed, in the present instance the defendants do not seem to know what procedures were followed in generating the figures for the Mirabals' contract.FN15 Therefore, since the defendants did not meet the burden of establishing their right to an exemption under section 1640(c), they are liable for the inaccurate disclosure of the annual percentage rate in the Mirabals' contract.FN16

FN15. See footnote 8, supra.

FN16. The opinion of Judge Moore suggests that the defendants avoided liability for the incorrect annual percentage rate by correcting it within 15 days of finding the error. Even assuming that the defendants did properly notify the plaintiffs to correct the error, although the plaintiffs deny this and the trial court made no finding of fact on the subject, the defendants still did not meet the requirements of 15 U.S.C. § 1640(b), the section which

provides for the exemption. The section reads:

A creditor has no liability under this section if within fifteen days after discovering an error, and prior to the institution of an action under this section or the receipt of written notice of the error, the creditor notifies the person concerned of the error and makes whatever adjustments in the appropriate account are necessary to insure that the person will not be required to pay a finance charge in excess of the amount or percentage rate actually disclosed.

Judge Moore suggests that because GMAC sent a letter to the obligors regarding the understatement of the rate and stated that the rate should be raised to 12.83 percent to make the contract correct, GMAC has complied with the requirements of the section. Unfortunately, this is not how the section operates. Section 1640(b) lays the burden of an error on the creditors. To comply with the section the creditor must make adjustments in the account so that the obligor pays a finance charge which is neither higher than the amount of the finance charge in the contract, nor higher than the finance charge which would be applicable to the annual percentage rate disclosed in the contract. Thus, if the creditor makes a mistake, he must bear the burden of the mistake and adjust whatever terms necessary downward so that all the terms of the contract correspond.

This is the plain meaning of the section. Congress did not say that if the creditor 'corrected his error' within 15 days he would avoid liability. Congress told the creditors to make 'whatever adjustments in the appropriate account are necessary to insure that the person will not be required to pay a finance charge in excess of the amount or percentage rate actually disclosed.'

In this case, if the creditors had complied with the section, they would have adjusted the finance charge and monthly payments downward a total $69.38 (as determined by the district court) so that the finance charge would correspond with the annual percentage rate actually disclosed of 11.08 percent.

***880** IV

We now turn to three questions concerning whether multiple civil penalties may be assessed on inaccurate disclosures arising from one credit transaction.

A

[9] First, plaintiffs press us to find other errors in the disclosure statement as did the trial court and they urge that for each failure to disclose they are entitled to a separate statutory penalty as the court below allowed. Thus, they seek multiple recovery under the Act for multiple errors committed in the disclosure statement.

The recent amendments to the Act, however, foreclose the possibility of multiple recovery for multiple errors in the disclosure statement. The amendments provide in part (15 U.S.C. § 1640(g)):

The multiple failure to disclose to any person any information required under this part to be disclosed in connection with a single account under an open end consumer credit plan, other single consumer credit sale, consumer loan, or other extension of consumer credit, shall entitle the person to a single recovery under this section but continued failure to disclose after a recovery has been granted shall give rise to rights to additional recoveries.

This clearly bars multiple recoveries for multiple failures to disclose. FN17

FN17. This particular amendment does not appear to have changed the law with regard to multiple recoveries for multiple errors in the disclosure statement, but only emphasized the fact that multiple recoveries were unwarranted. Certainly, strong policy considerations were present for denying multiple recoveries under the prior law. Primarily, however, the legislative history did not warrant imposition of multiple penalties. The House Report on the Truth in Lending Bill states:

Any creditor failing to disclose required information would be subject to a civil suit with . . . a maximum penalty not to exceed $1,000 on any individual credit transaction.

H.R.Rep. No. 1040, 90th Cong., 1st Sess. (1967) (to accompany H.R. 11601), 1968 U.S.Code Cong. & Admin.News, pp. 1962, 1976.

Practical considerations obviously motivated Congress to adopt this view. The penalty provisions of the Act were designed as an enforcement mechanism, not as a source of windfall gains for obligors. If an obligor is successful in an action against a creditor, he will recover twice the finance charge imposed up to $1,000 free and clear, as his costs, and attorney's fees will also be recovered. Any actual damages may be recovered on top of this award. 15 U.S.C. § 1640(a)(1). Furthermore, if multiple recoveries were granted for multiple disclosure errors, how would a court determine the number of disclosure errors committed? For instance, if a disclosure statement were omitted entirely, a court would have no way of computing the number of errors made in such a total failure. If twice the finance charge were equal to or greater than $1,000, the award could range anywhere from $1,000 (for the one failure of omitting the disclosure statement) to $50,000 or more (for failure to follow every rule and regulation which the court could find applicable to the transaction). Such a result would be highly undesirable. For the reasons noted, it is clear that multiple failures to disclose in any one transaction do not give rise to multiple recoveries. Therefore, the plaintiffs' claim of other disclosure errors need not be considered.

B

[10] Next, the plaintiffs urge that each defendant should be held separately liable under the Act and that the plaintiffs' recovery should be doubled as a result. The wording of the Act appears to support the plaintiffs' claim. The civil liability provision provides in relevant part that 'any creditor who fails to comply with any requirement (of the Act) with respect to any person is liable to such person-(for twice ***881** the finance charge up to $1,000 plus attorney's fees).' 15 U.S.C. § 1640(a) (emphasis added). The legislative history uses similar 'any creditor' language.

In most consumer credit transactions in which there are two creditors, one has sold the other the consumer credit contract in question. This is the situation in the present case. Thus, only one of the creditors is receiving the benefit of the finance charge, and in effect only one is providing the credit. Furthermore, as in the present situation where the dealer was following procedures established by the finance agency (GMAC), it would seem harsh to impose separate penalties on both creditors for basically a single failure on their part. The statutory language 'any creditors' is not dispositive on this point, as it could refer to the fact that Congress intended liability for disclosure violations to reach each and every creditor rather than just the creditor who held the credit contract or the one who made it. And thus, it need not imply that the joint creditors are separately liable under the Act. Moreover, any holding that the creditors here are separately liable would require only a change of dealings to avoid. Instead of GMAC buying the contract from the dealer, GMAC would have its own agents on the dealer's premises to arrange the extension of credit and would by this means exclude the dealer as a creditor. This result seems pointless. Since holding creditors separately liable on a single consumer credit transaction appears inconsistent with the general purposes of the Act and mandated by neither the statutory language nor practical considerations, we find the plaintiffs' pleas for such an extension of liability unconvincing. The creditors in this transaction, having acted jointly, are jointly liable under the Act.FN18

FN18. Accord, Starks v. Orleans Motors, Inc., 372 F.Supp. 928 (E.D.La), affirmed, 500 F.2d 1182 (5th Cir. 1974) (unreported order). However, in a situation where two creditors each

made separate and independent disclosure errors in one transaction, the result might be different. We do not face that situation here. Cf. Ljepya v. M.L.S.C. Properties, 353 F.Supp. 886 (N.D.Cal.1973).

C

[11] Finally, the plaintiffs urge that since they were each obligors in the transaction, they should each be allowed to recover a separate penalty. The statutory language supports such a construction. Section 1640(a), as amended, reads as follows:

Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part or part D of this subchapter with respect to any person is liable to such person in an amount equal to the sum of-

(1) any actual damage sustained by such person as a result of the failure;

(2)(A) in the case of an individual action twice the amount of any finance charge in connection with the transaction, except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000; . . .

(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court. (Emphasis added.)

This appears to indicate that Congress felt that the duty of the creditor ran to each obligor involved in a loan transaction and that for a failure to fulfill this duty each obligor could sue and recover.[FN19]

FN19. The legislative history appears to run counter to this notion. The House Report to the Act states:

Any creditor failing to disclose required information would be subject to a civil suit with a penalty equal to twice the finance change, with a minimum penalty of $100 and a maximum penalty not to exceed $1,000 on any individual credit transaction.

H.R.Rep. No. 1040, 90th Cong., 1st Sess. (1967) (to accompany H.R. 11601), 1968 U.S.Code Cong. & Admin.News, pp. 1962, 1976. However, this passage appears in a general description of the penalty provisions of the bill. It was not directed at determining whether joint obligors could recover separately.

***882** Some courts have found separate recoveries by joint obligors barred by the section dealing with general disclosure requirements, 15 U.S.C. § 1631. E.g., St. Marie v. Southland Mobile Homes, Inc., 376 F.Supp. 996 (E.D.La.1974). This section reads in part:

(a) Each creditor shall disclose clearly and conspicuously, in accordance with the regulations of the Board, to each person to whom consumer credit is extended, the information required under this . . . chapter.

(b) If there is more than one obligor, a creditor need not furnish a statement of information required under this . . . chapter to more than one of them.

These courts have equated 'statement of information' with the general requirement to disclose. From this, they have concluded that since subparagraph (b) requires only one statement be given to joint obligors, the creditor has failed to disclose (and hence is liable) only to the obligor to whom the statement is given.

We have recently answered these contentions in Allen v. Beneficial Finance Co. of Gary, 531 F.2d 797, 805-806 (7th Cir. 1976). There we said:

The flaw in this reasoning is twofold. First, the reasoning assumes that Congress intended that subparagraph (b) limit the general disclosure requirement of subparagraph (a). There is little to support this assumption. Congress could have assumed that even though a creditor need provide only one disclosure statement, he would disclose to all obligors the information required. Certainly, multiple obligors are expected to look at and rely upon the one statement given.FN20

FN20. The court in Rivers v. Southern Discount Company Atlanta II, 4 CCH Consumer Credit Guide P98,796 at 88,450 (N.D.Ga.1973), wrote:

The Act contemplates, in this Court's opinion, that each borrower is entitled to know the cost of his or her credit prior to signing. Though the Act does require that the creditor furnish only one correct copy of the disclosure statement to one borrower, it is contemplated that all borrowers will be able to view that document if they wish in order to glean the required information. If that one copy is incorrect, as in the case at Bar, then each borrower is deceived and each suffers damage.

Secondly, even if the creditor need only disclose to one of multiple obligors, this does not limit the right of other obligors to recover if disclosure to the one has been faulty. Congress could have expected all obligors to be protected by proper disclosure to only one in that the one who received disclosure would certainly take the best credit terms available. Faulty disclosure, however, would destroy this protection. Certainly, the other obligors would be as harmed as the one who received the faulty disclosure.

Congress appears to have included subparagraph (b) merely to facilitate compliance with the Act. As the House Report states:

In order to reduce needless paperwork, disclosure need only be made to one obligor. For example, if two people (e.g. a husband and wife) are the obligors, only one copy of the contract with the required disclosure information would need to be furnished.

H.R.Rep. No. 1040, 90th Cong., 1st Sess. (1967) (to accompany H.R. 11601), 1968 U.S.Code Cong. & Admin.News, pp. 1962, 1984.FN21

FN21. Because this description of subparagraph (b) is set out in the Report under 'Methods of Disclosure' instead of a section on disclosure requirements, the emphasis must be placed on the idea of facilitating compliance by reducing paperwork as opposed to reducing disclosure requirements.

Above all, however, the wording of subparagraph (b) provides the best clue to Congress' intent. Congress did not say disclosure need only be given to one of multiple obligors. Nor did it say that recovery may only be had by one. It said a 'statement of information' need only ***883** be furnished to one of multiple obligors. From all this we can conclude that Congress by including subparagraph (b) meant only to reduce the burden of paperwork on the creditor, and did not mean to foreclose any right of recovery by a joint obligor.

No other provision in any way implies a limitation on the right of joint obligors to recover separately under the Act. The language of the civil liability section is clear: 'Any creditor who fails to comply (with this Act) with respect to any person is liable to such person in an amount equal to the sum of' actual damages, the lesser of twice the finance charge or $1,000, and attorney's fees. Without more convincing evidence that Congress intended some other result, the command of such language cannot be ignored. The creditors in this action have failed to give proper disclosures to both John and Sharon Mirabal. Thus, they are liable to both, separately, for the statutory penalty of $1,000.

Practical considerations support this result. First, as noted in Rivers v. Southern Discount Company

Atlanta II, 4 CCH Consumer Credit Guide, P98,796 at 88,450 (N.D.Ga.1973), the creditor by requiring two signatories on a loan, gains additional security in the form of a joint obligor. Thus, it seems appropriate that his obligations under the Act and the punishment for failure to live up to these obligations should be commensurate with this greater security acquired. Furthermore, a holding that joint obligors could recover only one penalty would create problems in administering the Act. For instance, if one obligor sued would he be allowed the full penalty or only half of it? If granted the full penalty, could the other obligor sue the winner for his half? Which obligor could sue, only the one who received the disclosure statement? How could a court determine as between husband and wife joint obligors which of the two had received the disclosure statement? Congress, in the statute, provided no answers for these questions and so we can assume that it did not expect these problems to arise.

V

[12] As a final matter, we must decide whether the defendants have violated the two state acts regulating consumer automobile financing, the Illinois Sales Finance Agency Act, Ill.Rev.Stat. ch. 121 1/2, §§ 401 et seq., and the Illinois Motor Vehicle Retail Installment Sales Act, Ill.Rev.Stat. ch. 121 1/2, §§ 561 et seq. The court below found the defendants had both violated the Installment Sales Act, and that defendant GMAC had violated the Sales Finance Agency Act.

The Motor Vehicle Installment Sales Act provides that 'no person who violates this Act . . . may recover any finance charge . . ..' Ill.Rev.Stat. ch. 121 1/2, § 584(b). The plaintiffs contend that the defendants violated the Act in two major ways, first by failing to state the correct annual percentage rate and second, by failing to include all 'default, delinquency or similar charges' in the contract.

We have already noted that the understatement in the annual percentage rate was the result of a bona fide error. The penalty provision of the statute, section 584(b), provides an exception for bona fide errors. It states:

No person who violates this Act, except as a result of an accident or bona fide error of computation, may recover any finance charge . . ..

There are no other requirements to meet this exception, and thus, the defendants cannot be held liable under Illinois law for the error in disclosing the annual percentage rate.

[13] The plaintiffs' second contention, that not all 'default, delinquency, and similar charges' are disclosed in the contract 'clearly, conspicuously and in meaningful sequence' as required in section 565(12) of the Illinois Act is disposed of by the Federal Reserve Board regulations. The State of ***884** Illinois has adopted these regulations to conform its interpretation of its act to the interpretation given to the very similar Truth in Lending Act. FN22 In interpreting 15 U.S.C. § 1638(a)(9), which requires 'default, delinquency, or similar charges payable in the event of late payments' to be disclosed in a consumer credit transaction, the Board in the regulations has not provided much clarification of the statutory language. See 12 C.F.R. § 226.8(b)(4). In later interpretations rendered upon this regulation, however, the Board has clarified its position. The Board views the statute as requiring the disclosure of only those charges which become automatically due and payable in the event of a late payment.FN23 In the present transaction the only charge that fits this description is the automatic late payment penalty of '5% of the unpaid installment or $5 whichever is less.' The charges of which the plaintiffs complain and which are not included in the disclosure statement-such as charges for attorney's fees, costs of repossession and sale of repossessed property-are all imposed at the creditor's election and thus are not automatic. These charges, therefore, need not ***885** be included in the disclosure statement.FN24 Thus, under Illinois law these charges need not be disclosed in compliance with the Motor Vehicle Retail Installment Sales Act, and no violation has occurred.

FN22. The regulations promulgated by the Department of Financial Institutions of the State of Illinois pursuant to the Illinois Interest Act, Ill.Rev.Stat. ch. 74, § 4b provide in part:

Sec. 1. Definitions and interpretations. For the purpose of these Rules and Regulations all interpretations, definitions and Rules of Construction as appearing in the various Illinois Statutes and Federal Acts, Regulations and Releases, applicable hereto, shall be followed. Where a specific Rule, interpretation or definition in a particular area as contained in an Illinois Statute or Regulation is inconsistent with that of a comparable Federal Act, Regulation or interpretation, the Federal Act, Regulation or interpretation shall apply and the Illinois Act, Regulation or interpretation shall be disregarded. Where the State Statute, Rule, interpretation or definition is not required by Federal Act or Regulation, the State Statute Rule, interpretation, definition or terminology shall be followed as an additional requirement.

All Regulations and interpretations presently

All Regulations and interpretations presently in force and effect and as may hereafter be promulgated by the Board of Governors with regard to the CONSUMER CREDIT PROTECTION ACT, including amendments, modifications and revocations are hereby adopted as the interpretation, Rules and Regulations of this Department to the extent whereby the same are not an assumption of Federal authority.

For full text of these regulations see 2 CCH Consumer Credit Guide P6621-22 at 20,951 (Illinois).

FN23. Two interpretation letters issued by the Board have made this view clear. In a letter of April 10, 1972, No. 591, the Board wrote:

(Y)ou questioned whether attorney's fees and other foreclosure costs constitute charges for which disclosures must be made under § 226.8(b)(4) of Regulation Z.

It is staff's opinion that the thrust of the late payment, delinquency, or default disclosure required under § 226.8(b)(4) relates basically to the types of charges which a creditor may assess automatically, without other conditions, when a late payment, delinquency, or default occurs. However, if the charge is not automatic, but is based on the employment of the services of an attorney to effect collection or consists of other fees and charges payable in conjunction with foreclosure proceedings, such charges would not fall in the normal realm of charges to be disclosed under § 226.8(b)(4). The charges described in your letter appear to be based upon takeing foreclosure action and employing the services of an attorney. Consequently, it would not appear that such charges need to be disclosed under § 226.8(b)(4).

This excerpt of the letter is printed in the CCH Consumer Credit Guide at P30,834 (transfer binder).

A similar view was expressed in an earlier letter of March 19, 1970, No. 290, which read in part:

You further inquire as to whether or not Section 226.8(b)(4) of the Regulation requires the creditor to inform the customer that he may be obligated to pay court costs and attorney's fees in the event a suit is instituted upon default. It has been our position that if the imposition of attorney's fees was automatic, that is, if, for example, 10% attorney's fees become immediately due and collectible by virtue of default, that would constitute a default or delinquency charge which must be disclosed under Section 226.8(b). If, however, the imposition of attorney's fees were not automatic after default, but were conditioned upon employment of the services of an attorney to effect collection, the right to impose such fees under such circumstances did not constitute a default or delinquency charge and, therefore, was not a required disclosure.

For more complete text see CCH Consumer Credit Guide P30,528 (transfer binder).

This court, by accepting the Board's interpretation of the statute, does not wish to give its particular approval to such interpretation. However, as the Supreme Court noted in Mourning v. Family Publications Service, Inc., 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318, 329 (1973), when commenting upon the Board's rulemaking power under the Truth in Lending Act, 'the validity of a regulation promulgated thereunder will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.'' The interpretation is not so unlikely that we could say that it is not reasonably related, and so we 'defer to the informed experience and judgment of the agency to whom Congress delegated appropriate authority.' Id. at 372, 93 S.Ct. at 1662, 36 L.Ed.2d at 331.

FN24. A further ground for denying recovery under the Illinois Act lies in the fact that the act only requires that disclosure of these charges be made in the contract, not in any special disclosure statement. The charges for attorney's fees, and repossession and sale costs are all included on the back of the contract (i.e., within the contract, but outside the disclosure statement).

[14] The Illinois Sales Finance Agency Act provides for penal damages in the amount of one-fourth of the principal amount of the loan for violations of that act. Ill.Rev.Stat. ch. 121 1/2, § 416. These damages are applicable at the discretion of the court, and the trial court allowed plaintiffs to recover the full 25 percent on top of other damages awarded.

The trial court found that GMAC had purchased a retail installment contract 'which on its face violated the Illinois Motor Vehicle Retail Installment Sales Act' because the contract disclosed an incorrect annual percentage rate. Although the trial court made no reference to the specific sections of the Sales Finance Agency Act which the purchase of the contract violated, it must have meant to refer to Section 8.4 of the Act, Ill.Rev.Stat. ch. 121 1/2, § 408.4. This section provides:

Except for honest mistake, purchase of any retail contract, retail charge agreement, or evidence of indebtedness thereunder, which on its face violates this Act, the Retail Installment Sales Act or the Motor Vehicle Retail Installment Sales Act (violates this Act).

However, as we have already noted, the mistake here was an honest error and it was made by GMAC's agent, the dealer. Furthermore, the trial court did not find that the mistake was patent or obvious as the statute requires. Clearly, the mistake was not obvious as GMAC only found it after having received the contract by refiguring the percentage rate. No other provision of the Act appears applicable. Therefore, GMAC is not liable under the Illinois Sales Finance Agency Act.

The judgment for the plaintiffs is affirmed as modified by reducing the amount of the judgment to $2,000.00 plus costs and attorney's fees and the cause is remanded for further proceedings.

STEVENS, Circuit Justice (concurring).
There are two brief comments that I wish to add. First, I have no doubt about the constitutionality of the general rule that an appellate court must apply the law in effect at the time it renders its decision. See Thorpe v. Housing Authority, 393 U.S. 267, 282, 89 S.Ct. 518, 526, 21 L.Ed.2d 474, 484. Second, although I am persuaded that defendants did not meet their burden under § 1640(c) in this case, I am not sure that their evidence was insufficient as a matter of law. With these reservations I join Judge Sprecher's opinion.

MOORE, Senior Circuit Judge (dissenting):
Since I regard appellants' conduct as having completely complied both with Congressional intent in enacting the Truth in Lending ***886** Act (the 'Act') and with making an accurate disclosure of the financial obligations of the purchasers as required by the Act, I must dissent from the majority opinion which in my opinion is based primarily on its views that appellants should have maintained a more

error-proof bookkeeping department. Since the annual interest percentage calculation mistake did not affect the amount payable by appellants, it scarcely fits into the category of a misrepresentation or material omission. Nor can I reconcile the majority's finding of good faith with the result they reach. The facts as I read the record disclose that on July 14, 1971 John and Sharon Mirabal (as co-buyers) signed a 'Retail Installment Contract' on the occasion of their purchase of a new 1971 Buick from the seller-dealer Ed Murphy, a defendant herein. They financed the purchase by making a cash down-payment of $1696.65, by receiving a $600 credit on their turned-in 1964 Rambler and by financing the balance through GMAC on a thirty-six (36) months installment basis, which balance included the unpaid price of the car ($2,201), required physical damage insurance ($257) and a finance charge ($511.80).

All apparently went well for about six weeks when John Mirabal received a notice from Motorists Insurance Corporation (the insurer) that his insurance had been cancelled. He went to an attorney 'for the insurance, for them cancelling me.' The insurance is not involved in this case but the attorney 'went in and dug out' information and tole Mirabal that there had been an increase in the annual finance charge (Tr. 54). Other than his belief that the annual percentage rate had been increased, Mirabal had no other complaints. Factually, there is no basis for the claim that the change in the percentage rate affected the finance charge as disclosed in the Contract. Mirabal testified 'Q. Did you (sic) payment go up when the annual percentage rate was changed? A. No. * * * Q. The payments remained the same, is that correct? A. Yes.' There was no increase in the finance charge, as Mirabal recognized by referring to the monthly payment specified in the Contract, which was $82.55 and by answering the question 'Q. What are you paying now? A. $82.55'. (Tr. 58). In fact, Mirabal's counsel so stipulated. (Tr. 59).

These undisputed facts refute the fallacious fact assumption by the district court and the majority that the mistaken percentage figuration would have resulted in a downward adjustment in a total of $69.38. To the contrary, the Mirabals' financial obligation would not have been altered by one penny.

However, the attorney's excavations went deep and he 'dug up' enough theories under Sections 121 and 128 of the Truth in Lending Act (15 U.S.C. §§ 1631 and 1638), the Illinois Motor Vehicle Retail Installment Sales Act and the Illinois Sales Finance Agency Act as to cause the trial judge to enter a judgment in favor of plaintiffs jointly against GMAC and Ed Murphy jointly for $7,000 (seven violations-$1,000 each); against the same defendants jointly for $511.80 (the finance charge) under the Illinois Retail Installment Sales Act; and against GMAC for $615. under the Illinois Sales Finance Agency Act-a total of $8,126.80. On top of these amounts was to be an attorney's fee to be fixed by the court. All this arising out of the purchase of a $4,497.65 Buick.

The amended complaint is based primarily on alleged failures to disclose information which it is claimed is required by the provisions of the Act. These alleged failures as stated in the complaint are 'failing to make necessary disclosures of default, delinquency and similar charges, including attorney's fees, storage charges, collection expenses, sales expenses, interest, unearned finance charges resulting from acceleration on default' (par. 7a); 'failing to make such disclosures clearly, conspicuously and in meaningful sequence by not placing such disclosures adjacent to or near disclosures concerning installment due dates' (per. 7c); 'failing to make all such disclosures above ***887** or adjacent to the place for the customer's signature' (par. 7d); failure to disclose retained security interests (par. 7e); failure to use charts or tables to determine the annual percentage rate; failure to disclose that the rate should have been 12.83% instead of 11.08% as originally (until corrected) had been inserted in the contract; and failure to include certain charges not individually itemized in the finance charge.

To arrive at a proper decision attention must be focused primarily on the Contract itself and the statute and regulations with which it had to conform.

According to Congress' own declaration the Act had as its purpose 'to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit. . . .' Congress declared that '(T)he informed use of credit results from an awareness of the cost thereof by consumers' (15 U.S.C., Sec. 1601). Thus far Congress has used, as the most significant, two expressions 'awareness of the cost' and 'meaningful disclosure of credit terms'-both expressions being completely subjective in nature. And, akin to that other anomaly in the law-that mythical and fictitious character the 'reasonably prudent man'-the task of determining a subjective standard by objective criteria is left to the courts. Both 'awareness' and

'meaningful' must, of necessity, depend upon the capacity for understanding by the individual involved. Obviously, the laws cannot be written for separate intellectual levels. What will be meaningful to a C.P.A. business school graduate may not have any meaning to one who has not even had a grammar school education. Even the courts are not impervious to such bewilderment-witness the vast number of decisions under this very Truth in Lending Act on identical issues which have produced diametrically opposite results.[FN1] As to 'awareness', the range would be even wider. There is no requirement of law that the potential purchaser of a car take an examination to establish his 'awareness' of the manifold but necessary intricacies of contracts.

FN1. Thus, for example, some courts have held that a disclosure statement must describe contractual provisions for acceleration of principal and recovery of collection costs. See e.g., Woods v. Beneficial Finance Co., 395 F.Supp. 9 (D.C.Or.1975) (Acceleration clause not a 'charge' but should be disclosed in futuro); Meyers v. Clearview Dodge Sales, Inc., 384 F.Supp. 722 (E.D.La.1974); Johnson v. McCrackin-Sturman Ford, Inc., 381 F.Supp. 153 (W.D.Pa.1974) (now on appeal); Garza v. Chicago Health Clubs, Inc., 347 F.Supp. 955 (N.D.Ill.1972); Pollock v. Avco Financial Services, Inc., 4 CCH Consumer Credit Guide P98,766 (N.D.Ga.1974); Pugh v. American Tractor Trailer, Inc., 4 CCH Consumer Credit Guide P98,827 (D.Conn.1974) (semble). Other courts have reached the opposite conclusion. Washington Motor Sales, Inc. v. Ferreira, 329 A.2d 599; CCH Consumer Credit Guide P98,688 (N.J. Essex Co. 1974); cf., Evans v. Household Finance Corp., CCH Consumer Credit Guide P98,678 (S.D.Iowa 1974). In some instances decisions conflict in the same jurisdiction. Compare Jones v. East Hill Ford Sales, Inc., 398 F.Supp. 402 (W.D.Pa.1975) (now on appeal) with Johnson, supra, and compare Hamlet v. Beneficial Finance Co., CCH Consumer Credit Guide P98,646 (N.D.Ga.1974) with Pollock, supra.

The Congress must have sensed these problems when it bestowed on the Board of Governors of the Federal Reserve System (the Board) the task of prescribing 'regulations to carry out the purposes' of the Act 'to facilitate compliance therewith' (Sec. 105). The Board attempted to comply by issuing Regulation Z, 12 C.F.R. §§ 226.1 et seq. which regulations were, in effect, instructions to the future contract draftsman of what to do and how to do it. Thus the disclosures had to be made together 'on the same side of the page and above or adjacent to the place for the customer's signature.' Reg.Sec. § 226.8. Items to be disclosed included the amount, or method of computing the amount, of any default, delinquency, or similar charges payable in the event of late payments, a description of the security interest retained by the creditor, any penalty imposed for prepayment of principal***888** and identification of the method of computing any unearned portion of the finance charge in the event of prepayment.

Bearing in mind the essential purpose of the Act and the instructions issued by the Board, I turn to the Contract in issue.

The 'Retail Installment Contract', reproduced in reduced form as an 'Appendix' heroto, is a printed document, which details in clear and concise form the financial information which a buyer would need to be informed of his financial obligations. In bold type he is advised of the 'CASH PRICE' of the car he is purchasing-$4,497.65. He sees the amount credited on his 1964 Rambler turn-in-$600. and his cash downpayment-$1,696.65. The 'UNPAID BALANCE OF CASH PRICE' (an important item to him) is a simple arithmetical calculation stated as $2,201.00.

Since the buyer was electing to pay this balance over a period of three years, property damage insurance and a finance charge for the installment method of payment would add to the cost. These two charges are also disclosed in bold type, namely, insurance as $259. and the 'FINANCE CHARGE' as $511.80. The 'ANNUAL PERCENTAGE RATE' is stated as 11.08% (this figure was in error but was corrected by notice). These amounts added to the original cost of the car less credits came to $2,971.80 making the total cost to the purchaser (car, insurance and finance charges) $5,268.45, which is stated as 'DEFERRED PAYMENT PRICE'.

On the reverse side of the document entitled 'ADDITIONAL TERMS', is a series of paragraphs defining buyer-seller rights 'in the event' that certain contingencies occur. The most important of these

paragraphs from the buyer's point of view would be paragraph 6 which deals with the consequences 'In the event the buyer defaults in any payment due hereunder . . .' Under such circumstances 'the seller shall have the right, at his or its election, to declare the unpaid balance, * * * immediately due and payable . . ..' If the seller had cause and chose to exercise this option, it would have the effect of creating a prepayment which would entitle the buyer to the 'PREPAYMENT REBATE' of the FINANCE CHARGE as computed in accordance with the Rule of 78 as specifically set forth in paragraph 13 on the face of the contract.

Finally, the buyer's monthly obligations for the ensuing 36 months are clearly disclosed in item '10. PAYMENT SCHEDULE' as 36 payments of $82.55 to commence on August 28, 1971. The 'ANNUAL PERCENTAGE RATE' is stated as '11.08%- subsequently changed by GMAC to '12.83%', which change, as previously stated, did not affect the finance charge or monthly rate.

The printed contract form measures some 15 inches in length. The 'ADDITIONAL ITEMS' page on the reverse side is of equal length. Thus, if the entire contract were printed on one side of a paper (and all above the purchaser's signature) it would have been an unwieldy document of some 30 inches in length-not unlike an ancient Egyptian papyrus scroll. Query, whether such a scroll would have been a 'meaningful disclosure' in a 'meaningful sequence'. Rather would it not have brought forth an attack by some astute attorney that it had the opposite effect?

The court below, however, came to the conclusion that the 'ADDITIONAL TERMS' on the reverse side, such as the contingencies of default, delinquency, security interest, attorneys' fees and expenses as well as expenses and attorneys' fees on repossession, should have been on the other (or disclosure) side. Accordingly, it found, out of this one transaction, seven separate violations of the various statutes and imposed penalities of $1,000 for each plus the $511.80 finance charge and $615 for an alleged violation of an Illinois statute.

My essential disagreement with the conclusions of the court below stems from its ***889** findings in substance that items on the reverse side should under the law have been on the opposite side and were in effect 'charges' which had to be disclosed thereon. None of the items were in fact actual 'charges' and at the time of the signing of the Contract could not have been incorporated into the calculation of any figure expressing the financial obligation of the purchasers because they were unknown or contingent and prefaced by 'In the event that . . .'. An example will suffice. If the purchaser failed, to pay, if the seller had to repossess the car, if there were storage and other expenses and if attorneys' fees were incurred in the process, the purchaser would be liable. These highly contingent items-then incapable of ascertainment-could not possibly have been incorporated into any figure entitled a finance charge; yet the court below found that 'Plaintiffs were entitled to disclosure of the total finance charge, including charges for (subsequent and contingent or unknown items) * * $ (Opinion, Conclusions of Law, par. 3 a-g).

In a rather recent case, Morris v. First National Bank of Atlanta and Car Circus Company (N.D.Ga.1975) CCH Consumer Credit Guide, P98,568, the court was faced with the claim that the defendants there had failed to disclose the right to accelerate as a delinquency or late charge. The court came to the conclusion that 'disclosures relating to possible additional costs, that are occasioned by a default of the borrower and that cannot with certainty be determined at the time of a credit transaction, are not required by the Act or Reg. Z.' I agree with the court's reasoning. Accordingly the court found that 'no violation of the Act or Reg. Z has been demonstrated by the plaintiffs,' and recommended that the complaint be dismissed. The same judge had come to a similar conclusion in McDaniel v. Fulton National Bank of Atlanta, (N.D.Ga.1974) CCH Consumer Credit Guide, P98,683, finding no violation and dismissing the petition, saying, as can be said here, 'acceleration, in and of itself, does not increase the amount of the debt by one penny.' (p. 88, 264).

Even more recently (July 25, 1975) Judge Gurley[FN2] in a very similar situation but where the motor vehicle had actually been repossessed by the vendor pursuant to a provision authorizing repossession for failure to pay insurance premiums, said, as could be said here, mutatis mutandis: 'The contract executed is very clear in all respects. The date of the contract, the total purchase price of the new car, the cost of the life insurance, the allowances for the old car, the balance due on the old car, the Pennsylvania Sales Tax, the vehicle registration cost, the amount of the finance charge, the unpaid balance, the total payments required, the annual interest percentage rate, and when the payments

were to commence are all fully and completely set forth and contained in a most clear and intelligent manner.'

FN2. Senior District Judge, Western District of Pennsylvania.

The court there concluded that 'all disclosures required by the Act and Regulation Z were properly made to the plaintiffs in the installment sale contract.' Eric Jones, et al. v. East Hills Ford Sales, Inc., et al., 398 F.Supp. 402 (W.D.Pa.1975) (now on appeal). See also Johnson v. McCrackin-Sturman Ford, Inc., 381 F.Supp. 153 (W.D.Pa.1974), reaching a different result. FN3

FN3. Upon appeal, the Court of Appeals for the Third Circuit reversed in a comprehensive opinion filed December 16, 1975.

The fundamental purpose of the Act was to protect consumers, but the courts should be mindful of the admonition expressed in Shields v. Valley National Bank of Arizona, 56 F.R.D. 448, 451 (D.Ariz.1971) 'The Act should be strictly enforced by the courts but should not be allowed to be used as means of oppression or harrassment or unjust enrichment.' In addition, the comment by way of footnote by the court in McDaniel, ***890** supra, may well be heeded that 'Borrowers are in court re Truth-in-Lending complaints, not arising from failure of borrower to receive or understand critical information with respect to costs and charges incident to the credit transactions, but resulting from mere defense mechanisms, conceived by specializing TIL attorneys to defeat collection of creditors' suits to enforce payment of the underlying debt . . . (N)either the prior abuses against consumers (n)or the present novel arguments of inspired counsel should persuade this Court to decree a violation where the Act and Regulations fail to specify a disclosure requirement.' p. 88, 260.

In the case now before us there was no default bringing into being any of the contingencies of the Contract and no claim of lack of understanding of any of the essential financial terms. Nor are the arguments here advanced being used 'to defeat collection of creditors' suits to enforce payment of the underlying debt.' McDaniel, supra. They are being used to foist upon the seller and financing agency penalties for violations which I find to have been nonexistent.

Much is made by plaintiffs, the court below and the majority of the alleged error in stating the annual percentage rate. In so doing, plaintiffs are creating windmills at which to tilt. The testimony established that the stated 'ANNUAL PERCENTAGE RATE' was a calculation or conversion rate obtained from the finance charge-not the rate by which the finance charge was calculated. There was no refutation of this fact.

Thus Mr. Roark, Credit Manager of GMAC, testified that the finance charge of $511.80 was based on interest at 6.95% and that 'The annual percentage rate is a converted rate on an annual-it's a true interest rate on an annual basis.'; it is the finance charge translated into different terms. If any error were made in the annual percentage rate but not in the finance charge a correction of the rate would not cause any change in the finance charge. (Tr. 86). In other words: 'Q. * * * But the annual percentage rate is a conversion indicating what the 6.95 add-on would be at true interest, is that correct? A. Yes.' As the court itself observed 'the change that you discussed there in no way affected the total amount payable, and that the total amount payable under the contract remained the same as it was when it was first contracted for?' which elicited the answer 'There's no change in the finance charge or the payments or the amount. It has no bearing on it other than the disclosure.' (Tr. 87) 6.95 per cent was the rate in fixing the finance charge, the original disclosed conversion rate was 11.08 and the corrected notice was 12.83. This was only a mathematical conversion error. The finance rate, the payments and the gross amount remained the same (Tr. 87).

Plaintiffs' counsel endeavored to assert his own theories of calculation on his own hypotheses. Thus, whereas the witness had said that the finance charge is computed first and then converted to an annual percentage rate, counsel said 'I am doing the reverse' (Tr. 91), and upon this hypothesis claimed that the finance charge would be somewhat less. Counsel pursued his 'reverse' theory at length but the witness adhered to the method actually used, saying: 'You (counsel) are starting with an annual

percentage rate. We are starting with a finance charge.' (Tr. 94) and asserted that counsel was 'working backwards.' (Tr. 95). All that emerged from this exchange with the witness by counsel and court was that if some other method of calculation had been used the finance charge might have been some fifty to one hundred dollars lower. But lawsuits should not be decided on such speculative hypotheses. It is difficult to understand the trial court's finding that plaintiffs were entitled to receive a corrected statement (in fact they did receive one) and to an adjustment in the finance charge (none was required because the facts clearly indicated that it remained the same).

***891** At most, any error in mathematically computing the conversion rate would fall into a harmless error category. § 1640(b) allows a creditor to avoid liability under the Truth in Lending Act for errors:

'A creditor has no liability under this section for any failure to comply with any requirement imposed under this chapter, if within fifteen days after discovering an error, and prior to the institution of an action under this section or the receipt of written notice of the error, the creditor notifies the person concerned of the error and makes whatever adjustments in the appropriate account are necessary to insure that the person will not be required to pay a finance charge in excess of the amount or percentage rate actually disclosed.'

In this case notice was given and no adjustments were necessary because there was no excess finance charge.

Since, to me, it is clear that the difference in the stated annual percentage rate figure did not affect the FINANCE CHARGE, I find it unnecessary to pass upon the 'unintentional error' defense and the post-trial pleading problems presented. However, a review of the record discloses sufficient proof to justify its inclusion as an issue, F.R.Civ.P. 15(b) and the conclusion that it was unintentional.

Nor do I find any merit to the suppositious claim that a security interest attached to personal property left in the vehicle.

Taking into consideration the purpose of the Truth in Lending legislation and the directions given by the Board in Regulation Z, I am left with the firm conviction that the Contract conformed to the Act and Regulation Z and that the purchasers received the full benefit of the 'informed use of credit' which Congress wished to bestow upon them in clear, conspicuous and meaningful sequence. To adopt plaintiffs' version of how the Contract should have been drawn would lead only to the confusion of the very group of consumers Congress desired to protect.

Although agreeing with the majority as to multiple recoveries, I disagree that separate awards should be made to each of the Mirabals. They bought one Buick as husband and wife. As such they were one entity. Payment for the car was a single obligation.

I agree with the majority's conclusions as to any liability under the Illinois statutes.

In conclusion, I would reverse the judgment of the district court.

Appendix to follow.

***892** APPENDIX

[Click to View ]

Image 1 (5.12" X 5") Available for Offline Print

***893**

[Click to View ]

Image 2 (5.4" X 5.39") Available for Offline Print

***894**

[Click to View ]

Image 3 (5.42" X 6.4") Available for Offline Print

C.A.Ill. 1976.
Mirabal v. General Motors Acceptance Corp.,
537 F.2d 871

END OF DOCUMENT

West Reporter Image (PDF)

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

West Reporter Image (PDF)

478 A.2d 964

Supreme Court of Rhode Island.
Ernest A. MORIN et al.
v.
AETNA CASUALTY AND SURETY COMPANY et al.
No. 81-265-Appeal.
May 24, 1984.

Insureds brought action against insurers to recover damages resulting from a fire and explosion to their home and its contents. Insurers counterclaimed for compensatory and punitive damages on ground that insureds had been convicted of statutory burning, conspiracy to commit statutory burning, conspiracy to defraud an insurer, burning with intent to defraud an insurer, and attempting to obtain money under false pretenses. The Superior Court, Providence County, Cresto, J., entered judgment granting defendants' motion for summary judgment as to compensatory damages only, and both plaintiffs and defendants appealed. The Supreme Court, Bevilacqua, C.J., held that: (1) trial court properly admitted into evidence criminal record of the insureds, who were convicted of setting the fire that caused the damage, and (2) since the criminality of the insureds had been conclusively established, the question of whether punitive damages should be awarded the insurers on their counterclaim was a matter to be referred to the trier of fact, judge or jury.
Affirmed in part, reversed in part and remanded.

West Headnotes

[1] KeyCite Notes

228 Judgment
228XIV Conclusiveness of Adjudication
228XIV(A) Judgments Conclusive in General
228k643 Nature of Action or Other Proceeding
228k648 k. Civil or Criminal Proceedings. Most Cited Cases

In action by insureds to recover damages resulting from fire and explosion at their home, trial court properly admitted into evidence the criminal record of the insureds, who were convicted of setting the fire that caused the damage; that is, a criminal conviction is admissible to bar recovery in a civil suit based on the same facts or occurrence.

[2] KeyCite Notes

115 Damages
115V Exemplary Damages
115k91.5 Grounds for Exemplary Damages
115k91.5(1) k. In General. Most Cited Cases
(Formerly 115k91(1))

One seeking punitive damages must produce evidence of such willfullness, recklessness or wickedness, on part of party at fault, as amounts to criminality, which for the good of society and warning to the individual ought to be punished.

[3] KeyCite Notes

115 Damages
115X Proceedings for Assessment
115k208 Questions for Jury
115k208(8) k. Exemplary Damages. Most Cited Cases

Whether case is a proper one for the award of punitive damages is question of law for the court to decide; however, even when the court makes a determination that punitive damages may appropriately be awarded, such an award is discretionary with finder of fact.

[4] KeyCite Notes

228 Judgment
228V On Motion or Summary Proceeding
228k180 k. Actions in Which Summary Judgment Is Authorized. Most Cited Cases

Summary judgment is not proper vehicle for award of punitive damages.

[5] KeyCite Notes

217 Insurance
217XXVIII Miscellaneous Duties and Liabilities
217k3427 k. Questions of Law or Fact. Most Cited Cases
(Formerly 184k64(1))

Since, in action brought by insureds against their insurers to recover for fire and explosion at their home, the criminality of the insureds, who were convicted of burning with intent to defraud, had been conclusively established, the question of whether punitive damages should be awarded the insurers on their counterclaim was a matter to be referred to the trier of fact, judge or jury.

***964** Bradford Gorham, Providence, for plaintiffs.

William A. Curran/Dennis J. McCarten, Hanson, Curran & Parks, Providence, for defendants.

OPINION

BEVILACQUA, Chief Justice.
The plaintiffs, Ernest A. Morin and Ruth Morin, brought this civil action against the defendants, Aetna Casualty and Surety Company et al, to recover for damages resulting from a fire and explosion to their home and its contents. The defendants asserted as a defense that the plaintiffs ***965** intentionally caused the fire and filed a counterclaim seeking both compensatory and punitive damages on the ground that the plaintiffs had been convicted of statutory burning, conspiracy to commit statutory burning, conspiracy to defraud an insurer, burning with intent to defraud an insurer, and attempting to obtain money under false pretenses. *See* State v. Morin, R.I., 422 A.2d 1255 (1980).

Subsequently, defendants filed a motion for summary judgment. The trial justice granted defendants' motion as to compensatory damages, but denied the request for punitive damages. Both plaintiffs and defendants appeal.

The plaintiffs, on June 28, 1976, were the owners of a home located on Ruth Boulevard in Coventry. On this day, the home was extensively damaged by a fire. The real estate was insured by a policy issued by defendants. In the meantime, plaintiffs filed a sworn statement and proof of loss claiming a total loss to real and personal property in the amount of $261,000.

Thereafter, plaintiffs were indicted and charged with the above crimes. In January 1978, following a jury trial, plaintiffs were found guilty on all counts. After exhausting their appeals, their convictions were affirmed. *See* State v. Morin, R.I., 422 A.2d 1255 (1980).

During the pendency of the criminal proceedings, plaintiffs initiated this suit against defendants, alleging that they had unreasonably delayed in making payment of the insurance proceeds to the mortgage holders of the property. The plaintiffs also claimed that the delay resulted in the accrual of additional interest to plaintiffs' detriment. After payments of $49,754.72 and $12,695.28 were made respectively to each of the mortgagees, defendants filed a counterclaim to recover the sums paid, alleging that the payments made to Warwick Federal Savings and Loan Association and the Greater Providence Deposit Corporation, the mortgagees, were made as a direct result of the fraud perpetrated by plaintiffs.

Thereafter, defendants filed a motion for summary judgment as to plaintiffs' claim as well as their own counterclaim. In granting the motion, the trial justice held that because plaintiffs were already criminally convicted, they were collaterally estopped from litigating their claim in a civil suit.

On appeal, we will confine ourselves to two issues: (1) whether a criminal conviction is admissible to bar recovery in a civil suit based on the same facts or occurrence; and (2) whether punitive damages are allowable, when the parties have been convicted of criminal conduct in obtaining money under the terms of their fire policy, in a civil suit based upon the same transaction or occurrence.

I

The first issue of whether a criminal conviction is admissible to bar recovery in a civil suit based on the same facts or occurrence is one of first impression in this jurisdiction.

Responding to this issue, plaintiffs contend that a criminal conviction is not admissible as evidence in a civil suit in which the truth of the facts underlying the conviction is raised. As a general rule, this is true. *Aetna Casualty & Surety Co. v. Anderson,* 200 Va. 385, 388, 105 S.E.2d 869, 872 (1958); *see* *State v. Bradnack,* 69 Conn. 212, 214, 37 A. 492, 493 (1897). However, this rule is subject to a widely recognized exception. A majority of jurisdictions will not exclude criminal judgments from evidence in a civil suit where the party's motive in bringing the civil suit is to benefit from his criminal act. *See, e.g., State Farm Mutual Automobile Insurance Co. v. Worthington,* 405 F.2d 683, 686 (8th Cir.1968); *Imperial Kosher Catering, Inc. v. Traveler's Indemnity Co.,* 73 Mich.App. 543, 545, 252 N.W.2d 509, 510 (1977); *Mineo v. Eureka Security Fire and Marine Insurance Co.,* 182 Pa.Super. 75, 81, 125 A.2d 612, 615 (1956); ***966** *Eagle, Star & British Dominions Insurance Co. v. Heller,* 149 Va. 82, 106, 140 S.E. 314, 321 (1927).

However, the courts are generally divided over the question of whether the evidence is only prima facie evidence [FN1] or conclusive evidence of the facts determined. *Seattle-First National Bank v. Cannon,* 26 Wash.App. 922, 927-28, 615 P.2d 1316, 1319-20 (1980).

FN1. A minority of jurisdictions hold that a judgment of a conviction, where admissible, is only admissible as prima facie evidence. *See, e.g., North River Insurance Co. of New York v. Militello,* 100 Colo. 343, 347, 67 P.2d 625, 626-27 (1937); *Asato v. Furtado,* 52 Haw. 284, 289, 474 P.2d 288, 293 (1970); *Schindler v. Royal Insurance Co.,* 258 N.Y. 310, 314, 179 N.E. 711, 712 (1932).

Courts recognizing this exception have relied on one of two theories. Some courts have held that recovery is barred on the basis of "the public interest which requires that the laws against crime be enforced, and that courts aid no man in any effort he may make to benefit from his own violation of them." *Mineo v. Eureka Security Fire & Marine Insurance Co.,* 182 Pa.Super. at 84, 125 A.2d at 617; *see* *Imperial Kosher Catering, Inc. v. Traveler's Indemnity Co.,* 73 Mich.App. at 545, 252 N.W.2d at 510. The other theory that has been relied upon is that of collateral estoppel, which prevents the "relitigation of a particular issue or a determinative fact after the party estopped has a full and fair

opportunity to present its case in order to promote the policy of ending disputes." Seattle-First National Bank v. Cannon, 26 Wash.App. at 927, 615 P.2d at 1320; *see* Travelers Insurance Co. v. Thompson, 281 Minn. 547, 555, 163 N.W.2d 289, 294 (1968).

We believe that the better view is the one adopted in the Pennsylvania case of *Mineo v. Eureka Security Fire & Marine Insurance Co.,* 182 Pa.Super. 75, 125 A.2d 612 (1956).

In *Mineo,* a case similar to the one at bar, the owners of a restaurant destroyed by fire were convicted of having set the fire. Prior to the fire, the restaurant owners assigned their interest in four fire insurance policies to the plaintiff, to whom they owed money. The plaintiff then brought suit against the defendant insurance companies to recover for the damage caused by the fire. *Id.* at 77, 125 A.2d at 613. At trial the defendant introduced records of the insureds' convictions into evidence. *Id.* at 77, 125 A.2d at 614. In admitting the evidence the court held that reason can lead to no other conclusion than "when one is convicted of a felony and subsequently attempts to benefit from the commission, the record of his guilt should be a bar to his recovery." *Id.* at 86, 125 A.2d at 618.

The plaintiffs erroneously rely on *Korsak v. Prudential Property & Casualty Insurance Co.,* R.I., 441 A.2d 832 (1982), in support of their claim that a criminal conviction is not admissible as evidence in a subsequent civil suit in which the truth of the issues underlying the conviction is raised. The case before us, however, is distinguishable from *Korsak.* In *Korsak* we held that the insured's nolo contendere plea, which was followed by a suspended sentence with probation, was not admissible as summary-judgment proof of the facts underlying the conviction. *Id.,* 441 A.2d at 834. Here, unlike in *Korsak,* plaintiffs were convicted by a jury after a trial. Their convictions therefore are substantially different than a nolo plea followed by probation or a deferred sentence. We have held most recently in *State v. Gobern,* R.I., 423 A.2d 1177, 1179 (1981), that a nolo plea is equivalent to a plea of guilty only in respect to the case in which it is pleaded. *See* *Doughty v. De Amoreel,* 22 R.I. 158, 159, 46 A. 838, 838 (1900).

[1] KC We adopt the reasoning of the Pennsylvania court in *Mineo.* The plaintiffs in the instant case were tried and found guilty on criminal charges arising out of the fire at their home. To allow plaintiffs thereafter to initiate a civil suit against the defendants in an attempt to collect the insurance proceeds for the damage ***967** caused by the fire while excluding the evidence of their convictions would afford plaintiffs the opportunity to reap the benefits of their crimes. To permit such recovery, we believe, would violate all standards of public policy and defy the administration of justice.

We therefore conclude that the trial justice committed *no error* in admitting into evidence the criminal record of the insureds who were convicted of setting the fire that caused the damage. We are of the opinion that the conviction is a bar to recovery, and the granting of defendant's motion for summary judgment was proper.

II

Next, we will briefly consider whether the trial justice erred in denying defendants' prayer for punitive damages on the counterclaim.

The defendants moved for entry of judgment on their counterclaim against plaintiffs in their motion for summary judgment. The defendants alleged in their counterclaim that plaintiffs' actions were willful, malicious, and intentional and thus sought punitive damages.

[2] KC [3] KC We have held on several occasions that punitive damages are allowed in tort actions only when it can be shown that the defendant has acted maliciously or in bad faith. *Carvalho v. Coletta,* R.I., 457 A.2d 614, 616 (1983); *Berberian v. New England Telephone and Telegraph Co.,* 117 R.I. 629, 633-34, 369 A.2d 1109, 1112 (1977). Accordingly, one seeking punitive damages must produce "evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality, which for the good of society and warning to the individual, ought to be

punished." Sherman v. McDermott, 114 R.I. 107, 109, 329 A.2d 195, 196 (1974) (quoting Hagan v. Providence & Worcester Railroad Co., 3 R.I. 88, 91 (1854)); Adams v. Lorraine Manufacturing Co., 29 R.I. 333, 338, 71 A. 180, 182 (1908). Whether a case is a proper one for the award of punitive damages is a question of law for the court to decide. Sherman v. McDermott, 114 R.I. at 108, 329 A.2d at 196; Kenyon v. Cameron, 17 R.I. 122, 125, 20 A. 233, 234 (1890). However, even when the court makes a determination that punitive damages may appropriately be awarded, such an award is discretionary with the finder of fact. Scully v. Matarese, R.I., 422 A.2d 740, 741 (1980); Petrone v. Davis, 118 R.I. 261, 267, 373 A.2d 485, 488 (1977).

After granting the motion for summary judgment with respect to defendants' claim for compensatory damages, the trial justice made a determination that punitive damages should be denied. However, he did not specify his reasons for denying said damages. Therefore, we must speculate whether the trial justice determined as a matter of law that the case was an inappropriate one for the award of punitive damages or whether he inappropriately failed to consider this question.

[4] KC [5] KC Summary judgment is not a proper vehicle for the award of punitive damages in any event. In this case, since criminality has been conclusively established the question of whether punitive damages are to be awarded should be referred to the trier of fact, judge or jury as the case may be.

Therefore, the plaintiffs' appeal is denied and dismissed, the defendants' appeal is sustained, and the case is remanded to the Superior Court for further proceedings in accordance with our instructions.

R.I.,1984.
Morin v. Aetna Cas. and Sur. Co.
478 A.2d 964

END OF DOCUMENT

West Reporter Image (PDF)

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.