Palmisano v. Toth
R.I.,1993.

Supreme Court of Rhode Island.
Debra N. PALMISANO et al.
v.
Bernard J. TOTH et al.
**No. 92-350-M.P.**

May 7, 1993.

Premises liability case was brought against parking lot owner and its four partners to recover for injuries caused by attack in parking lot. The Superior Court, Washington County, Ragosta, J., compelled production of documents relating to partners' personal financial information and compelled answers to similar questions at depositions. Owner and partners petitioned for certiorari. The Supreme Court, Murray, J., held that: (1) motion to strike claim for punitive damages defers all discovery relating to the punitive damage claim until justice of superior court has ruled on the motion after evidentiary hearing, and (2) to be entitled to discovery of defendant's financial worth, plaintiff must make prima facie showing that viable issue exists for awarding punitive damages.

Petition granted, order quashed, and case remanded.
West Headnotes
**[1] Damages 115 87(1)**

115 Damages
115V Exemplary Damages
115k87 Nature and Theory of Damages Additional to Compensation
115k87(1) k. In General. Most Cited Cases
Punitive or exemplary damages are to punish tort-feasor whose wrongful conduct was malicious or intentional and to deter him or her and others from similar, extreme conduct.

**[2] Damages 115 87(1)**

115 Damages
115V Exemplary Damages
115k87 Nature and Theory of Damages Additional to Compensation
115k87(1) k. In General. Most Cited Cases
Standard for imposing punitive damages is satisfied only if defendant's conduct requires deterrence and punishment over and above that provided in award of compensatory damages.

**[3] Damages 115 87(1)**

115 Damages
115V Exemplary Damages
115k87 Nature and Theory of Damages Additional to Compensation
115k87(1) k. In General. Most Cited Cases
Punitive damages are extraordinary sanction disfavored in the law, but will be permitted if ordered with great caution and within narrow limits.

**[4] Damages 115 208(8)**

115 Damages
115X Proceedings for Assessment
115k208 Questions for Jury
115k208(8) k. Exemplary Damages. Most Cited Cases
Whether party seeking punitive damages has met the high standard imposed on such an award is question of law for trial justice.

**[5] Damages 115 208(8)**

115 Damages
115X Proceedings for Assessment
115k208 Questions for Jury
115k208(8) k. Exemplary Damages. Most Cited Cases
Once trial justice determines that there are adequate facts to support award of punitive damages, then question of whether and to what extent party is entitled to punitive damages is in discretion of trier of fact.

**[6] New Trial 275 76(1)**

275 New Trial
275II Grounds
275II(F) Verdict or Findings Contrary to Law or Evidence
275k76 Excessive Damages

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

275k76(1) k. In General. Most Cited Cases
(Formerly 115k94)

**New Trial 275 77(2)**

275 New Trial
275II Grounds
275II(F) Verdict or Findings Contrary to Law or Evidence
275k77 Mistake, Passion, or Prejudice of Jurors
275k77(2) k. Excessive Damages in General. Most Cited Cases
(Formerly 115k94)
Trial justice may set aside punitive damage award if award clearly appears to be excessive or to represent passion and prejudice of jury, rather than their unbiased judgment.

**[7] New Trial 275 162(1)**

275 New Trial
275III Proceedings to Procure New Trial
275k162 Remission or Reduction of Excess of Recovery
275k162(1) k. In General. Most Cited Cases
If trial justice determines that punitive damage award is excessive, he or she may order new trial on damages alone unless plaintiff agrees to remittitur.

**[8] New Trial 275 76(1)**

275 New Trial
275II Grounds
275II(F) Verdict or Findings Contrary to Law or Evidence
275k76 Excessive Damages
275k76(1) k. In General. Most Cited Cases
Trial justice may review punitive damage award as he or she would review award for pain and suffering and thereby disregard jury's verdict on motion for new trial if award shocks conscience or clearly demonstrates that jury proceeded upon clearly erroneous basis.

**[9] New Trial 275 75(1)**

275 New Trial
275II Grounds
275II(F) Verdict or Findings Contrary to Law or Evidence
275k75 Inadequate Damages
275k75(1) k. In General. Most Cited Cases
Jury award of punitive damages may not be reviewed for inadequacy, and trial justice may not review jury's failure to award punitive damages.

**[10] Pretrial Procedure 307A 24**

307A Pretrial Procedure
307AII Depositions and Discovery
307AII(A) Discovery in General
307Ak24 k. Discovery Methods and Procedure. Most Cited Cases
Requiring plaintiff to make prima facie showing that viable issue exists for awarding punitive damages is moderate and fair avenue for providing plaintiff with opportunity to discover relevant information while protecting defendant's right to privacy.

**[11] Pretrial Procedure 307A 25**

307A Pretrial Procedure
307AII Depositions and Discovery
307AII(A) Discovery in General
307Ak25 k. Sequence and Timing; Condition of Cause. Most Cited Cases
Once plaintiff establishes in evidentiary hearing before trial justice that prima facie case for punitive damages exist, plaintiff may then proceed with discovery into defendant's financial worth to extent necessary to address issue of punitive damages, namely, defendant's net worth or annual income.

**[12] Pleading 302 362(2)**

302 Pleading
302XVI Motions
302k361 Striking Out Matter from Pleading
302k362 In General
302k362(2) k. Grounds for Striking Out Matter in General. Most Cited Cases
If defendant believes that punitive damage claim cannot be supported factually and legally, defendant may move to strike it.

**[13] Pleading 302 365(3)**

302 Pleading
302XVI Motions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

302k361 Striking Out Matter from Pleading
302k365 Application and Proceedings Thereon
302k365(3) k. Hearing, Determination, and Order. Most Cited Cases
Motion to strike claim for punitive damages has function of testing propriety of claim by evidentiary hearing.

**[14] Pretrial Procedure 307A 🔑25**

307A Pretrial Procedure
307AII Depositions and Discovery
307AII(A) Discovery in General
307Ak25 k. Sequence and Timing; Condition of Cause. Most Cited Cases
Motion to strike claim for punitive damages defers all discovery relating to claim until justice of superior court has ruled upon the motion.

**[15] Pleading 302 🔑365(1)**

302 Pleading
302XVI Motions
302k361 Striking Out Matter from Pleading
302k365 Application and Proceedings Thereon
302k365(1) k. In General. Most Cited Cases
Motion to strike claim for punitive damages may be referred to justice of superior court on whatever calendar presiding justice of that court determines appropriate.

**[16] Pleading 302 🔑365(3)**

302 Pleading
302XVI Motions
302k361 Striking Out Matter from Pleading
302k365 Application and Proceedings Thereon
302k365(3) k. Hearing, Determination, and Order. Most Cited Cases
Plaintiff opposing motion to strike punitive damages claim may present evidence to constitute prima facie showing of eligibility for punitive damages in accordance with standards that defendant acted so willfully, maliciously, or recklessly as to amount to conduct bordering on criminality.

**[17] Pleading 302 🔑365(3)**

302 Pleading
302XVI Motions
302k361 Striking Out Matter from Pleading
302k365 Application and Proceedings Thereon
302k365(3) k. Hearing, Determination, and Order. Most Cited Cases
At hearing on motion to strike punitive damages claim, defendant may cross-examine witnesses and introduce evidence that tends to negate showing made by plaintiff.

**[18] Pleading 302 🔑365(3)**

302 Pleading
302XVI Motions
302k361 Striking Out Matter from Pleading
302k365 Application and Proceedings Thereon
302k365(3) k. Hearing, Determination, and Order. Most Cited Cases
At conclusion of hearing on motion to strike claim for punitive damages, judge will determine whether evidence warrants submission of punitive damages issue to trier of fact.

**[19] Pleading 302 🔑362(2)**

302 Pleading
302XVI Motions
302k361 Striking Out Matter from Pleading
302k362 In General
302k362(2) k. Grounds for Striking Out Matter in General. Most Cited Cases
If trial justice finds after evidentiary hearing that punitive damage issue should not be submitted to trier of fact, justice will strike claim for punitive damages, but if justice finds that showing is adequate as matter of law to justify submission of issue of punitive damages to trier of fact, justice will deny motion to strike.

**[20] Certiorari 73 🔑17**

73 Certiorari
73I Nature and Grounds
73k11 Decisions and Proceedings of Courts, Judges, and Judicial Officers
73k17 k. Particular Proceedings in Civil Actions. Most Cited Cases
Determinations by superior court justice on motion to strike claim for punitive damages may be reviewed in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

discretion of Supreme Court on petition for certiorari.

**[21] Pretrial Procedure 307A ⚷36.1**

307A Pretrial Procedure
307AII Depositions and Discovery
307AII(A) Discovery in General
307Ak36 Particular Subjects of Disclosure
307Ak36.1 k. In General. Most Cited Cases

If motion to strike punitive damage claim is denied, plaintiff may proceed to seek discovery relating to wealth or ability of defendant to respond to punitive damage award insofar as such evidence may be relevant to determination of amount adequate to deter defendant from similar activities in future.

**[22] Pretrial Procedure 307A ⚷36.1**

307A Pretrial Procedure
307AII Depositions and Discovery
307AII(A) Discovery in General
307Ak36 Particular Subjects of Disclosure
307Ak36.1 k. In General. Most Cited Cases

If motion to strike claim for punitive damages is granted, then no discovery will be permitted on issue of defendant's ability to respond to punitive damages.

**[23] Labor and Employment 231H ⚷870**

231H Labor and Employment
231HVIII Adverse Employment Action
231HVIII(B) Actions
231Hk864 Monetary Relief; Damages
231Hk870 k. Exemplary or Punitive Damages. Most Cited Cases
(Formerly 255k41(5) Master and Servant)

Jury may not award punitive damages on respondeat superior theory.

***316** Thomas J. Grady, Westerly, for plaintiffs.
Paul V. Reynolds, Kevin Cain, William Landry, Providence, for defendants.

OPINION

MURRAY, Justice.

This case is before us on the defendants' petition for certiorari, seeking review of a Superior Court order that granted the plaintiffs' motions to compel the production of documents relating to the defendants' personal financial information and to compel the defendants to answer similar questions at reconvened depositions. The defendants also ask this court for guidance regarding procedures to be followed during the course of discovery when a party seeking punitive damages requests disclosure of another's financial assets.

The facts of the underlying cause of action, as adduced by the pleadings, are as follows. On May 11, 1990, plaintiff Debra N. Palmisano (Debra) was employed as a waitress by Amscot, Inc., doing business as Old Mountain Lanes, a South Kingstown, Rhode Island, bowling alley with an attached restaurant and bar. On that evening she finished her work shift at approximately 10:10 p.m. and walked from the establishment toward her car, which was parked in a parking lot owned and operated by Bank of New England-Old Colony, N. A. To get to her car, she had to traverse a portion of a parking lot owned and operated by defendant Clock Place Associates (Clock Place), a Rhode Island partnership. While walking in a dark, unlit section toward the rear of Clock Place's premises, Debra was viciously attacked and assaulted by a person engaged in robbing a store situated on Clock Place's property.

As a result of the attack, Debra alleges, she suffered and continues to suffer from physical and psychological injuries; her husband, Christian G. Palmisano, alleges that he has suffered from a loss of consortium. The plaintiffs filed an action in Washington County Superior Court on March 8, 1991, against Clock Place and its four partners, Bernard J. and Robert L. Toth (the Toths), Leonard Terrien (Terrien), and Lawrence C. LeBlanc (LeBlanc), individually and as general partners. The four counts against defendants allege that they were negligent (1) in failing to provide adequate lighting in the Clock Place parking lot, (2) in failing to make available respective parking areas for employees of Old Mountain Lanes as required by an agreement entered into by Clock Place, (3) in failing to warn or to protect Debra against the dangerous condition of Clock Place's parking area, and (4) in failing to provide adequate security on or about the Clock Place premises.

On March 17, 1992, plaintiffs filed a motion to amend the complaint in the form of a second amended complaint. The plaintiffs' motion was granted on April 22, 1992, and the second amended complaint was filed the next day. In addition to the aforementioned four counts, plaintiffs now seek

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

punitive damages, asserting that "Defendants' conduct, individually and jointly, rises to the level of willfulness, recklessness or wickedness, as to amount to criminality, which for the good of society and warning to the individuals, ought to be punished."

In furtherance of their request for punitive damages, plaintiffs sought information relating to defendants' personal finances, first by way of depositions and next by way of extensive requests for production directed to each named defendant. The three defendants who had been deposed, the Toths and LeBlanc, each refused to answer questions asked by plaintiffs' counsel***317** that ventured into the areas of his personal finances and defendant Clock Place's financial condition.

The requests for production, each filed on April 24, 1992, sought inter alia personal financial statements submitted to all financial institutions, deeds to all real estate holdings and related mortgages, certain Internal Revenue Service forms, certificates or statements evidencing investments, insurance policies, and registration certificates of items of tangible personal property such as automobiles, boats, and airplanes. On May 14, 1992, each defendant objected to plaintiffs' request for production on the grounds that plaintiffs' complaint failed to state a claim upon which relief may be granted with respect to punitive damages, thereby rendering this information irrelevant and immaterial and not designed to lead to the discovery of admissible evidence. The defendants also contend that this request for production is premature, that awarding punitive damages under Rhode Island law violates defendants' constitutional rights to due process, and that the request is so broad as to be burdensome in nature.

In response to defendants' objections, plaintiffs filed motions to compel each defendant to produce the documents previously requested and to compel the Toths and LeBlanc to answer certain questions at future depositions. These matters were heard by a Superior Court justice on June 15, 1992, as were defendants' motions for a separate trial and for a stay of discovery in regard to defendants' financial conditions pending the resolution of plaintiffs' claim for compensatory damages and a determination by the trial justice of whether plaintiffs are eligible for punitive damages. All four motions were continued until July 3, 1992, at which time defendants' motions were denied and plaintiffs' motions to compel production of documents and to compel three defendants to answer questions pertaining to financial assets at future reconvened depositions were granted.

Prior to the appropriate order's being entered by the trial justice, defendants filed with this court a petition for writ of certiorari and a motion for a stay of the Superior Court order. A single justice of this court stayed the discovery order on July 9, 1992, pending review of defendants' petition for certiorari by the full court when it reconvened in September 1992. We granted certiorari on September 24, 1992, and ordered the stay to remain in effect.

The issues raised by defendants question the fairness as well as the constitutionality of Rhode Island's law on punitive damages. The defendants also assert that plaintiffs have not established a case that would warrant the imposition of punitive damages. Lastly defendants contend that in no circumstances are defendant Terrien's financial records discoverable because he had no active involvement in any wrongful act of the partnership and that, therefore, punitive damages cannot be imposed on him vicariously. We shall address each issue in turn.

I

The defendants maintain that to order discovery of confidential information concerning one's personal finances solely because the opposing party has demanded punitive damages absent some factual basis for doing so would subject a party to annoyance, undue expense, embarrassment, and oppression. The defendants further contend that this practice would allow an opposing party to use the discovery process to harass and cause undue hardship on a defendant. Hence defendants suggest that this court adopt procedures through which a plaintiff might make a showing that he or she is entitled to punitive damages before a defendant is required to disclose his or her personal financial information.

[1] Prior to any exposition of the necessary procedures to be followed before permitting discovery into one's personal finances, we consider the status of punitive damages in Rhode Island. The nature of punitive or exemplary damages is twofold: to punish the tortfeasor whose wrongful conduct was malicious or intentional and to deter him or her and others from similar ***318** extreme conduct. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

67, 101 S.Ct. 2748, 2759, 69 L.Ed.2d 616, 632 (1981); *Greater Providence Deposit Corp. v. Jenison,* 485 A.2d 1242, 1244 (R.I.1984); *Abbey Medical/Abbey Rents, Inc. v. Mignacca,* 471 A.2d 189, 195 (R.I.1984).

This court and others have held that the party seeking punitive damages has the burden of producing " 'evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality, which for the good of society and warning to the individual, ought to be punished.' " *Sherman v. McDermott,* 114 R.I. 107, 109, 329 A.2d 195, 196 (1974). *See also Emery-Waterhouse Co. v. Rhode Island Hospital Trust National Bank,* 757 F.2d 399, 407 (1st Cir.1985); *Jenison,* 485 A.2d at 1244. This court has stated that for punitive damages to be awarded there must be a showing that the defendant acted with malice or in bad faith. *Morin v. Aetna Casualty and Surety Co.,* 478 A.2d 964, 967 (R.I.1984). Similarly, the United States District Court for the District of Rhode Island has stated that under Rhode Island law one must allege that the other party acted with the intent to cause harm. *See Wilson Auto Enterprises, Inc. v. Mobil Oil Corp.,* 778 F.Supp. 101, 107 (D.R.I.1991); *Carvalho v. Coletta,* 457 A.2d 614, 616 (R.I.1983).

[2][3] The standard in Rhode Island for imposing punitive damages is rigorous and will be satisfied only in instances wherein a defendant's conduct requires deterrence and punishment over and above that provided in an award of compensatory damages. *Davet v. Maccarone,* 973 F.2d 22, 27 (1st Cir.1992). An award of punitive damages is considered an extraordinary sanction and is disfavored in the law, but it will be permitted if awarded with great caution and within narrow limits. *D'Amato v. Rhode Island Hospital Trust National Bank,* 772 F.Supp. 1322, 1324 (D.R.I.1991).

[4][5] Whether a party seeking punitive damages has met the high standard imposed on such an award is a question of law for the trial justice. *Id.* at 1325;*Peckham v. Hirschfeld,* 570 A.2d 663, 668 (R.I.1990); *Morin,* 478 A.2d at 967;*Sherman,* 114 R.I. at 108, 329 A.2d at 196. Once a trial justice determines that there are adequate facts to support an award of punitive damages, then the question of whether and to what extent the party is entitled to punitive damages is in the discretion of the trier of fact. *Borden v. Paul Revere Life Insurance Co.,* 935 F.2d 370, 382 (1st Cir.1991); *Sarkisian v. The NewPaper, Inc.,* 512 A.2d 831, 836 (R.I.1986); *Morin,* 478 A.2d at 967;*Sherman,* 114 R.I. at 108-09, 329 A.2d at 196.

[6][7][8][9] The ultimate award of punitive damages as fixed by a jury, however, is not entirely insulated from further scrutiny by the trial justice. *Sarkisian,* 512 A.2d at 836. For instance, the trial justice may set aside a punitive-damage award if the award "clearly appears to be excessive, or to represent the passion and prejudice of the jury rather than their unbiased judgment." *Zarrella v. Robinson,* 460 A.2d 415, 418-19 (R.I.1983) (quoting *McFetters v. Cardone,* 47 R.I. 144, 146, 131 A. 385, 385 (1926)). If the trial justice determines that the punitive-damage award is excessive, he or she may order a new trial on damages alone unless the plaintiff agrees to a remittitur. *See Mazzaroppi v. Tocco,* 533 A.2d 203, 204 (R.I.1987). Additionally the trial justice may review this award as he or she would review an award for pain and suffering and thereby "disregard the jury's verdict on a motion for a new trial if the award 'shocks the conscience or clearly demonstrates that the jury * * * proceeded upon a clearly erroneous basis in arriving at its award.' " *Zarrella,* 460 A.2d at 418 (quoting *Wood v. Paolino,* 112 R.I. 753, 757, 315 A.2d 744, 746 (1974)). In no event, however, may a jury award be reviewed for inadequacy, nor may a trial justice review a jury's failure to award any punitive damages. *Dias v. Vieira,* 572 A.2d 877, 879 (R.I.1990).

As early as 1926 our predecessors on this court concluded that the financial ability of a defendant is always a matter of vital consideration in estimating the amount of punitive damages that should be awarded. ***319***McFetters v. Cardone,* 47 R.I. 144, 147, 131 A. 385, 385-86 (1926); *Hargraves v. Ballou,* 47 R.I. 186, 190, 131 A. 643, 646 (1926). The obvious rationale for permitting the trier of fact to hear evidence regarding a defendant's financial condition is to afford the jury or the trial justice a point of reference in assessing an amount of punitive damages that would adequately serve as a punishment. *Vollert v. Summa Corp.,* 389 F.Supp. 1348, 1351-52 (D.Haw.1975).

The difficulty in permitting a defendant's financial condition to be considered in assessing an award of punitive damages arises as early as the discovery stage of litigation. Just as plaintiffs in the case at bar have done, a party to an action in which punitive damages are sought will attempt to learn the extent of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the defendant's wealth through discovery whereas such information would be otherwise immaterial and irrelevant to the determination of the defendant's liability. However, this discovery request invades the traditionally private domain of one's personal finances and oftentimes inconveniently seeks disclosure of unnecessary specific details. *Gierman v. Toman,* 77 N.J.Super. 18, 23, 185 A.2d 241, 244 (1962). Particularly troublesome to defendants in this case and in other cases is the likelihood of a defendant's being prejudiced personally and professionally by the disclosure that he or she possesses considerable assets and of such evidence's tainting the jury's determination of compensatory damages. 1 J. Ghiardi & J. Kircher, *Punitive Damages Law and Practice,* § 5.36 at 48 (1985).

In light of the prejudicial nature of requiring a defendant to reveal his or her financial worth, both federal and state courts throughout the country have considered various means by which a defendant would be protected from an unwarranted invasion of privacy and harassment while allowing a plaintiff limited inquiry into that defendant's financial condition. *See generally* James McLoughlin, Annotation, *Necessity of Determination or Showing of Liability for Punitive Damages Before Discovery or Reception of Evidence of Defendant's Wealth,* 32 A.L.R. 4th 432 (1981). The circumstances in which some jurisdictions have required a defendant to disclose his or her financial condition range from a special verdict during the trial on the liability issue, which concludes that the defendant is liable also for punitive damages, to a showing by a plaintiff that a prima facie case exists for punitive damages, to a less rigid showing by a plaintiff that evidence exists that warrants the imposition of punitive damages. To the contrary, other courts have altogether refused to adopt such preliminary requirements and instead have found that a simple allegation and claim for punitive damages renders information relating to punitive damages as discoverable as information pertaining to liability.

The strictest and seemingly most burdensome procedure a plaintiff must follow before being permitted to inquire into a defendant's financial condition is that espoused by the Appellate Division of the New York Supreme Court. In *Rupert v. Sellers,* 48 A.D.2d 265, 272, 368 N.Y.S.2d 904, 912 (1975), the court stated that the plaintiff would not be permitted to inquire into the defendant's net worth until the jury rendered a special verdict that the plaintiff was entitled to such damages after a trial on the defendant's liability for compensatory damages. The court also required that the discovery be conducted expeditiously so that the evidence might be presented to the same jury that determined liability. *Id.* at 273, 368 N.Y.S.2d at 913. Although this bifurcation of the liability issue and punitive-damage issue ensures that the defendant's financial affairs will not be inadvertently presented during the trial on the liability issue, we believe that this procedure may unnecessarily lengthen the judicial process. We turn, then, to the next procedure.

In Colorado, New Jersey, and Wyoming, courts have determined that there must be prima facie proof of a defendant's liability for punitive damages before his or her financial information may be discovered by an opposing party. *See Leidholt v. District Court,* 619 P.2d 768 (Colo.1980); *Gierman v. Toman,* 77 N.J.Super. 18, 185 A.2d 241 (1962); *Campen v. Stone,* 635 P.2d 1121 (Wyo.1981). In *Campen,* the ***320** Wyoming Supreme Court set forth a procedure for the discovery and the subsequent presentation of evidence of a defendant's financial status. We are concerned at this juncture with the discovery issue only. The first two steps in *Campen* are as follows:
"1. The plaintiff may claim in his [or her] complaint a right to punitive damages and then seek pretrial discovery of a defendant's wealth.
"2. Defendant may move for a protective order requiring the plaintiff to make a prima facie showing to the trial court that a viable issue exists for punitive damages. Upon such a showing, the pretrial discovery would be allowed." *Campen,* 635 P.2d at 1132.

Because we are mindful of the rights of a defendant to be protected from undue harassment, embarrassment, and oppression, we find that a defendant's interests will be best served if we adopt a clear standard to be satisfied by a plaintiff before permitting him or her to inquire into prejudicial information.

[10][11] We believe that to require a plaintiff to make a prima facie showing that a viable issue exists for awarding punitive damages is a moderate and the most fair avenue for providing a plaintiff with the opportunity to discover relevant information while protecting a defendant's right to privacy. If we demand that a plaintiff demonstrate at the outset that the defendant acted with intent to cause harm, *see Wilson Auto Enterprises, Inc.,* 778 F.Supp. at 107,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with malice, or in bad faith, *see* Morin, 478 A.2d at 967, we ensure that a defendant's conduct is so wrongful and egregious as to warrant punishment and deterrence before ordering the defendant to disclose his or her personal financial information. Once the plaintiff establishes in an evidentiary hearing before the trial justice that a prima facie case for punitive damages exists, he or she is then afforded the opportunity to proceed with discovery into the defendant's financial worth to the extent necessary to address the issue of punitive damages, namely, the defendant's net worth or annual income, without posing an undue burden on the defendant.

We believe that determining whether a plaintiff has an adequate legal and factual basis to support a claim for punitive damages could not readily be determined on an objection to a motion to compel discovery. We are aware that the motion-calendar justice is not in a position to conduct extensive evidentiary hearings. Consequently, in the exercise of our plenary revisory powers, we shall fashion a remedy in order to create a procedure for such an evidentiary hearing. *See* *Cheetham v. Cheetham,* 121 R.I. 337, 342, 397 A.2d 1331, 1334 (1979); *Hyde v. Superior Court,* 28 R.I. 204, 212, 66 A. 292, 295 (1907).

[12][13][14][15][16][17][18][19][20] What then should be the remedy? If a defendant believes that a punitive-damage claim cannot be supported factually and legally, the defendant may move to strike the claim for punitive damages. This motion will not be in strict accord with Rule 12(f) of the Superior Court Rules of Civil Procedure, but instead it will have the appropriate expanded function to test by an evidentiary hearing the propriety of a claim for punitive damages. The filing of such a motion to strike will have the effect of deferring all discovery relating to the punitive-damage claim until a justice of the Superior Court has ruled upon said motion. The motion may be referred to a justice of the Superior Court on whatever calendar the presiding justice of that court determines appropriate. The plaintiff may present evidence in opposition to the motion sufficient to constitute a prima facia showing of his or her eligibility for punitive damages, which would be determined in accordance with our standards that the defendant acted so willfully, maliciously, or recklessly as to amount to conduct bordering on criminality. *Sherman,* 114 R.I. at 109, 329 A.2d at 196. The defendant may cross-examine witnesses and may introduce evidence that tends to negate the showing made by the plaintiff. At the conclusion of said hearing, the justice will determine in accordance with our holding in *Morin* whether the evidence presented as a matter of law and fact warrants submission to a ***321** trier of fact (either judge or jury) of the punitive-damage issue. If the justice finds that such a showing has not been made, he or she will strike the claim for punitive damages. If the justice finds that the showing is adequate as a matter of law to justify the submission of the issue of punitive damages to the trier of fact, he or she will deny the motion to strike. These determinations by a justice of the Superior Court may be reviewed in the discretion of this court on a petition for certiorari.

[21][22] If the motion to strike is denied, then the plaintiff may proceed to seek discovery relating to the wealth or ability of the defendant to respond to a punitive-damage award insofar as such evidence may be relevant to a determination of the amount adequate to deter the defendant from similar activities in the future. If the motion to strike is granted, then no discovery will be permitted on the issue of the defendant's ability to respond to punitive damages.

Now, with respect to defendants' contention in the instant case that plaintiffs have not established a case that would warrant the imposition of punitive damages, we find that arguments in support of this assertion may be presented to the trial justice in the course of a forthcoming evidentiary hearing on whether defendants acted with malice, with intent to cause harm, or in bad faith. We note that in the July 1992 hearing on plaintiffs' and defendants' motions, the trial justice indicated that he would not make any factual findings regarding punitive damages. Likewise we shall not make such factual findings at this juncture but instead leave the question to the determination of the trial justice presiding over the evidentiary hearing on whether a prima facie case exists for the imposition of punitive damages.

## II

In respect to the constitutional issue raised by defendants in their petition for certiorari, we decline to address this issue on its merits in the posture in which this case has been presented to us.

[23] We shall only observe that the protection given by settled Rhode Island decisional law to defendants significantly exceeds that afforded by Alabama courts, as approved by the Supreme Court in *Pacific*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). A result such as that obtained in *Haslip* could never have occurred under Rhode Island law. At the outset our rule would not permit a jury to award punitive damages on a *respondeat-superior* theory. *See* Lake Shore & Michigan Southern Railway Co. v. Prentice, 147 U.S. 101, 114-15, 13 S.Ct. 261, 265-66, 37 L.Ed. 97, 104 (1893) (quoting Mr. Justice Brayton in Hagan v. Providence & Worcester Railroad Co., 3 R.I. 88, 90-91 (1854)).

No further analysis of *Haslip* is necessary or desirable on this record. We shall, of course, entertain challenges to any award for punitive damages on common law or constitutional grounds when such issues are properly presented to us.

III

The last issue raised by defendants is whether the trial justice erred in ordering defendant Terrien to produce documents regarding his financial status when he had no active involvement in the alleged reckless acts of his partners. The defendants thus conclude that because punitive damages cannot be awarded vicariously in situations in which the principal has not actually participated in the wrongful act of the agent, Terrien's financial records are irrelevant and undiscoverable. The plaintiffs, on the other hand, argue that the Supreme Court's decision in *Haslip* governs this issue and that Terrien would be vicariously liable under the theory of *respondeat superior* for the punitive damages arising out of his partners' wrongful acts. Additionally plaintiffs suggest that the Rhode Island Uniform Partnership Act, G.L.1956 (1992 Reenactment) §§ 7-12-12 through 7-12-55, contemplates the imposition of vicarious liability for punitive damages. We disagree with plaintiffs.

Our rule on vicarious liability is not in any way governed by or even persuaded by ***322** the Supreme Court's determination in *Haslip.* All the Court held in *Haslip* was that the Alabama procedures did not shock the conscience of the majority sufficiently to constitute a denial of due process. This does not vary or expand the case law in this jurisdiction relating to the award of punitive damages.

However, since we are remanding this case to the Superior Court for an evidentiary hearing, we shall leave it to a justice of that court to determine whether the plaintiffs are able to make a prima facie showing of Terrien's involvement vel non in any act of wickedness, recklessness, or criminality.

For the foregoing reasons the defendants' petition for certiorari is granted. The order of the Superior Court is quashed, and the case may be remanded to the Superior Court for further proceedings in accordance with this opinion.

R.I.,1993.
Palmisano v. Toth
624 A.2d 314

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

West Reporter Image (PDF)

288 B.R. 884

Motions, Pleadings and Filings

United States District Court,
D. Kansas.
Perry W. QUENZER and Lori A. Quenzer, Plaintiffs,
v.
ADVANTA MORTGAGE CORPORATION USA, Defendant.
No. 02-4004-SAC.
Jan. 9, 2003.

Chapter 13 debtors brought adversary proceeding to rescind residential mortgage transaction based on lender's admitted violation of the Truth in Lending Act (TILA). The Bankruptcy Court, James A. Pusateri, J., 266 B.R. 760, granted debtors' motion for partial summary judgment on rescission claim, and then explained effects of rescission, 274 B.R. 899. Lender appealed. The District Court, Crow, Senior District Judge, held that, in adversary proceeding brought by Chapter 13 debtors to rescind residential mortgage transaction subject to requirements of the Truth in Lending Act (TILA), based on mortgagee's mistake in inadvertently using incorrect form in attempt to notify them of their cancellation rights, bankruptcy court had discretion to condition the voiding of mortgagee's security interest upon terms that were equitable and just in view of surrounding circumstances, and should have required debtors to return property received in connection with mortgage transaction as condition to rescission.
Reversed and remanded.

West Headnotes

[1] KeyCite Notes

51 Bankruptcy
 51XIX Review
  51XIX(B) Review of Bankruptcy Court
   51k3782 k. Conclusions of Law; De Novo Review. Most Cited Cases

On appeal in bankruptcy case, district court reviews bankruptcy court's conclusions of law de novo.

[2] KeyCite Notes

92B Consumer Credit
 92BII Federal Regulation
  92BII(A) In General
   92Bk36 k. Rescission Rights; Liens on Residences. Most Cited Cases

While debtor's tender back of consideration received is not mandated as prerequisite to exercise of right of rescission under the Truth in Lending Act (TILA), it may under certain circumstances be an appropriate condition attached thereto due to equitable nature of rescission. Truth in Lending Act, § 123(a, b), 15 U.S.C.A. § 1635(a, b).

[3] KeyCite Notes

92B Consumer Credit
 92BII Federal Regulation

92BII(A) In General
92Bk36 k. Rescission Rights; Liens on Residences. Most Cited Cases

Though borrower's right to rescind consumer credit transaction subject to the Truth in Lending Act (TILA) may be statutorily granted, it remains an equitable doctrine, which is subject to equitable considerations. Truth in Lending Act, § 123(a, b), 15 U.S.C.A. § 1635(a, b).

[4] KeyCite Notes

92B Consumer Credit
92BII Federal Regulation
92BII(A) In General
92Bk36 k. Rescission Rights; Liens on Residences. Most Cited Cases

Term "rescission," as it is used in the Truth in Lending Act (TILA), does not mean an annulment that is definitively accomplished by unilateral pronouncement, but rather a remedy that restores status quo ante Truth in Lending Act, § 123(a, b), 15 U.S.C.A. § 1635(a, b).

[5] KeyCite Notes

92B Consumer Credit
92BII Federal Regulation
92BII(A) In General
92Bk36 k. Rescission Rights; Liens on Residences. Most Cited Cases

Court may condition borrower's exercise of right to rescind consumer credit transaction under the Truth in Lending Act (TILA) on his return of property received in connection with transaction. Truth in Lending Act, § 123(a, b), 15 U.S.C.A. § 1635(a, b).

[6] KeyCite Notes

92B Consumer Credit
92BII Federal Regulation
92BII(C) Effect of Violation of Regulations
92Bk60 k. In General; Validity of Transactions. Most Cited Cases

In adversary proceeding brought by Chapter 13 debtors to rescind residential mortgage transaction subject to requirements of the Truth in Lending Act (TILA), based on mortgagee's mistake in inadvertently using incorrect form in attempt to notify them of their cancellation rights, bankruptcy court had discretion to condition the voiding of mortgagee's security interest upon terms that were equitable and just in view of surrounding circumstances, and should have required debtors to return property received in connection with mortgage transaction as condition to rescission; under circumstances of debtors' case, rendering debt unpaid and completely unsecured based on mortgagee's inadvertent error would be completely inequitable, and would exact a penalty entirely disproportionate to mortgagee's offense. Truth in Lending Act, § 123(a, b), 15 U.S.C.A. § 1635(a, b).

[7] KeyCite Notes

92B Consumer Credit
92BII Federal Regulation
92BII(C) Effect of Violation of Regulations
92Bk64 Actions for Violations

92Bk65 k. Time to Sue and Limitations. Most Cited Cases

One year statute of limitations on statutory damages claim under the Truth in Lending Act (TILA) did not affect debtors' right to raise damages claim defensively by way of recoupment after one-year statute of limitations had expired, but only to extent that debtors raised claim defensively by way of counterclaim or as objection to creditor's proof of claim. Truth in Lending Act, § 130(e), 15 U.S.C.A. § 1640(e).

[8] KeyCite Notes

241 Limitation of Actions
241I Statutes of Limitation
241I(B) Limitations Applicable to Particular Actions
241k41 k. Set-Offs, Counterclaims, and Cross-Actions. Most Cited Cases

As general matter, defendant's right to plead recoupment, a defense arising out of some feature of transaction on which plaintiff's action is grounded, survives expiration of period provided by statute of limitation that would otherwise bar recoupment claim as independent cause of action.

***885** Michael D. Doering, Doering & Associates, P.C., Kansas City, MO, for Advanta Mortgage Corp.

Frederick W. Schwinn, Topeka, KS, for Perry W. Quenzer.

MEMORANDUM AND ORDER

CROW, Senior District Judge.
This case is on appeal from two orders of the bankruptcy court relating to a home mortgage transaction.

## • Facts

The facts are few and undisputed. On June 7, 1997, the Quenzers received a mortgage loan in the principal amount of $69,600 from Advanta's predecessor in interest, The Mortgage Banc, Inc. At the closing of the mortgage loan transaction, Mortgage Banc provided the Quenzers with certain disclosures required under the Federal Truth in Lending Act (TILA).

As part of the disclosures provided in that transaction, Mortgage Banc inadvertently and erroneously gave the Quenzers a copy of the Notice of Right to Cancel form designed to inform borrowers of their rights in refinancing transactions, rather than a copy of the proper notice relating to an initial mortgage transaction. The parties agree that failing to provide the Quenzers with the proper notice constitutes a violation of the Truth in Lending Act (TILA), 15 U.S.C. § 1635 and 12 C.F.R. § 226.23(b)(2) ("Regulation Z"). The parties further agree that as a result of Mortgage Banc's failure to provide the proper form of notice, the Quenzers' right to rescind the mortgage transaction was extended from three days to three years.

Approximately two years thereafter, the Quenzers filed a chapter 13 bankruptcy petition. In August of 1999, a few days after filing their bankruptcy petition, they timely notified Advanta of their intent to rescind the mortgage transaction.[FN1] Approximately ***886** two months after having given such notice, the Quenzers filed an adversary complaint in their pending bankruptcy case, requesting a finding that the mortgage lien was void, by virtue of their rescission. The bankruptcy court agreed, issuing the orders giving rise to this appeal.

FN1. Advanta, as assignee of the subject transaction, is subject to the Quenzer's right of rescission pursuant to the TILA. See 15 U.S.C. § 1641(c).

First, the bankruptcy court found that Advanta's mortgage lien on the Quenzers' home immediately became void when the Quenzers gave notice to Advanta that they were exercising their right to rescind the mortgage transaction. *In re Quenzer,* 266 B.R. 760, 771 (Bankr.D.Kan.2001). The court further found that it had no authority to modify that effect of the statutory rescission by applying equitable principles.

The bankruptcy court then held that because the mortgage lien was void, Advanta became a mere unsecured creditor in an amount equal to the principal of the loan, less: 1) all closing costs of $1,956.76; 2) all subsequent payments the Quenzers made under the loan, totaling $19, 298.82; 3) statutory damages assessed for Advanta's failure to honor the Quenzers' valid rescission request, in the amount of $250; and 4) statutory damages assessed for The Mortgage Banc's disclosure violation, in the amount of $250. Accordingly, the court found that after set off, the debtors owed Advanta $48,344.42, and that the debtors could have the penalties (totaling $500) set off against Advanta's claim against them.

Advanta appeals these two decisions which alter not only the amount, but also the previously secured status of its claim against the Quenzers' bankruptcy estate, recognizing that as a mere unsecured creditor, it may be prevented from forcibly collecting on its claim by the effect of Kansas homestead exemption laws or prior judgments of other creditors.

[1] KC "On appeal from the bankruptcy court, the district court sits as an appellate court." *In re Barber,* 191 B.R. 879, 882 (D.Kan.1996). The parties agree that all issues present questions of law, as to which this court's scope of review is de novo. *See In re Villa West Associates,* 146 F.3d 798, 802 (10th Cir.1998).

**• Application of equitable principles**

Advanta's primary contention is that the bankruptcy court erred by not conditioning Advanta's duty to release the mortgage lien upon the Quenzers' prior tender of the original principal amount of the mortgage loan, less any tender obligations of Advanta. Advanta disputes the court's conclusion that it had no authority to do equity.

The relevant section of TILA provides:

**§ 1635 Right of rescission as to certain transactions**

(a) Disclosure of obligor's right to rescind

Except as otherwise provided in this section, in the case of any consumer credit transaction... in which a security interest...is or will be retained... in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction ... by notifying the creditor... of his intention to do so.

(b) Return of money or property following rescission

When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor...becomes void upon such rescission. Within 20 days after receipt of a notice of rescission, the creditor ***887** shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction.... Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take

possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it. **The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.**

15 U.S.C. § 1635(a) and (b) (bold added).

Advanta contends that the statute, by virtue of the language bolded above, imposes a duty on the bankruptcy court to apply equitable principles to the entirety of the rescission process, (Dk.11, p. 10) and to condition its obligation to release its mortgage on the Quenzer's prior tender of the principal amount of the mortgage loan. This would place the parties in the same positions they were in prior to the transaction, as is the common result, if not the goal, of traditional rescission. *See* *Garrison v. Berryman,* 225 Kan. 644, 646-647, 594 P.2d 159 (1979), quoting *Dreiling v. Home State Life Ins. Co.,* 213 Kan. 137, Syl. ¶ 4-6, 515 P.2d 757 (1973). Under this theory, in the event the Quenzers are unable to tender the principal amount of the mortgage loan, the mortgage would not be voided and Advanta's claim against the bankruptcy estate would remain secured.

The Quenzers claim that the statute prohibits the bankruptcy court from applying equity to alter the result of the statutory provisions, so that when they rescinded the mortgage transaction, Advanta's security interest was automatically voided per the statutory language, without any prior tender by Quenzers, as the bankruptcy court held. Under this approach, the statutory and regulatory language permitting the court to alter certain "procedures" is not so broad as to constitute a general grant of authority to do equity, or to permit the court to substitute its "sense of what is equitable for the remedy that Congress created." *Quenzer,* 266 B.R. at 771.

The Tenth Circuit has previously held that courts can alter TILA's statutory scheme because rescission is an equitable remedy. In *Rachbach v. Cogswell,* 547 F.2d 502, 505 (10th Cir.1976), the Tenth Circuit specifically considered whether the debtor was required to pay, or tender, the balance due on the note as a prerequisite to rescission. It held that under TILA, "the tender back of consideration received is not a prerequisite to rescission." *Id.* "Section 1635(a) requires only that the obligor exercise his right of rescission by notifying the creditor within the prescribed time limit of his intent to rescind." *Id.* It then found, however, based upon "an incomplete record," no abuse of discretion in the trial court's imposition of an equitable condition, *i.e.,* an award of interest on the unpaid note balance, upon the right of rescission.

*Rachbach* was based upon the court's inherent authority to do equity, rather than upon any express statutory language permitting the court to modify the procedures prescribed therein, as the last sentence of subsection (b), stating "[T]he procedures prescribed by this subsection shall apply except when otherwise ordered by a court," had not yet been added to the statute. *See* 15 U.S.C. § 1635(b) (1994). The court reasoned:

***888** Rachbach argues that the trial court erred in awarding interest on the unpaid note balance. Rescission is an equitable remedy. (citations omitted.) Section 1635(b) says that when an obligor exercises his right to rescind "he is not liable for any finance or other charge." This provision does not preclude a court from doing equity. In its denial of motions to amend findings and grant a new trial, the district court said: "(T)he provision of 15 U.S.C. § 1635(b) with respect to the disallowance of interest or finance charges after rescission is inapplicable to this case because the plaintiff has had the benefit of the use of the loan proceeds and * * * the payment of interest on those loan proceeds is an equitable condition to the right of rescission * * *."

*Rachbach,* 547 F.2d at 505. This holding was reached despite the statutory language, then as now, which states that upon rescission, the obligor "is not liable for any finance or other charge." Thus, the Tenth Circuit has imposed equitable considerations to modify the clear language of the statute, although not in the context of rescission procedure.

[2] [3] [4] [5] The analysis in *Rachbach* leads this court to conclude that although a debtor's tender back is not mandated as a prerequisite to rescission, it may be an appropriate condition attached thereto under certain circumstances because of the equitable nature that statutory remedy. Although the right to rescind may be statutorily granted, it remains an equitable doctrine subject to

equitable considerations. *Brown v. National Permanent Federal Savings and Loan Association,* 683 F.2d 444, 447 (D.C.Cir.1982). Within the meaning of this law, "rescission" does not mean an annulment that is definitively accomplished by unilateral pronouncement, but rather a remedy that restores the *status quo ante*. *Ray v. Citifinancial, Inc.,* 228 F.Supp.2d 664 (D.Md. Oct.28, 2002). Thus the court may condition rescission and the return of monies under the equitable remedy of 15 USCA § 1635(b) on the debtors' return of property received in connection with the transaction.

This interpretation is confirmed by TILA's legislative history, which clarifies that "the courts, at any time during the rescission process, may impose equitable conditions to insure that the consumer meets his obligations after the creditor has performed his obligations as required by the act." S.Rep. No. 368, 96th Cong., 2d Sess. 29 (1980), reprinted in 1980 U.S.C.C.A.N. 236, 265.

The court is not persuaded that statutory revisions to TILA or its regulations after *Rachbach* alter this result. The first sentence of subsection (b) states that "when an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission." The last sentence of subsection (b), added after *Rachbach* was decided, states that "the procedures prescribed by this subsection shall apply except when otherwise ordered by a court." The court finds that the debtor's act of notifying the creditor of rescission and the resultant voiding of the creditor's security interest in the first sentence of subsection (b) is one of the "procedures" which the last sentence in the subsection expressly permits the court to modify. *See* Black's Law Dictionary on Westlaw (Garner, Ed., 7th ed.1999), defining "procedure" as "1. A specific method or course of action."

The court reaches this conclusion despite its awareness that the current language of Regulation Z, added in 1981, does ***889** not expressly include the "automatic" voiding of the security interest upon rescission among those procedures it specifically authorizes a court to modify. *See Williams v. Homestake Mortgage Co.,* 968 F.2d 1137, 1141-42 (11th Cir.1992); *Regency Savings Bank v. Chavis,* 333 Ill.App.3d 865, 267 Ill.Dec. 504, 776 N.E.2d 876 (2 Dist.2002) (both rejecting argument that FRB Regulation Z means that the voiding of the creditor's security interest may not be conditioned on the consumer's tender because that technical reading of the regulation is not a realistic recognition of the full scope of the statutory scheme.)

Conditioning the avoidance of Advanta's mortgage on the return of its money by the Quenzers gives effect to the plain language of § 1635 without offending the policy underlying the rescission doctrine. This court cannot accept the proposition that strict enforcement of TILA justifies rendering a debt in the amount at issue here unpaid and completely unsecured, given the passage of time and other circumstances present. Even though the defendant violated TILA, automatically relegating its entire claim to unsecured status under these circumstances would be completely inequitable and would exact a penalty entirely disproportionate to its offense.

[6] Accordingly, the court holds that the bankruptcy court may impose conditions that run with the voiding of a creditor's security interest upon terms that would be equitable and just to the parties in view of all the surrounding circumstances, and that it should require the debtors' return of property received in connection with the transaction as a condition to rescission in this case. Because the bankruptcy court mistakenly believed that such modification was outside the scope of its authority, the court vacates the judgment of that court and remands the case for imposition of such conditions, including a potential assessment of interest on Advanta's claim from the time of the transaction until the Quenzers rescinded it.

**• Statute of Limitations**

[7] Advanta next contends that the Quenzer's claim for statutory damages FN2 is barred by the statute of limitations. Advanta asserts that the governing statute of limitations, 15 U.S.C. § 1640(e), provides a one year limitation for statutory damages in stating that "any action...may be brought...within one year from the date of the occurrence of the violation." *Id.* The mortgage loan

transaction was consummated on June 7, 1997, which the parties agree is the date of the occurrence of the violation. Because the Quenzer's adversary action was not brought until December 10, 1999, Advanta contends it is time barred.

> FN2. The bankruptcy court assessed statutory damages in the amount of $250 for Advanta's failure to honor the Quenzers' valid rescission request, and in the amount of $250 for The Mortgage Banc's disclosure violation, but stated that in the event Advanta saved its mortgage lien, it believed the "penalties should be fixed at $2000 each, for a total of $4000."

The Quenzers agree that they would "typically" be barred from recovering statutory damages by the one-year statute of limitations, but contend that their damages are permitted "as a matter of defense by recoupment," as provided by 15 U.S.C. § 1640(e). Because Advanta filed a Proof of Claim form in the Quenzer's bankruptcy action, seeking to collect its debt from them, Quenzers believe they may seek civil penalties as a matter of defense, without the bar of the one-year statute applicable to actions initiated by the debtor.

The relevant subsection provides:

***890** Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation. This subsection does not bar a person from asserting a violation of this subchapter in an action to collect the debt which was brought more than one year from the date of the occurrence of the violation as a matter of defense by recoupment or set-off in such action, except as otherwise provided by State law....

15 USC § 1640(e).

The bankruptcy court found that "Advanta has filed a proof of claim in the debtor's bankruptcy case, seeking to collect against its debt from the debtors and making applicable the second sentence of § 1640(e), which allows the debtors to seek the civil penalties as a matter of defense by recoupment or set-off." (Dk. 11, Appendix, Order Determining the Claim of Defendant, p. 9).

Advanta recognizes the plain language in the second sentence of this subsection, but contends that recoupment can be used only defensively, thus this language is inapplicable to cases such as this one in which a debtor hails the creditor into court, taking affirmative action. Advanta focuses upon the Quenzer's filing of their complaint seeking affirmative relief from the bankruptcy court, *i.e.,* a declaration that Advanta's lien is void and its debt unsecured.

[8] As a general matter a defendant's right to plead "recoupment," a " 'defense arising out of some feature of the transaction upon which the plaintiff's action is grounded,' " (citations omitted), survives the expiration of the period provided by a statute of limitation that would otherwise bar the recoupment claim as an independent cause of action. So long as the plaintiff's action is timely, *see ibid.,* a defendant may raise a claim in recoupment even if he could no longer bring it independently...

*Beach v. Ocwen Federal Bank,* 523 U.S. 410, 415, 118 S.Ct. 1408, 140 L.Ed.2d 566 (1998).

It appears to this court that the Quenzer's did not raise Advanta's TILA violation defensively as recoupment, as a counterclaim, or as an objection to Advanta's Proof of Claim, but instead affirmatively asserted it in their Complaint to Enforce Truth in Lending Rescission. Dk. 11, Appendix, Complaint, p. 5, ¶ 19, p. 6 ¶ e. If so, the Quenzer's claim for statutory damages would appear to be barred by the one-year statute of limitations. Because the bankruptcy court has greater expertise in construing its own pleadings, however, the court will not resolve this issue, but will remand it for further consideration by the bankruptcy court.

IT IS THEREFORE ORDERED that the decisions the bankruptcy court dated May 31, 2001, and December 7, 2001, are reversed and the case is remanded for further proceedings consistent with the

views expressed herein.

D.Kan.,2003.
Quenzer v. Advanta Mortg. Corp. USA
288 B.R. 884

Motions, Pleadings and Filings (Back to top)

• 5:02cv04004 (Docket) (Jan. 09, 2002)
END OF DOCUMENT

West Reporter Image (PDF)

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

C Ray v. Citifinancial, Inc.
D.Md.,2002.

United States District Court,D. Maryland.
Robert RAY
v.
CITIFINANCIAL, INC.
**No. CIV. JFM-02-2758.**

Oct. 28, 2002.

Order was entered by the United States Bankruptcy Court for the District of Maryland, authorizing Chapter 13 debtor and his nondebtor-spouse to rescind consumer credit transaction without tendering back to lender the full principal balance of loan. Lender appealed. The District Court, Motz, J., held that: (1) section of the Truth in Lending Act (TILA) dealing with borrower's right to rescind consumer credit transactions did not give borrower the right to definitively annul transaction by unilateral pronouncement, and did not preclude court from conditioning rescission upon borrower's tender to lender of the latter's "legal due"; but (2) court did not necessarily have to condition exercise of right of rescission under the TILA upon tender to lender of remaining principal balance of loan.

Reversed and remanded.
West Headnotes
**[1] Consumer Credit 92B 36**

92B Consumer Credit
92BII Federal Regulation
92BII(A) In General
92Bk36 k. Rescission Rights; Liens on Residences. Most Cited Cases
Section of the Truth in Lending Act (TILA) dealing with borrower's right to rescind consumer credit transactions did not give borrower the right to definitively annul transaction by unilateral pronouncement, and did not preclude court from conditioning rescission upon borrower's tender to lender of the latter's "legal due." Truth in Lending Act, § 125, 15 U.S.C.A. § 1635.

**[2] Cancellation of Instruments 69 1**

69 Cancellation of Instruments
69I Right of Action and Defenses
69k1 k. Nature and Scope of Remedy. Most Cited Cases
Word "rescission," in its legal sense, does not signify an annulment that is definitively accomplished by unilateral pronouncement, but is in nature of remedy restoring the status quo ante.

**[3] Contracts 95 266(1)**

95 Contracts
95IV Rescission and Abandonment
95k263 Conditions Precedent to Rescission
95k266 Restoration of Consideration or Benefit
95k266(1) k. In General. Most Cited Cases
If party has legal or equitable right to rescind transaction, he may do so, but only upon returning any benefit he has received.

**[4] Consumer Credit 92B 36**

92B Consumer Credit
92BII Federal Regulation
92BII(A) In General
92Bk36 k. Rescission Rights; Liens on Residences. Most Cited Cases
In providing borrowers with right to rescind consumer credit transactions subject to the Truth in Lending Act (TILA), Congress was using the word "rescission" in its legal sense, not to signify an annulment definitively accomplished by unilateral pronouncement, but as being in nature of remedy restoring the status quo ante. Truth in Lending Act, § 125(a, b), 15 U.S.C.A. § 1635(a, b).

**[5] Consumer Credit 92B 36**

92B Consumer Credit
92BII Federal Regulation
92BII(A) In General
92Bk36 k. Rescission Rights; Liens on Residences. Most Cited Cases
In authorizing Chapter 13 debtor and his spouse to rescind consumer credit transaction subject to the Truth in Lending Act (TILA), bankruptcy court did not necessarily have to condition exercise of right of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

rescission on tender to lender of remaining principal balance of loan, but could consider, based on fact that debtor was in bankruptcy and that interests of unsecured creditors were also implicated, or based on any excessive interest and points or unwanted insurance charges that debtor and wife had been required to pay, whether to allow rescission following the tender of less than full remaining principal balance. Truth in Lending Act, § 125(a, b), 15 U.S.C.A. § 1635(a, b).

***665** Scott C. Borison, Legg Law Firm LLC, Frederick, MD, for Robert Ray.
Richard L. Costella, Miles and Stckbridge PC, Baltimore, MD, for Citifinancial, Inc.

MEMORANDUM

MOTZ, District Judge.

This is an appeal by CitiFinancial, Inc., from an order of the Bankruptcy Court rescinding CitiFinancial's lien on the debtor's home without conditioning the rescission upon the debtor tendering to CitiFinancial its "legal due." I find that the Bankruptcy Court erred in its analysis of the legal issues in certain respects and that the errors led the court to an inadequate consideration of the factors that should have guided the exercise of its discretion in determining the relief to afford the debtor. I further find, however, that, contrary to the position advanced by CitiFinancial, the Bankruptcy Court does have authority under section 1635(b) of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1635(b), to order rescission of a lien without conditioning the rescission upon return to the creditor of the net balance due on the loan secured by the lien. Accordingly, I will reverse the Bankruptcy Court's order and remand the case to the Bankruptcy Court for further proceedings.

I.

On October 9, 2000, the debtor, Robert Ray, and his spouse, Rose Ray, borrowed $18,876.08 from CitiFinancial. The interest on the loan, which the Rays paid a five point fee to obtain, was 18.99% per year. The loan was secured by a second mortgage on the Rays' home. As part of the transaction, the Rays were required to pay a prepaid finance charge of $943.81; a credit life insurance premium of $2,350.15; an involuntary unemployment insurance ***666** premium of $1,225.80; and a recording/releasing fee of $175.00. The Rays obligated themselves to make 120 monthly payments of $352.24, a total of $42,268.80 over ten years.

On April 3, 2001, Mr. Ray filed for bankruptcy under Chapter 13. When CitiFinancial filed a secured claim in the amount of $16,938.09, Ray instituted a complaint alleging that CitiFinancial had violated TILA and the Home Ownership Equity Protection Act ("HOEPA") by failing to disclose three business days prior to the loan closing the requisite credit terms of the loan. After conducting a trial at which four witnesses testified, the Bankruptcy Court, crediting the Rays over the two witnesses presented by CitiFinancial, found in favor of Mr. Ray on his HOEPA claim.[FN1] He then awarded statutory damages in the amount of $3,775.24 (plus attorney fees) against CitiFinancial. Further, he ordered that CitiFinancial's lien on the Ray residence be rescinded without requiring Ray to tender to CitiFinancial the principal net balance due on the loan.

FN1. The Bankruptcy Court ruled against Ray on his TILA claim because he did not prove actual damages.

CitiFinancial has not appealed either the Bankruptcy Court's findings or the damages award. It has, however, appealed the order of rescission.

II.

A.

It is undisputed that section 1635 of TILA applies to a HOEPA claim. However, the parties have diametrically opposed views concerning the scope of a court's power to order rescission of a security interest under that section. Ray argues that the section precludes a court from conditioning rescission upon a debtor's return of the benefit he received under the loan transaction being rescinded. CitiFinancial, on the other hand, relying upon the Fourth Circuit's decision in *Powers v. Sims and Levin,* 542 F.2d 1216 (4th Cir.1976), contends that a court must condition rescission upon the return to the creditor of its "legal due," i.e., the amount loaned minus any appropriate offsets ordered by the court. In my judgment, neither of these views is correct.

I will begin my analysis with a recitation of the text of sections 1635(a) and 1635(b). However, it is difficult to glean from the statutory language itself the issues that divide the parties. Therefore, I recommend that any novitiate to TILA skip over the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

text of the statute on first reading and refer back to it as my opinion unfolds.

(a) **Disclosure of obligor's right to rescind.** Except as otherwise provided in this section, in the case of any consumer credit transaction ... in which a security interest ... is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor in accordance with regulations of the Board, of his intention to do so....

(b) **Return of money or property following rescission.** When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by ***667** operation of law, becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value.... If the creditor does not take possession of the property within 20 days after tender by obligor, ownership of the property vests in the obligor without obligation on his part to pay for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.

15 U.S.C. §§ 1635(a)-(b).

B.

[1] Ray takes the position that under section 1635(a) and the first sentence of section 1635(b) "rescission" is complete as soon as a consumer gives timely notice to the lender that he does not want to consummate the transaction. As noted by he Bankruptcy Court, this reading of the statute is dependent upon the assumption that when Congress enacted section 1635, it was ascribing what might be characterized as the "dictionary meaning" to "rescission," i.e., "to revoke, annul, or to repeal" or "to invalidate (an act, measure, etc.) by a later action or higher authority." *Random House's Webster's Dictionary* (2000). If this assumption is correct and rescission simply is the giving of notice of annulment, it follows that after the notice is given, nothing remains for a court to condition rescission upon, even if the consumer has already received a benefit under the annulled transaction. In that event, the only remedy available to the creditor is to bring an action at law to recover the money or other property it had delivered to the consumer.

Some courts have adopted this view. *See, e.g., In re Quenzer,* 266 B.R. 760, 767-68 (Bankr.Kans.2001); *In re Myers,* 175 B.R. 122, 128-29 (Bankr.Mass.1994); *In re Celona,* 98 B.R. 705, 707-08 (Bankr.E.D.Pa.1989); *In re Chancy,* 33 B.R. 355, 356-57 (Bankr.N.D.Okla.1983); *In re Piercy,* 18 B.R. 1004, 1007 (Bankr.W.D.Ky.1982); *see also Williams v. Gelt Financial Corp.,* 237 B.R. 590, 598-99 (E.D.Pa.1999). Others, including the Fourth Circuit, have rejected it. *See Powers,* 542 F.2d at 1222;*see also, e.g., Williams v. Homestake Mortgage Co.,* 968 F.2d 1137, 1140-42 (11th Cir.1992); *In re Wepsic,* 231 B.R. 768 (Bankr.S.D.Cal.1998). The Fourth Circuit precedent, of course, is governing here. However, since the Bankruptcy Court's opinion questions *Powers'* continuing authority, I will briefly note the reasons I believe the view espoused by Ray and the court decisions upon which he relies is too narrow and does not provide sufficient breadth for fulfillment of Congressional intent.

[2][3][4] Within the meaning of the law, "rescission" does not mean an annulment that is definitively accomplished by unilateral pronouncement. Rather, it contemplates a remedy that restores the *status quo ante.* If a party has a legal or equitable right to annul a transaction, he may do so, but only upon returning any benefit he has received. *See, e.g., Washington Homes, Inc. v. Interstate Land Dev. Co., Inc.,* 281 Md. 712, 382 A.2d 555, 563 (1978); *Lazorcak v. Feuerstein,* 273 Md. 69, 327 A.2d 477, 481-82 (1974); ***668***Funger et al. v. Mayor and Council of Town of Somerset et al.,* 244 Md. 141, 223 A.2d 168, 173 (1966) (dicta); *Norton v. Young,* 3 Me. 30 (1824); *Conner v. Henderson,* 15 Mass. 319 (1818). It is clear to me that it is in that sense that Congress used "rescission" when enacting TILA.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Section 1635(a) and the first sentence of section 1635(b), upon which Ray relies, must be read in conjunction with the second, third, and fourth sentences of section 1635(b). Those three sentences modify conventional rescission doctrine (that contemplates a simultaneous restoration of the *status quo ante)* by requiring a creditor to take certain actions before becoming entitled to a tender from the debtor. However, if Congress had not contemplated that a court has the power to condition annulment of the transaction upon a debtor's return of that which he has received, its enactment of the sequencing provisions of section 1635(b) would have been nonsensical. Why should Congress have established a procedure for restoring the *status quo ante* if a debtor could avoid the obligations the procedure imposes upon him simply by asserting that his notice of rescission under section 1635(a) voided the creditor's security interest and eviscerated any rights that it might have other than as an unsecured creditor?

Surely, Congress's establishment in the second, third, and fourth sentences of section 1635(b) of a procedure for restoring the *status quo ante* was not intended to be an empty gesture. Just as surely, Congress did not intend that if faced with a debtor's refusal to return the benefit he had received in defiance of the statutory mandate, a court of equity would be powerless to grant an effective remedy. Since these are the implications of Ray's interpretation of the language of section 1635(a) and the first sentence of section 1635(b), his interpretation must fail.

III.

A.

[5] Having concluded that section 1635 does not preclude a court from conditioning rescission upon a debtor's tender to the creditor of the latter's "legal due," I must now consider whether section 1635 requires such a tender. Citing *Powers v. Sims and Levin, supra,* CitiFinancial argues that this question must be answered in the affirmative.

In *Powers* the borrowers made a loan for certain home improvements and to pay off existing debts. After giving timely notice of rescission, the borrowers declared that they would return the portion of the loan proceeds that was to be used for home improvements but not the portion used to pay off existing debts. The Fourth Circuit ruled that in light of that declaration, the borrowers were not entitled to rescind the transaction and void the security interest the creditor had obtained on their property. According to the Fourth Circuit, "surely the Congress did not intend to require a lender to relinquish its security interest when it is now known that the borrowers did not intend and were not prepared to tender restitution of the funds expended by the lender in discharging the prior obligations of the borrowers." 542 F.2d. at 1221. Thus, the court held "that when rescission is attempted under circumstances which would deprive the lender of its legal due, the attempted rescission will not be judicially enforced unless it is so conditioned that the lender will be assured of receiving its legal due." *Id.* at 1222;*see also Abel v. Knickerbocker Realty Co.,* 846 F.Supp. 445, 450 (D.Md.1994) ("[T]he weight of authority-and the apparent rule in this Circuit-holds that the Court should condition the obligor's right to rescind upon its tender to the lender of the remaining principal.").

B.

In its opinion the Bankruptcy Court held that "the *Powers* direction that a TILA rescission cannot be judicially enforced in the absence of returning the legal due to the lender has been rendered permissive and no longer mandatory." In support of this holding the court cited two factors: the enactment of HOEPA and the Federal Reserve Board's changes to Regulation Z.

I do not find this reasoning to be persuasive. The Bankruptcy Court was correct in noting that HOEPA provides harsher penalties for statutory violations than does TILA. However, these enhanced penalties are for statutory damages only. *See*15 U.S.C. § 1640(a)(4). Nothing in HOEPA suggests that it is intended to diminish a creditor's right to tender of its legal due under section 1634(b).

Likewise, the only possibly relevant amendment to Regulation Z promulgated since the *Powers* decision was the addition of subsection (d)(4) to 12 C.F.R. § 226.23. That subsection was added after Congress amended section 15 U.S.C. § 1635(b) to add the last sentence reading, "The procedures prescribed by this subsection shall apply except when otherwise ordered by a court." FN2 Implementing this statutory change, the addition made in new subsection (d)(4) to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

regulatory provision provides that, "The procedures outlined in paragraphs (d)(2) and (3) of this section may be modified by court order." One court has found it to be significant that subsection (d)(4) does not encompass subsection (d)(1), relating to the voiding of a security interest "when a consumer rescinds a transaction." *See* In re Quenzer, 266 B.R. at 764-70. According to the reasoning in that case, subsection (d)(4)'s reference only to subsection (d)(2) and (d)(3) implies that a court does not have the power to condition a rescission upon the return to the creditor of its legal due. However, the substance of subsection (d)(1) itself was the same when the Fourth Circuit decided *Powers,* and there is no reason to suspect that the addition of the last sentence to 15 U.S.C. § 1635(b) and of subsection (d)(4) to 12 C.F.R. § 226.23-both of which simply make express the power to condition rescission that the *Powers* court found to be implied-would lead the Fourth Circuit to conclude the *Powers* holding has now become "permissive and no longer mandatory."

FN2. This provision was added for the apparent purpose of codifying the holding in *Powers* and similar cases, *see, e.g., Brown v. National Perm. Fed. Sav. & Loan Ass'n,* 683 F.2d 444, 447-49 (D.C.Cir.1982); *Williams v. Homestake Mortgage Co.* 968 F.2d 1137, 1140 (11th Cir.1992), permitting a court to condition the voiding of a security interest upon the debtor's tender to the creditor its legal due. *See*S.Rep. No. 96-368, 96th Cong., 1st Sess. 29 (1979), *reprinted in,* 1980 U.S.C.C.A.N. 236, 264-65 (emphasis added); *see also* In re Lynch, 170 B.R. 26, 29-30 (Bankr.D.N.H.1994).

C.

Although I find the Bankruptcy Court's reasoning to have been faulty, I do not believe this ends the inquiry.

Read literally, the holding in *Powers* would prevent the Bankruptcy Court from voiding CitiFinancial's security interest in the Rays' home without conditioning that action upon the Rays' tendering to CitiFinancial the net principal balance due. However, sound application of the principles of *stare decisis* involves contextual analysis, and I am persuaded the Fourth Circuit would perceive the circumstances of this case to be sufficiently different from those presented in *Powers* to justify the Bankruptcy Court's exercise of its discretionary authority to condition the voiding of CitiFinancial's lien on something less than a tender to CitiFinancial of the net principal balance due.

***670** There are at least three respects in which this case is distinguishable from *Powers.* First, in *Powers* the only competing equities were between the creditor and the debtor, who sought to obtain the benefit of the bargain without giving due consideration in return. In contrast, in this case the interests of third parties, unsecured creditors of Ray, may present another set of competing equities. It is undisputed that if CitiFinancial's security interest is not voided, the monthly payments of $352.24 that Ray will have to make to CitiFinancial will prevent him from making the monthly payments of $200.00 he is scheduled to make to unsecured creditors under his proposed Chapter 13 plan (that has been approved by the Bankruptcy Court). Although the record is not presently clear on the point, it appears that although part of the proceeds of the unlawful loan CitiFinancial made to Ray in October, 2000 were used to pay off other creditors, CitiFinancial also improved its own position vis-a-vis other creditors by obtaining a more secure interest than it previously had on debts Ray owed to it. If that is so, the Bankruptcy Court might wish to consider conditioning rescission of CitiFinancial's lien not upon a tender of all of the net principal balance due (minus statutory damages and perhaps attorney fees) FN3 but, instead, the net principal balance on "new" money that CitiFinancial lent as part of the October 2000 transaction.

FN3. I add the word "perhaps" before "attorney fees" because an issue developed during oral argument on appeal that the parties and the court might wish to consider on remand. In its earlier opinion the Bankruptcy Court, after approving the attorney fees requested by Ray, directed that the amount of the fees be deducted as an offset from the remaining net balance due from Ray to CitiFinancial. That may be the correct ruling. However, it has the practical effect of converting Ray's attorney into an unsecured creditor or, at best, giving him a priority administrative claim. Whether or not that is the result intended by the fee-shifting provisions of TILA may be an issue that should be explored.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Second, the Bankruptcy Court found that in addition to not providing Ray with the disclosures required by TILA and HOEPA, CitiFinancial also imposed unwanted and unneeded insurance charges upon the Rays as part of the loan transaction. Although this did not constitute a statutory violation for which the Rays were entitled to damages, in exercising its equitable power to fashion appropriate relief on remand, the Bankruptcy Court might want to consider deducting any of these insurance charges (and interest paid thereon) from the remaining principal balance that should be tendered to CitiFinancial.

Third, in fashioning appropriate relief, the Bankruptcy Court might also wish to consider any excessive interest and points it finds the Rays to have paid in connection with the unlawful loan.

In summary, I find that a court does have the authority to condition rescission of a security interest upon the debtor tendering to the creditor its legal due. Further, I find that *Powers* is still binding precedent and must be considered by a court in determining whether and to what extent it may order the rescission of a security interest without requiring tender to the creditor of its legal due. At the same time, I find that *Powers* is factually distinguishable from the present case and does not mandate that the Bankruptcy Court require Ray to tender the full amount of the net principal balance due as a condition to the rescission of CitiFinancial's loan. Rather, the Bankruptcy Court, while giving proper deference to the holding in *Powers* that a debtor may not receive a windfall at the creditor's expense, has discretionary authority to reduce (and, if it finds the circumstances warrant, eliminate)***671** the creditor's security interest to the extent that equitable considerations so dictate.

A separate order is being entered herewith.

ORDER

For the reasons stated in the accompanying memorandum, it is, this 28th day of October 2002

ORDERED

1. The order entered by the Bankruptcy Court on July 22, 2002 rescinding the loan transaction between the parties without conditioning rescission on the tender of the remaining loan proceeds is reversed; and

2. This case is remanded to the Bankruptcy Court for further proceedings.

D.Md.,2002.
Ray v. Citifinancial, Inc.
228 F.Supp.2d 664

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

West Reporter Image (PDF)

114 R.I. 107, 329 A.2d 195

Supreme Court of Rhode Island.
Morris Edward SHERMAN
v.
Donald F. McDERMOTT.
No. 1944-Appeal.
Dec. 13, 1974.

Civil action for assault and battery and false imprisonment. On remand, 235 A.2d 881, the Superior Court, Providence and Bristol Counties, Weisberger, P.J., entered default judgment against defendant policeman and entered judgment for plaintiff in amount of $200 for compensatory damages but denied plaintiff's request for punitive damages, and plaintiff appealed. The Supreme Court, Doris, J., held that plaintiff who was arrested and severely beaten by defendant while being held by two other policemen was entitled to recover punitive damages; and that proof that policeman was financially capable of paying such damages was not a condition precedent to an award of punitive damages. Reversed and remitted with direction.

West Headnotes

[1] KeyCite Notes

30 Appeal and Error
30XVI Review
30XVI(I) Questions of Fact, Verdicts, and Findings
30XVI(I)3 Findings of Court
30k1008 Conclusiveness in General
30k1008.1 In General
30k1008.1(8) Particular Cases and Questions
30k1008.1(13) k. Negligence and Torts in General. Most Cited Cases

Where testimony in civil action for assault and battery and false imprisonment was uncontradicted and was cited as basis for trial court's judgment in favor of plaintiff, appellate court would accept testimony as substantially accurate recollection of facts of case.

[2] KeyCite Notes

115 Damages
115X Proceedings for Assessment
115k208 Questions for Jury
115k208(8) k. Exemplary Damages. Most Cited Cases

Whether facts in case are adequate to support an award of punitive damages is a question of law for court to decide.

[3] KeyCite Notes

115 Damages
115X Proceedings for Assessment
115k208 Questions for Jury

115k208(8) k. Exemplary Damages. Most Cited Cases

Whether plaintiff is entitled to punitive damages once court has determined case to be a proper one for such an award is left to discretion of trier of fact.

[4] KeyCite Notes

37 Assault and Battery
 37I Civil Liability
 37I(B) Actions
 37k36 Damages
 37k39 k. Exemplary. Most Cited Cases

168 False Imprisonment KeyCite Notes
 168I Civil Liability
 168I(B) Actions
 168k32 Damages
 168k35 k. Exemplary. Most Cited Cases

Assault and battery and false imprisonment are torts that will support an award of punitive damages.

[5] KeyCite Notes

37 Assault and Battery
 37I Civil Liability
 37I(B) Actions
 37k36 Damages
 37k39 k. Exemplary. Most Cited Cases

168 False Imprisonment KeyCite Notes
 168I Civil Liability
 168I(B) Actions
 168k32 Damages
 168k35 k. Exemplary. Most Cited Cases

Plaintiff who was arrested by defendant policeman, who was held by two other policemen and severely beaten by defendant about face and head with a club, who did not provoke the attack and who spent eight hours in a cell at police station before being released on bail was entitled to recover punitive damages from policemen in civil action for assault and battery and false imprisonment.

[6] KeyCite Notes

37 Assault and Battery
 37I Civil Liability
 37I(B) Actions
 37k36 Damages
 37k39 k. Exemplary. Most Cited Cases

168 False Imprisonment KeyCite Notes

168I Civil Liability
168I(B) Actions
168k32 Damages
168k35 k. Exemplary. Most Cited Cases

Proof that policeman who administered severe beating to arrestee was financially capable of paying punitive damages to arrestee who brought civil action for assault and battery and false imprisonment was not a condition precedent to an award of punitive damages.

****196 *110*** Berberian & Tanenbaum, Aram K. Berberian, Cranston, for plaintiff.

Louis A. Mascia, City Sol., Steven S. Saber, Asst. City Sol., Providence, for defendant.

OPINION

****107*** DORIS, Justice.
This is a civil action for assault and battery and false imprisonment in which a justice of the Superior Court entered a default judgment against the defendant in the amount of $50. In an action brought by the defendant pursuant to G.L.1956 (1969 Reenactment) s 9- ****108*** 21-4,[FN1] this court vacated the default judgment, and the case was remanded to the Superior Court for trial on the merits. Petition of Donald F. McDermott, 103 R.I. 182, 235 A.2d 881 (1967) .

FN1. General Laws 1956 (1969 Reenactment) s 9-21-4 has been repealed by P.L.1972, ch. 169, s 7.

When the case was reached for trial in Superior Court, defendant again failed to answer, and on plaintiff's motion, was called and defaulted by order or the Superior Court. The plaintiff then moved for assessment of damages pursuant to s 9-20-2, and the case was heard before a Superior Court justice sitting without a jury. The plaintiff's request for punitive damages was denied, and judgment for plaintiff was entered in the amount of $200 for compensatory damages. From this judgment, plaintiff now appeals.

At the hearing for assessment of damages, plaintiff testified that he was arrested by defendant, an officer in the Providence Police Department, that while being held by two other policemen, he was severely beaten by defendant about the legs and head with a club, and that he spent 8 hours in a cell at the Providence police station before being released on bail.

[1] This testimony was uncontradicted, and, far from being rejected by the Superior Court justice, was cited as the basis for the judgment in favor of plaintiff. We may, therefore, accept this testimony as a substantially accurate recollection of the facts of the case. Sweet v. Sweet, 100 R.I. 231, 214 A.2d 191 (1965) ; Jackowitz v. Deslauriers, 91 R.I. 269, 162 A.2d 528 (1960) .

[2] [3] Whether these facts are adequate to support an award of punitive damages is a question of law for the court to decide. Kenyon v. Cameron, 17 R.I. 122, 125, 20 A. 233, 234 (1890) . Whether plaintiff is entitled to punitive damages, ****109*** once the court has determined the case to be a proper one for such an award, is left to the discretion of the trier of fact. Kenyon v. Cameron, supra at 125, 20 A. at 234.

The Superior Court justice held that the evidence submitted was insufficient to make out a proper case for punitive damages on which he might exercise his discretion. This court has held that punitive damages may be assessed '* * * upon evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amounted to criminality, which for the good of society and warning to

the individual, ought to be punished." Adams v. Lorraine Mfg. Co., 29 R.I. 333, 338, 71 A. 180, 182 (1908), quoting Hagan v. Providence & Worcester R.R., 31 R.I. 88 (1854) . Such 'willfulness, recklessness or wickedness' has been held to be found in torts involving maliciousness, wantonness ****197*** or willfulness. Worthington v. Shewcov, 89 R.I. 169, 152 A.2d 91 (1959) ; Hargraves v. Ballou, 47 R.I. 186, 131 A. 643 (1926) .

[4] [5] It is clear that assault and battery and false imprisonment are such torts and will support an award of punitive damages. Martin v. Estrella, 107 R.I. 247, 266 A.2d 41 (1970) ; Parrillo v. DeLibero, 82 R.I. 207, 106 A.2d 732 (1954) ; Wilmot v. Bartlett, 37 R.I. 568, 94 A. 427 (1915) ; Hickey v. Booth, 29 R.I. 466, 72 A. 529 (1909) ; Smith v. Macomber, 28 R.I. 248, 66 A. 570 (1907) . In the instant situation, where not only was there no evidence of any provocation for defendant's attack, but also plaintiff was held helpless while a severe beating was administered by one sworn to uphold the law, there is, in our opinion, sufficient evidence of maliciousness, wantonness and willfulness to support an award of punitive damages.

[6] The Superior Court justice also held there was an insufficient showing of defendant's financial capacity for punitive damages to be added. In Norel v. Grochowski, 51 R.I. 376, 155 A. 357 (1931) , this court held that the financial ability of the defendant to respond is relevant to the issue of the amount of punitive damages to be awarded, and in that case used this factor to reduce the plaintiff's award by one-half. The case did not hold that proof of ability to pay the sum requested was a condition precedent to the court's holding that the case was a proper one for punitive damages, but only that on defendant's representation of an inability to pay, the court would reduce the award accordingly.

We hold, therefore, that the Superior Court justice erred in finding that there was insufficient evidence to warrant an exercise of his discretion as to whether punitive damages should have been awarded.

The appeal of the plaintiff is sustained, the judgment appealed from is reversed as to the issue of punitive damages, and the case is remitted to the Superior Court with direction to consider in its discretion plaintiff's request for punitive damages.

R.I. 1974.
Sherman v. McDermott,
114 R.I. 107, 329 A.2d 195

END OF DOCUMENT

West Reporter Image (PDF)

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

West Reporter Image (PDF)

99 B.R. 892

United States Bankruptcy Court,
C.D. Illinois.
In re Larry STONEKING and Sharon Stoneking, Debtors.
Larry STONEKING, Sharon Stoneking, and Richard E. Barber, Chapter 7 Trustee for Larry Stoneking and Sharon Stoneking, Plaintiffs,
v.
USA FINANCIAL SERVICES, INC., Defendant.
Bankruptcy No. 87-81970.
Adv. No. 88-8247.
May 10, 1989.

Chapter 7 debtors filed adversary complaint against lender, alleging that truth-in-lending disclosure statement provided with respect to security interest violated Truth-in-Lending Act and Truth-in-Lending Regulation Z. The Bankruptcy Court, William V. Altenberger, J., held that: (1) security agreement granted broader interest than that disclosed in disclosure statement, and Truth-in-Lending Regulation Z was accordingly violated; (2) bona fide error defense provided by Truth-in-Lending Act was not available as that defense could not be maintained by creditor who failed to accurately describe security interest; and (3) use of the challenged language could not be justified to avoid violating Federal Trade Commission's credit practices rule that prohibits nonpurchase money security interest in household goods as defined within rule.
Judgment for debtors.

West Headnotes

[1] KeyCite Notes

92B Consumer Credit
 92BII Federal Regulation
  92BII(B) Disclosure Requirements
   92Bk56 k. Security Interests; Confession of Judgment Clauses. Most Cited Cases

Security agreement which was checked to indicate that security interest included consumer goods located at borrower's stated address and to reference Schedule A granted broader security interest than that disclosed in truth-in-lending disclosure statement which was checked to indicate security interest was being given in specifically listed items, and Truth-in-Lending Regulation Z requirement for disclosure of security interest was accordingly violated. Truth in Lending Regulations, Regulation Z, § 226.18(m), 15 U.S.C.A. foll. § 1700.

[2] KeyCite Notes

92B Consumer Credit
 92BII Federal Regulation
  92BII(C) Effect of Violation of Regulations
   92Bk61 Civil Liabilities and Penalties for Violations
    92Bk62 k. Unintentional Violations and Bona Fide Errors. Most Cited Cases

Bona fide error defense provided by Truth-in-Lending Act was not available to lender which failed to accurately describe security interest; the defense pertains to clerical errors such as those occurring in billing or in making mathematical calculations. Truth in Lending Act, § 130(c), 15 U.S.C.A. § 1640(c).

[3] KeyCite Notes

92B Consumer Credit
92BII Federal Regulation
92BII(B) Disclosure Requirements
92Bk56 k. Security Interests; Confession of Judgment Clauses. Most Cited Cases

Failure of security agreement disclosure of security interest to track with truth-in-lending disclosure statement could not be justified on theory that questioned language in security agreement was used by lender to avoid violating Federal Trade Commission's credit practices rule that prohibits nonpurchase money security interest in household goods as defined by rule. Truth in Lending Act, § 226.18(m), 15 U.S.C.A. foll. § 1700.

***893** Barry M. Barash, Galesburg, Ill., for debtors.

Richard E. Barber, Galesburg, Ill., Trustee.

Kevin D. Schneider, Peoria, Ill., for defendant.

OPINION

WILLIAM V. ALTENBERGER, Bankruptcy Judge.
On March 27, 1987, the Debtors borrowed $2,988.37 from the Defendant. The security agreement portion of the Note provided as follows:

SECURITY AGREEMENT

To secure the payment of the above described loan to the undersigned, Debtor(s) grant(s) a security interest to the Secured Party in the personal property described below, or in an Appendix A listing attached thereto. This Security Agreement will secure future advances, and shall include property of the same type as the below-described items acquired by the Borrower(s) within 10 days from the date hereof, or in the event of future advances, all such items acquired by Borrower(s) from the date hereof to a date which is 10 days from the date of any future advances.

□ This loan is secured by a mortgage(s) on real estate of even date herewith (or ______).

[/] Consumer goods located at Borrower's above address. This Security Agreement will include any specific items which may be listed below.

[/] See Schedule A

□ Motor Vehicle

[/] Other (describe) wage assignment and all accessions to and proceeds from the described collateral.

The Truth-in-Lending Disclosure Statement provided in part as follows:

*Security*

You are giving a security interest in:

□ The goods or property being purchased

□ Motor vehicle

[/] Your wage assignment, tent, weight set, golf clubs, stereo, RCA T.V. Quasar VCR, guitar, hand tools, lawn mower,

Real estate located at none

The Debtors filed a Chapter 7 proceeding in bankruptcy and then filed an adversary complaint against the defendant alleging the Disclosure Statement violated the Truth-in-Lending Act, specifically, Section 128(a)(9), 15 U.S.C. Section 1638(a)(9), and the Truth-in-Lending Regulations, Regulation Z, specifically Section 226.18(m), and Section 226.17(a)(1). FN1 The Debtors' specific charge is that the Security Agreement gives the defendant a broad right to claim a security interest in consumer goods located at the Debtors' residence, while the Disclosure Statement only reveals a limited security interest in specific items. The ***894** Debtors contend this documentation gives rise to a twofold violation of Truth-in-Lending. First, that Section 226.18(m) has been violated because it requires disclosure of the security interest by item or type, and the disclosure of the security interest is limited to specific items and does not track when compared to the broad grant of security found in the Security Agreement. Second, the Disclosure Statement is not clear and conspicuous as required by Section 226.17(a).

FN1. The Truth-in-Lending Regulations, Regulation Z, can be found at 12 CFR, Section 226.18, 17(a); 15 USCA, following Section 1700.

[1] KC The defendant contends first, that the language "Consumer goods located at Borrower's above address" is not intended to create a security interest in all the Debtors' consumer goods, but was used in compliance with the mandates of Truth-in-Lending and that the language was restricted and limited by the language immediately following it, i.e. "This Security Agreement will include any specific items which may be listed below" and the box situated below that statement which was checked and contained the language, "See Schedule A", and Schedule A and the Federal disclosure Statement track one another identically.

Section 128(a)(9) of the Truth-in-Lending Act; 15 U.S.C. Section 1638(a)(9) provides as follows:

For each consumer credit transaction other than an open end credit plan, the creditor shall disclose each of the following items, to the extent applicable: ...

(9) where the credit is secured, a statement that a security interest has been taken in ... (B) property not purchased as part of the credit transaction identified by item or type....

Section 226.18 of Regulation Z provides in part as follows:

For each transaction, the creditor shall disclose the following information as applicable:

* * *

(m) *Security Interest.* The fact that the creditor has or will acquire a security interest in the property purchased as part of the transaction or in other property identified by item or type.

The tracking issue presented in this case has been ruled upon by the Seventh Circuit Court of Appeals, the District Court for the Central District of Illinois, and this Court, in a variety of factual situations. In all these cases, these courts have required the Disclosure Statement to track the security interest granted by the security agreement. *Bulger v. Thorp Credit, Inc., of Illinois,* 609 F.2d 1255 (7th Cir.1979); *Teel v. Thorp Credit, Inc., of Illinois,* 609 F.2d 1268 (7th Cir.1979); *In re Peacock, Richard E. Barber, Trustee, v. USA Financial Services, Inc., f/k/a Heights Finance Corporation,* 101 B.R. 22 (C.D.Ill.1989); *Doubet v. USA Financial Services, Inc., f/k/a Heights Finance*

Corporation, 714 F.Supp. 980, 985-86 (C.D.Ill.1989) . . In *Doubet* the District Court stated:

Comment 18(m)-4 of the official staff commentary under Regulation Z provides that an after-acquired property clause is not a security interest to be disclosed under Section 226.18(m), but this does not end the Court's analysis. The language from the Note and Security Agreement which was checked by the creditor reads: "Consumer goods *now owned* or hereafter acquired within 10 days of the date of this loan ..." (emphasis added). Giving meaning to all of the words used in that phrase, the Court finds that this language is not an after-acquired property clause; even though it does indicate that a security interest would be taken in after-acquired property, the language also makes clear that the security interest extends to consumer goods *now owned.* Only a very strained interpretation of this provision could result in the conclusion that this was nothing more than an after-acquired property clause, and the Court finds that this provision grants a security interest in the Plaintiffs' consumer goods which is much broader than that described in the Federal Disclosure Statement.

The facts of the case presently before this Court are similar to those in *Peacock,* in that the security agreement grants a broader security interest than that disclosed in the Disclosure Statement.

***895** The Defendant argues that a proper interpretation of the questioned language leads to the conclusion the language of the two documents track. The Defendant's position is not well taken. A plain reading of the Security Agreement indicates that the defendant was taking the security interest in consumer goods located at the Debtors' address, *including* (our emphasis) any items described in Schedule A. By using the word "include", a proper interpretation of the Security Agreement would be that the security interest covered more than just the items listed on Schedule A. FN2 If the security interest was to be limited to those items listed on Schedule A, then appropriate language would have been "Consumer goods located at Borrower's above address. The security agreement will be limited to the specific items which may be listed below." As the Security Agreement grants a broader security interest in consumer goods other than those listed on Schedule A, and as the Disclosure Statement only lists those items shown on Schedule A, the Disclosure Statement does not track with the Security Agreement, and Section 226.18(m) of Regulation Z has been violated.

FN2. The word "include" is defined as "to take in, enfold, or comprise as a discrete or subordinate part or item of a larger aggregate, group, or principle." Webster's Third New International Dictionary 1143 (1976).

In the alternative, the Defendant contends that it intended to take a security interest in only those specific items which are listed on Schedule A, that the language is ambiguous and susceptible to more than one meaning and therefore a question of fact exists as to the intent of the parties. The answer to that contention is simply that once sued for a Truth-in-Lending violation, a creditor cannot argue that its intent was contrary to a plain reading of the documentation, and this Court does not find the language to be ambiguous and susceptible to more than one meaning. The language is clear that the security interest is being taken in consumer goods located at the Debtors' address, including those items listed on Schedule A.

[2] KC The Defendant also contends that the disclosure was the result of a bona fide error, therefore the Defendant is entitled to the bona fide error defense provided by Section 130(c) of the Act, 15 U.S.C. Section 1640(c), which provides as follows:

(c) A creditor or assignee may not be held liable in any action brought under this section or section 125 for a violation of this title if the creditor or assignee shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error. Examples of a bona fide error include, but are not limited to, clerical, calculation, computer malfunction and programing, and printing errors, except that an error of legal judgment with respect to a person's obligations under this title is not a bona fide error.

This defense is not available to the Defendant, as it pertains to clerical errors such as those occurring

in billing or in making mathematical calculations, and cannot be maintained by a creditor who fails to accurately describe a security interest. *In re Sherman,* 13 B.R. 259 (Bkrtcy.R.I.1981). *See also Partridge v. Alaimo,* (DC Conn.1982) CCH, Consumer Credit Guide, para. 96,936.

[3] Finally, the Defendant contends that the questioned language was used by the Defendant in order to avoid violating the Federal Trade Commission's Credit Practices Rule, which prohibits a non-purchase money security interest in "household goods", as defined within that Rule. FN3 Specifically, the Defendant argues the use of the *type* or category "household goods" suggested in the Comments to Truth-in-Lending without itemizing the property would lead to liability under the Credit Practices Rule, and to avoid this result, many lenders utilize a document such as Schedule A to specifically identify and list the items of property which also contains a disclaimer that no items of personal property ***896** prohibited by the Credit Practices Rule will be included in the security interest. The Defendant concludes by stating if the subject language is construed so as to create a security interest in "all consumer goods" then the Security Agreement would be in violation of the Credit Practices Rule.

FN3. The Federal Trade Commission's Credit Practices Rule can be found at 16 CFR Part 444. See also CCH Consumer Credit Guide, para. 10,471.

This defense is a red herring. The FTC's Federal Credit Practices Rule defines "Household goods" as being

Clothing, furniture, appliances, one radio and one television, linens, china, crockery, kitchenware, and personal effects (including wedding rings) of the consumer and his or her dependents, provided that the following are not included within the scope of the term "household goods":

(1) Works of art;

(2) Electronic entertainment equipment (except one television and one radio);

(3) Items acquired as antiques; and

(4) Jewelry (except wedding rings).

and then goes on to make it an unfair credit practice for a lender to directly or indirectly take or receive from a consumer an obligation that constitutes or contains a non-possessory security interest in household goods other than a purchase money security interest.

Section 226.18(m) permits a disclosure of a security interest by item or type. One of the official comments to Section 226.18 points out the problem with describing collateral by type and using the term "household goods". It reads as follows:

Non-purchase money transactions. In non-purchase money transactions, the property subject to the security interest must be identified by item or type. This disclosure is satisfied by a general disclosure of the category of property subject to the security interest, such as "motor vehicles," "securities," "certain household items," or "household goods." (Creditors should be aware, however, that the federal credit practices rules, as well as some state laws, prohibit certain security interests in household goods.) At the creditor's option, however, a more precise identification of the property or goods may be provided.

A similar problem exists by using the term "Consumer Goods".

It is apparent that in preparing the Security Agreement and the disclosure under Section 226.18, a creditor must be careful not to violate the Credit Practices Rule by taking a security interest in nonpermissible collateral. The drafting problem is not insurmountable, and with a little thought and a little care, it is possible to draft both a Security Agreement and a Disclosure that comply with

Truth-in-Lending without violating the Credit Practices Rule. The Defendant's own argument suggests one approach through the use of a disclaimer. Another approach is suggested by the official comments through the use of a precise identification. The Defendant failed to do either. Certainly just as it would not be appropriate to contend that the Credit Practices Rule can be violated in complying with Truth-in-Lending, it is not appropriate to contend that Truth-in-Lending can be violated in order to comply with the Credit Practices Rule.

THEREFORE, this Court finds that judgment should be entered in favor of the Debtors and against the Defendant in the amount of $1,000.00, plus reasonable attorney's fees to be determined by this Court, and costs.

Because this Court finds that the Defendant has violated the disclosure requirements of Truth-in-Lending under Section 226.18(m), this Court need not decide the question of whether the Defendant violated Section 226.17(a)(1) which requires federal disclosures to be made clearly and conspicuously.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

Bkrtcy.C.D.Ill.,1989.
In re Stoneking
99 B.R. 892

END OF DOCUMENT

West Reporter Image (PDF)

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

West Reporter Image (PDF)

778 F.Supp. 101

Motions, Pleadings and Filings

United States District Court,
D. Rhode Island.
WILSON AUTO ENTERPRISES, INC., and Arthur Wilson, Plaintiffs,
v.
MOBIL OIL CORPORATION, and John Does 1-10, and Mobil Oil Corporation's Agents, Servants, or Employees, Defendants.
Civ. A. No. 91-359L.
Nov. 19, 1991.

Purchaser of land sued vendor's lessee for negligence, trespass, nuisance, and strict liability for damages resulting from lessee's alleged chemical contamination of land. Lessee moved to dismiss complaint for failure to state claim upon which relief could be granted. The District Court, Lagueux, J., held that: (1) lessee owed no duty of care to purchaser; (2) purchaser stated claim with respect to allegation of trespass by virtue of lessee's air stripping operation; and (3) lessee failed to state claim for punitive damages.
Granted in part, and denied in part.

West Headnotes

[1] KeyCite Notes

170A Federal Civil Procedure
- 170AXI Dismissal
  - 170AXI(B) Involuntary Dismissal
    - 170AXI(B)5 Proceedings
      - 170Ak1825 k. Motion and Proceedings Thereon. Most Cited Cases

170A Federal Civil Procedure KeyCite Notes
- 170AXI Dismissal
  - 170AXI(B) Involuntary Dismissal
    - 170AXI(B)5 Proceedings
      - 170Ak1827 Determination
        - 170Ak1829 k. Construction of Pleadings. Most Cited Cases

When considering motion to dismiss for failure to state claim, court must view facts and pleadings in light most favorable to nonmoving party; moving party carries burden of establishing that nonmoving party can prove no facts that would entitle him to relief, and allegations in complaint are presumed true for purpose of testing their sufficiency. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

[2] KeyCite Notes

272 Negligence
- 272V Heightened Degrees of Negligence
  - 272k272 k. In General. Most Cited Cases
    (Formerly 272k1)

Rhode Island does not recognize more than one degree of negligence.

[3] KeyCite Notes

272 Negligence
  272IV Breach of Duty
    272k250 k. In General. Most Cited Cases
      (Formerly 272k1)

Before defendant can be held liable for negligence in Rhode Island, there must be breach of duty owed to plaintiff.

[4] KeyCite Notes

272 Negligence
  272XVII Premises Liability
    272XVII(K) Persons Liable
      272k1260 k. In General. Most Cited Cases
        (Formerly 272k29)

Under Rhode Island law, where purchaser bought property in arms-length transaction, he lost any possible standing to sue vendor's lessee for negligence in connection with damages allegedly resulting from lessee's chemical contamination of property; lessee owed no duty of care to purchaser, who apparently neither asked about possible chemical contamination nor tested for it, despite obvious possibility that property might be soaked with pollutants.

[5] KeyCite Notes

400 Vendor and Purchaser
  400I Requisites and Validity of Contract
    400k32 Misrepresentation and Fraud by Vendor
      400k37 Application of Doctrine of Caveat Emptor
        400k37(1) k. In General. Most Cited Cases

In Rhode Island, caveat emptor is still dominant principle in real estate sales.

[6] KeyCite Notes

115 Damages
  115III Grounds and Subjects of Compensatory Damages
    115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
      115III(A)2 Mental Suffering and Emotional Distress
        115k57.8 Nature of Injury or Threat in General
          115k57.10 k. Physical Illness, Impact, or Injury; Zone of Danger. Most Cited Cases
            (Formerly 115k50)

115 Damages KeyCite Notes
  115III Grounds and Subjects of Compensatory Damages
    115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
      115III(A)2 Mental Suffering and Emotional Distress
        115k57.30 Fear of Developing Disease

115k57.33 k. Cancer. Most Cited Cases
(Formerly 115k50)

In Rhode Island, plaintiff must prove current manifestation of injury; neither mental anguish without physical symptoms nor heightened risk of cancer is enough to create cause of action in tort.

[7] KeyCite Notes

386 Trespass
386I Acts Constituting Trespass and Liability Therefor
386k9 Trespass to Real Property
386k12 k. Entry. Most Cited Cases

Liability for trespass to property requires invasion of one person's property by another person who has no right or privilege to enter.

[8] KeyCite Notes

386 Trespass
386II Actions
386II(A) Right of Action and Defenses
386k22 Defenses
386k27 k. Title or Right of Possession of Defendant or Third Person. Most Cited Cases

Presence of contaminants leaked during vendor's lessee's leasehold provided no basis for purchaser's trespass claim against that lessee; when lessee leased land, its right of possession permitted it to occupy and use land within constraints of lease, and none of lessee's activities during its leasehold on land could constitute trespass against purchaser.

[9] KeyCite Notes

386 Trespass
386II Actions
386II(B) Proceedings in General
386k40 Declaration, Complaint, or Petition
386k40(4) k. Statement of Acts Constituting Trespass. Most Cited Cases

Purchaser of land alleged sufficient facts to support nominal trespass claim against vendor's lessee by alleging that lessee tortiously placed air stripping operation on land and refused to remove it.

[10] KeyCite Notes

279 Nuisance
279I Private Nuisances
279I(A) Nature of Injury, and Liability Therefor
279k1 k. Nature and Elements of Private Nuisance in General. Most Cited Cases

Under Rhode Island law, purchaser of land had no nuisance claim against vendor's lessee arising from lessee's alleged chemical contamination of land; purchaser did not allege that lessee invaded purchaser's interests while lessee was neighboring, contemporaneous landowner proximate to purchaser's property.

[11] KeyCite Notes

279 Nuisance
279I Private Nuisances
279I(A) Nature of Injury, and Liability Therefor
279k1 k. Nature and Elements of Private Nuisance in General. Most Cited Cases

Under Rhode Island law, to create liability as private nuisance, offending condition must come from outside plaintiff's land.

[12] KeyCite Notes

279 Nuisance
279I Private Nuisances
279I(A) Nature of Injury, and Liability Therefor
279k1 k. Nature and Elements of Private Nuisance in General. Most Cited Cases

Under Rhode Island law, purchaser of property cannot assert private nuisance claim against seller-or seller's lessee-for contamination that occurred before sale.

[13] KeyCite Notes

313A Products Liability
313AI Scope in General
313AI(A) Products in General
313Ak5 k. Strict Liability. Most Cited Cases

Under Rhode Island law, strict products liability doctrine does not encompass sale of land.

[14] KeyCite Notes

272 Negligence
272VIII Dangerous Situations and Strict Liability
272k306 k. Dangerous Substances. Most Cited Cases
(Formerly 272k22)

Under Rhode Island law, purchaser of land which vendor's lessee had allegedly chemically contaminated had no claim against lessee based on theory of strict liability for abnormally dangerous activities.

[15] KeyCite Notes

405 Waters and Water Courses
405III Subterranean and Percolating Waters
405k104 k. Pollution. Most Cited Cases

Under Rhode Island law, liability for pollution of ground water requires invasion of legally recognizable right of injured party.

[16] KeyCite Notes

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(E) Amendments
170Ak839 Complaint
170Ak841 k. New Cause of Action in General. Most Cited Cases

Purchaser of land suing vendor's lessee for lessee's alleged chemical contamination of land was entitled to amend his complaint to add count based upon Rhode Island statute providing liability for any person who negligently or intentionally pollutes ground water; purchaser's scattered references to statute in pleadings and memoranda put lessee sufficiently on notice that statutory liability might be issue in litigation. R.I.Gen.Laws 1956, § 46-12-21 .

[17] KeyCite Notes

115 Damages
115V Exemplary Damages
115k91.5 Grounds for Exemplary Damages
115k91.5(1) k. In General. Most Cited Cases
(Formerly 115k91(1))

In Rhode Island, punitive damages must be based upon intentional and malicious conduct toward plaintiff; conduct that is merely reckless does not justify punitive damages.

[18] KeyCite Notes

115 Damages
115VIII Pleading
115k151 k. Grounds for Exemplary Damages. Most Cited Cases

Under Rhode Island law, purchaser of land suing vendor's lessee for lessee's alleged chemical contamination of land failed to allege facts that would justify punitive damages; purchaser did not allege facts that would suggest that lessee acted with malice, i.e., intention to cause harm.

***103** Arthur E. Chatfield, III, Providence, R.I., for plaintiffs.

Joseph H. Hameline, Rosemary M. Allen, Mintz, Levin, Cohn, Ferris, Golvsky & Popeo, P.C. , Boston, Mass., Richard W. MacAdams, MacAdams & Wieck, Providence, R.I., for defendants.

MEMORANDUM AND ORDER

LAGUEUX, District Judge.

I. INTRODUCTION

At issue is whether a purchaser of real estate has a cause of action in negligence, trespass, nuisance, or strict liability against a former lessee of the seller for damages allegedly resulting from the lessee's chemical contamination of the property. In November 1988, Arthur Wilson bought a parcel of developed land in Foster, Rhode Island, from an entity named Little Rest Realty Company ("LRRC"). Before this transaction, Mobil Oil Corporation had leased the land, for the operation of a retail gas station, for several decades from LRRC and its predecessors. Mobil's lease with LRRC (the "Lease") ended four months before Wilson bought the property, and Mobil vacated when the Lease ended. Wilson never took assignment of LRRC's rights under the Lease or any other lease between Mobil and LRRC or its predecessors. When Wilson purchased the property, the former gas station was still in

place. Wilson apparently did not have the property assessed for environmental defects.

After discovering chemical contamination on the property, Wilson and his company (collectively, "Wilson") brought this diversity suit against Mobil Oil Corporation and its unidentified agents (collectively, "Mobil"), alleging various violations of Rhode Island common law. This matter is now before the Court on Mobil's motion, under Fed.R.Civ.P. 12(b)(6), to dismiss the entire complaint for failure to state a claim upon which relief can be granted. For the reasons that follow, Mobil's motion is granted in part and denied in part.

## II. DISCUSSION

[1] When considering a motion to dismiss under Rule 12(b)(6), the Court must view the facts and pleadings in the light most favorable to the non-moving party. The moving party, here Mobil, carries the burden of establishing that the non-moving ***104** party, Wilson, can prove no facts that would entitle him to relief. *Mendonsa v. Time Inc.,* 678 F.Supp. 967, 968 (D.R.I.1988). The allegations in the complaint are presumed true for the purpose of testing their sufficiency. *Seveney v. United States Gov't, Dep't of Navy,* 550 F.Supp. 653, 655 (D.R.I.1982). The substantive laws of Rhode Island are controlling.

Wilson charges, essentially, that Mobil's faulty storage tanks contaminated the property during the years Mobil leased and occupied the land, that Mobil has been aware of the contamination since at least 1983, and that Mobil did not inform Wilson or LRRC of this problem before Wilson bought the property in 1988. Wilson alleges that his property and business have lost value as a result of the contamination, that he unwittingly drank contaminated water from a well on the property, and that he has suffered mental anguish and possible future injuries from the entire experience. Wilson additionally alleges that Mobil has contracted with a private firm to operate an "air stripping" machine on Wilson's property as part of an ongoing effort to clean the land's groundwater. Wilson does not allege any facts supporting privity of contract between Wilson and Mobil.

Wilson's complaint lists seven common law theories of liability: (I) negligence; (II) gross negligence; (III) negligence per se; (IV) intentional, reckless, or negligent invasion of the plaintiff's person, creating an increased likelihood that Wilson could develop cancer and lose profits; (V) trespass; (VI) nuisance; and (VII) strict liability.

None of these theories of liability supports a cause of action by a buyer of land against a former lessee of the seller. The trespass claim, however, will survive the motion to dismiss because Wilson alleges that Mobil presently maintains air stripping machinery on Wilson's land.

### *Counts I, II and III*

[2] Rhode Island does not recognize more than one degree of negligence. *Corrigan v. Dun & Bradstreet, Inc.,* 91 F.Supp. 424, 426 (D.R.I.1950). The legal authority that Wilson cites to support his differentiation of three distinct kinds of negligence does not have effect in Rhode Island. The Court must analyze the allegations of negligence, gross negligence, and negligence per se as one allegation of negligence.

[3] Before a defendant can be held liable for negligence, there must be a breach of a duty owed to the plaintiff. *Paquin v. Tillinghast,* 517 A.2d 246, 248 (R.I.1986); *Ryan v. State Dep't of Transp.,* 420 A.2d 841, 843 (R.I.1980). Even if the Court assumes that Mobil's activities as lessee caused environmental damage to the property Wilson now owns, and that this contamination injured Wilson, no liability will attach unless Mobil breached a duty of care that it owed to Wilson.

[4] Wilson has alleged no facts that would create such a duty. This Court adopts the reasoning of *Wellesley Hills Realty Trust v. Mobil Oil Corp.,* 747 F.Supp. 93, 100 (D.Mass.1990), in which the District Court for Massachusetts explained that the common law does not:

support the imposition of a duty on an owner of land to maintain his or her property in a certain condition or to refrain from any activity affecting the property which would extend to future owners of the land. The imposition of such a duty would be unreasonable because such future owners may not be known or even contemplated at the time the landowner creates or maintains a condition on his or her property.

That Mobil was a lessee and not an owner of the property only diminishes Mobil's possible obligations to subsequent purchasers.

Absent misrepresentation or contractual privity, the purchaser of property bears the risk of defects existing in the land at the time of transfer, FN1 and he is expected to make his own inspections. *Id.; Philadelphia Elec. Co. v. Hercules, Inc.,* 762 F.2d 303, 312 (3d Cir.), *cert. denied,* ***105** 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985); Prosser & Keeton on Torts, 5th ed., § 64 at 446-47 (1984). Wilson's attorney suggested in oral argument that a purchaser of land should not have to test soil samples before taking title. This assertion runs counter to modern and traditional real estate practice. *See, e.g.,* Schnapf, *Environmental Liability: Law & Strategy for Businesses and Corporations,* § 13.01 (1990) (discussing the importance and prevalence of environmental due diligence before acquiring property or closing corporate or financial transactions).

FN1. In Rhode Island, new homes also carry a warranty of habitability. *Sousa v. Albino,* 120 R.I. 461, 388 A.2d 804, 805 (1978). This doctrine is not relevant to the present litigation.

[5] Caveat emptor is still the dominant principle in real estate sales. *Philadelphia Elec.,* 762 F.2d at 312-13; *see also Wellesley Hills,* 747 F.Supp. at 100. A prospective purchaser has the option to examine the land to his satisfaction and walk away from the deal if he is not content with what he learns. The prospective purchaser can pose questions to the seller, and untruthful answers could give rise to an action for misrepresentation. The prospective purchaser can bargain with the seller for security or indemnity against unknown defects. The seller of contaminated land-particularly property on which a former gas station still stands, putting buyers on notice that dangerous chemicals may have leached into the soil-will assume that prospective buyers might learn of the contamination, and so the price for such land usually reflects, at least partly, its discounted value. Known defects in property reduce its market value. Caveat emptor, in short, requires the buyer to seek information so that the selling price can better reflect the land's actual, economic value.

Wilson apparently neither asked about possible chemical contamination nor tested for it, despite the obvious possibility that the property might be soaked with pollutants. The seller of land owes no duty of care to a purchaser who does not make even the most basic inquiries. The seller's former *lessee,* as a matter of both logic and public policy, also owes no such duty.

Wilson asserts, in essence, that Mobil owed a duty of care to the world at large, which includes Wilson. Plaintiff's Memorandum, pp. 1-2. Wilson quotes general language from such important sources as *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928), and the Second Restatement of Torts, to support his contention that Mobil's actions fell below the standard of care required by the common law. But Wilson consistently overlooks the fundamental principle of negligence law that liability requires a duty of care owed specifically to the plaintiff. Mobil might have contractual liability to LRRC or statutory liability to Rhode Island or the federal government, but Mobil owed no common law duty of care to subsequent purchasers of property that it leased. While Mobil's neighbors in Foster may have had no choice in becoming victims of Mobil's alleged chemical leaks, Wilson could have avoided his troubles by the simple exercise of reasonable diligence before buying

this property.

As an alternative argument, Wilson seeks to show the existence of a duty of care by suggesting that Mobil's obligations to LRRC automatically became obligations to Wilson when Wilson purchased the property. Absent allegations of contractual privity or affirmative misrepresentation, however, Mobil's duties to LRRC do not run with the land. Wilson has not stated a negligence claim.

*Count IV*

Wilson further alleges that Mobil intentionally, recklessly, or negligently invaded Wilson's person, creating an increased likelihood that Wilson could develop cancer and lose profits. Wilson has alleged no facts to support a charge that Mobil's actions were intended to affect Wilson. And as explained above, Rhode Island does not recognize differing degrees of negligence; allegations of reckless or negligent conduct are treated as allegations of negligence.

As explained above, Mobil owed no duty of care to Wilson. For this reason alone, this Count is legally insufficient. The same arguments for dismissing Counts I, II, and III compel dismissal of Count IV.

[6] ***106** This Count also fails because it lacks a sufficient allegation of injury. Wilson has alleged only possible future harms, but no actual, present injury. In Rhode Island, a plaintiff must prove a current manifestation of injury; neither mental anguish without physical symptoms nor a heightened risk of cancer is enough to create a cause of action in tort. *Reilly v. United States,* 547 A.2d 894, 896 (R.I.1988); *Plummer v. Abbott Lab.,* 568 F.Supp. 920, 922, 923 (D.R.I.1983). Therefore, Wilson has not stated a cause of action under this Count.

*Count V*

[7] [8] Wilson's allegation of trespass to property states a valid, albeit limited, cause of action. Wilson asserts that Mobil's alleged contamination of the property constituted a trespass against him, the subsequent purchaser. Liability for trespass to property requires an invasion of one person's property by another person who has no right or privilege to enter. *See Wellesley Hills,* 747 F.Supp. at 99. When Mobil leased the land, its right of possession permitted it to occupy and use the land within the constraints of the Lease. Any of Mobil's activities during its leasehold on the land could not constitute a trespass against Wilson. *Id.* The presence of contaminants leaked during Mobil's leasehold, therefore, would give no basis for Wilson's trespass claim.

[9] Whether the presence of Mobil's air stripping operation constitutes a "continuing trespass," however, is a different matter. *See Regan v. Cherry Corp.,* 706 F.Supp. 145, 150-51 (D.R.I.1989); Restatement (Second) of Torts, §§ 158 & 161(1) at 277, 289 (1965). One may be liable for trespass if he intentionally places on or fails to remove from another's land something that he has a duty to remove, Restatement (Second) of Torts § 158(c), or if he tortiously places an object on another's land, *id.* § 161(1). No injury need be shown. *Id.* § 158.

Given Wilson's version of the facts, which the Court must accept as true for this motion, the Court cannot conclude that the air stripping operation was not tortiously placed on Wilson's land and that Mobil has no duty to remove it. In other words, it is unclear whether the presence of this machinery constitutes a privileged entry onto Wilson's land. Mobil's placement, through an agent, of the machinery on Wilson's land might amount to trespass, depending on Mobil's legal obligations to remove it or maintain it there. Until the legal status of the air stripping operation is further clarified, Wilson has alleged sufficient facts to support a nominal trespass claim and defeat Mobil's motion to dismiss this Count of the complaint.

*Count VI*

[10] [11] [12] Wilson's allegation of nuisance is legally insufficient. Wilson has not alleged that Mobil invaded his interests while Mobil was a *neighboring, contemporaneous* landowner proximate to Wilson's property. To create liability as a private nuisance, the offending condition must come from *outside* the plaintiff's land. *Wellesley Hills,* 747 F.Supp. at 98. A buyer of property cannot assert a private nuisance claim against a seller-or the seller's lessee-for contamination that occurred before the sale. *Id.* at 98-99; *Philadelphia Elec.,* 762 F.2d at 313-14; *Hanlin Group, Inc. v. International Minerals & Chem. Corp.,* 759 F.Supp. 925, 935 (D.Me.1990).

*Count VII*

[13] Wilson's final Count alleges strict liability. If this claim is based on a products liability theory, *see Castrignano v. E.R. Squibb & Sons, Inc.,* 546 A.2d 775, 779 (R.I.1988), then the claim obviously fails because Mobil never owned or sold the property at issue, and, in any event, the strict products liability doctrine does not encompass the sale of land.

[14] If this claim is based on the theory of strict liability for abnormally dangerous activities, as typified by *Rylands v. Fletcher,* L.R. 3 H.L. 330 (1868), then the claim also fails. Rhode Island has rejected the doctrine of *Rylands v. Fletcher.* ***107** *Rose v. Socony-Vacuum Corp.,* 173 A. 627, 54 R.I. 411, 416 (1934); Prosser & Keeton on Torts, § 78 at 549.

[15] Liability for pollution of groundwater requires the invasion of a legally recognizable right of the injured party. *Rose,* 54 R.I. at 417. Under the facts alleged, however, Wilson had no legally recognizable rights against Mobil's actions during the Lease. *See Wellesley Hills,* 747 F.Supp. at 101-02. Imposing strict liability on Mobil for Wilson's alleged injuries, like imposing a duty of care in negligence, would violate the rule of caveat emptor in real estate transactions. When Wilson purchased the property from LRRC in an arms-length transaction, he lost any possible standing to sue the previous owners and lessees in negligence, nuisance, trespass, or strict liability.

Mobil had no greater duty than reasonable care toward foreseeable plaintiffs. *Gagnon v. Landry,* 103 R.I. 45, 234 A.2d 674, 677 (1967). Wilson must prove Mobil's negligence, including a duty of care toward Wilson, in order to recover damages in tort. And as explained above, Wilson has not alleged facts that would create a duty of care. The strict liability claim, therefore, also fails to justify a grant of relief.

*R.I. Gen. Laws Chapter 46-12*

[16] Wilson additionally hints at a statutory cause of action against Mobil, but he has not overtly asserted such a claim. Wilson's complaint states that Mobil owed him a duty of care pursuant to R.I.Gen.Laws ch. 46-12. Second Amended Complaint, para. 44. In Count III of the complaint and the corresponding section of his memorandum in opposition to Mobil's motion to dismiss, Wilson cites chapter 46-12 in connection with his claim of negligence per se. FN2 The claim of negligence per se, as explained above, is not a claim upon which relief can be granted.

FN2. Wilson's attorney quotes the language of R.I.Gen.Laws § 46-12-21 but cites the statute incorrectly as section 46-12-22. Plaintiffs' Memorandum, p. 14.

But Wilson may have stated a completely different, statutory cause of action. In accordance with Rule 8(f) of the Federal Rules of Civil Procedure, this Court must construe Wilson's pleadings to effect substantial justice. The parties have not addressed whether R.I.Gen.Laws ch. 46-12, particularly section 46-12-21, creates liability beyond the scope of common law negligence. FN3 Without intimating whether this statute supports a cause of action by Wilson against Mobil, this Court believes that substantial justice would be defeated if Wilson were denied a fair opportunity to present a coherent claim based on section 46-12-21. His scattered references to the statute in pleadings and memoranda have put Mobil sufficiently on notice that statutory liability might be an issue in this litigation. He should be permitted to amend his complaint to add one count based upon R.I.Gen.Laws § 46-12-21.

FN3. R.I.Gen Laws § 46-12-21 provides:

*Liability.*-Any person who shall negligently or intentionally pollute groundwater shall be liable to any other person who is damaged by that pollution.

*The Defendants' Motion to Strike*

[17] KC Mobil has additionally moved to strike Wilson's requests for punitive damages and damages based on mental anguish. In Rhode Island, punitive damages must be based upon *intentional* and *malicious* conduct toward the plaintiff. *Regan*, 706 F.Supp. at 153. Conduct that is merely reckless does not justify punitive damages. *Id.* at 152-53.

[18] KC Wilson has not alleged facts that would justify punitive damages. In his complaint, Wilson makes the conclusory statement that Mobil acted "with wantonness, recklessness, and outrageousness." Second Amended Complaint, para. 48. He fails, however, to allege malice or an intent to harm others. The Court is not merely pointing out that Wilson neglected to employ particular adverbs: Wilson has not alleged any facts that would suggest that Mobil acted with malice-with an intention to cause harm. By charging Mobil with wantonness and outrageousness, Wilson alleges gross recklessness, but nothing more. Accordingly, Mobil's motion to strike Wilson's ***108** prayer for punitive damages is granted.

Additionally, because this Court now dismisses Count IV of the complaint, the Court also strikes Wilson's request for compensatory damages based on mental anguish.

III. CONCLUSION AND ORDER

Accordingly, the defendants' motion to dismiss the complaint, for failure to state a claim upon which relief can be granted, is granted with respect to Counts I, II, III, IV, VI, and VII. The defendants' motion is denied with respect to Count V. The defendants' motion to strike the plaintiffs' prayer for punitive damages and compensatory damages based on mental anguish is granted. The plaintiffs are granted leave to amend the complaint, within 30 days of this Order, to add one count alleging violation of R.I.Gen.Laws § 46-12-21.

It is so ordered.

D.R.I.,1991.
Wilson Auto Enterprises, Inc. v. Mobil Oil Corp.
778 F.Supp. 101

Motions, Pleadings and Filings (Back to top)

• 1:91CV00359 (Docket) (Jul. 12, 1991)
END OF DOCUMENT

West Reporter Image (PDF)

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

West Reporter Image (PDF)

329 F.3d 1167, 03 Cal. Daily Op. Serv. 4481, 2003 Daily Journal D.A.R. 5722

Briefs and Other Related Documents

United States Court of Appeals,
Ninth Circuit.
Melvin T. YAMAMOTO; Elaine S. Yamamoto; Maxine H. Tampon, Plaintiffs-Appellants,
v.
BANK OF NEW YORK; BNC Mortgage; U.S. Financial Corporation, Defendants-Appellees.
No. 01-16427.
Argued and Submitted May 9, 2003.
Filed May 29, 2003.

Mortgagors brought action against mortgagee, seeking statutory damages and rescission based upon mortgagee's alleged failure to disclose their right to cancel, and an alleged inaccurate disclosure of appraisal fees, in violation of the Truth in Lending Act (TILA). the United States District Court for the District of Hawai'i, Samuel P. King, J., dismissed action, based upon mortgagors' admission that they could not fulfill TILA's tender requirement. Mortgagors appealed. The Court of Appeals, Rymer, Circuit Judge, held that: (1) mortgagee's security interest did not become automatically void upon mortgagors' notice that they were exercising their right to rescind loan based upon mortgagee's alleged TILA violations, and (2) before ordering recision, District Court could require that mortgagors provide proof of their ability to repay loan proceeds if rescission were granted.
Affirmed.

West Headnotes

[1] KeyCite Notes

92B Consumer Credit
  92BII Federal Regulation
    92BII(C) Effect of Violation of Regulations
      92Bk60 k. In General; Validity of Transactions. Most Cited Cases

Whether a decree of rescission of a loan under TILA should be conditional upon debtor's tender of loan proceeds depends upon the equities present in a particular case, as well as consideration of the legislative policy of full disclosure that underlies TILA and the remedial and penal nature of the private enforcement provisions of TILA. Truth in Lending Act, § 125(b), 15 U.S.C.A. § 1635(b); 12 C.F.R. § 226.23.

[2] KeyCite Notes

92B Consumer Credit
  92BII Federal Regulation
    92BII(C) Effect of Violation of Regulations
      92Bk60 k. In General; Validity of Transactions. Most Cited Cases

Mortgagee's security interest did not become automatically void upon mortgagors' notice that they were exercising their right to rescind loan based upon mortgagee's alleged failure to disclose their right to cancel and alleged inaccurate disclosure of appraisal fees in violation of TILA, where mortgagee contested mortgagors' right to rescind and presented evidence that it did not violate TILA. Truth in Lending Act, § 125(b), 15 U.S.C.A. § 1635(b); 12 C.F.R. § 226.23.

[3] KeyCite Notes

92B Consumer Credit
92BII Federal Regulation
92BII(C) Effect of Violation of Regulations
92Bk60 k. In General; Validity of Transactions. Most Cited Cases

Before ordering rescission of a mortgage loan based upon mortgagee's alleged TILA violations, the District Court could require that mortgagors provide proof of their ability to repay loan proceeds, less interest and finance charges, if rescission of the loan were granted. Truth in Lending Act, § 125(b), 15 U.S.C.A. § 1635(b); 12 C.F.R. § 226.23.

***1168** Gary Victor Dubin, Honolulu, HI, for the Plaintiffs-Appellants.

Mark D. Bernstein, Honolulu, HI, for Defendant-Appellee, U.S. Financial Mortgage Corp.

Steven K.S. Chung, Oshima Chun Fong & Chung , Honolulu, HI, for Defendant-Appellee, BNC Mortgage, Inc.

Mary Martin, Stanton Clay Chapman Crumpton & Iwamura , Honolulu, HI, and Gary Y. Okuda, Leu & Okuda, Honolulu, HI, for Defendant-Appellee, Bank of New York.

Appeal from the United States District Court for the District of Hawaii; Samuel P. King, Senior District Judge, Presiding. D.C. No. CV-99-00360-SPK(BMK).

Before GOODWIN, RYMER, and T.G. NELSON, Circuit Judges.

RYMER, Circuit Judge:
This appeal requires us to decide whether a court may order borrowers who seek recission of a mortgage under the Truth in Lending Act (TILA), 15 U.S.C. § 1635, to show that proceeds can be tendered if they prevail. Here, the borrowers testified that they could not fulfill TILA's tender requirement, and the district court gave them sixty days before dismissing their recission claim to attempt to do so. When they were unable to provide evidence that they could tender the proceeds, the court granted summary judgment in favor of the lender. We hold that a district court has discretion to modify the sequence of rescission events in these circumstances, and affirm.

I

On January 23, 1997, Melvin and Elaine Yamamoto, through their mortgage broker U.S. Financial Mortgage Corp. (USF), borrowed $172,500 from BNC Mortgage, Inc. (BNC) to refinance an existing mortgage on their home. The loan was co-signed by their daughter, Maxine Tampon. On February 3, 1997, BNC assigned the Yamamoto/Tampon mortgage to the Bank of New York (BNY).

After making eight payments (totaling approximately $12,000), the Yamamotos and Tampon defaulted. In March 1998, the Yamamotos filed for Chapter 7 bankruptcy relief. BNY subsequently obtained a stipulation for relief from the bankruptcy stay and instituted foreclosure proceedings on the Yamamotos' home, the property ***1169** secured by the loan. The Yamamotos received a discharge in bankruptcy June 15, 1998.

In July 1998 the Yamamotos and Tampon notified BNC that they were exercising their right to cancel the loan due to BNC's failure to provide them with notice of right to cancel forms required under TILA. They claimed that upon receipt of the letter the mortgage was automatically void and BNC was required to release its security interest in their home within 20 days. BNC responded that a timely Notice of Right to Cancel had been provided on January 24, 1997. The Yamamotos/Tampon mailed a similar letter to BNY on September 30, 1998. BNY then discontinued the foreclosure proceedings.

The Yamamotos and Tampon brought suit against BNY, seeking statutory damages and recission on account of the failure to disclose the right to cancel and an inaccurate disclosure of appraisal fees in violation of TILA. BNY filed a third-party complaint against BNC, the original lender, who in turn filed a fourth-party action against USF, the Yamamotos' mortgage broker. The parties brought cross-motions for summary judgment. The district court determined that the damages claim was barred by TILA's one-year statute of limitations, 15 U.S.C. § 1640(e), but it found a triable issue of fact as to whether Yamamotos/Tampon received the proper disclosures. The court also held that the bankruptcy trustee was the proper plaintiff to pursue recission rather than the Yamamotos, and that the Yamamotos and Tampon, who had indicated that they were unable to tender the proceeds, could have sixty days to try to do so.[FN1] When the Yamamotos/Tampon failed to comply with either condition, the court dismissed the action and entered judgment for BNY. This appeal followed. [FN2]

FN1. The court dismissed the state law claim brought under Hawaii's Unfair and Deceptive Trade Practices Act. The Yamamotos and Tampon do not challenge this ruling, nor do the Yamamotos appeal the decision to substitute the bankruptcy trustee in their stead. The Yamamotos' status makes no difference to resolution of the recission claim in any event, as Tampon may pursue this relief in her own right. While their brief mentions the issue of whether BNY was entitled to summary judgment on their claim for statutory damages, the issue is not argued and we deem it abandoned. *See Kohler v. Inter-Tel Techs.,* 244 F.3d 1167, 1182 (9th Cir.2001) ( "Issues raised in a brief which are not supported by argument are deemed abandoned.").

FN2. There is a question whether the district court entered a final decision that is appealable under 28 U.S.C. § 1291 because its order did not explicitly deal with the third and fourth-party complaints which arguably could be read as seeking relief beyond contribution and indemnity. However, in response to our request for supplemental briefing, BNY and BNC represented that their complaints were reactive only and were therefore mooted by the court's ruling on summary judgment in favor of BNY. This, together with the fact that the court's order does dismiss the action, satisfies us that we may exercise appellate jurisdiction. *See Peura v. Mala,* 977 F.2d 484, 487 n. 3 (9th Cir.1992) (oversight in not disposing of third-party claims does not bar appellate jurisdiction); *see also Fed. Ins. Co. v. Scarsella Bros., Inc.,* 931 F.2d 599, 601 (9th Cir.1991) (inferring rejection of claims where decision resolved all issues necessary to establish legal rights and duties of the parties).

II

Tampon argues that the district court could not deny her recission for failure to pay back loan proceeds without first determining whether TILA was violated, and without recognizing that TILA, and Federal Reserve Board Regulation Z implementing it, 12 C.F.R. § 226.23(d), automatically voided BNY's security interest in her property once she exercised her right to rescind. [FN3] She posits that language added ***1170** in 1981 to Regulation Z indicates that a court has no discretion to change the substantive provisions of the Act, which is what she contends that the court did when it required tender prematurely. BNY counters that courts have long had equitable discretion to make repayment of loan proceeds a prerequisite to rescission under TILA, and that discretion to alter the sequence of recission events is expressly preserved by Regulation Z.

FN3. She also maintains that the sixty days allowed was inadequate and that no determination was ever made about the amount required to be tendered. However, no objection on either basis was made in the district court. Tampon never asked for more time, or indicated any ability to repay any amount. Nor did her counsel manifest any confusion about how the recission amount would be calculated. Therefore, we focus only on the legal question the appeal presents: whether the court had discretion to dismiss Tampon's recission claim for inability to tender proceeds without first determining if TILA

were violated.

TILA was enacted in 1968 "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). If required disclosures are not made, the consumer may rescind. *See* 15 U.S.C. § 1635(a). Section 1635(b) governs the return of money or property when a borrower exercises the right to rescind. FN4 It provides that the borrower is not liable for any finance or other charge, and that any security interest becomes void upon such a rescission. The statute adopts a sequence of rescission and tender that must be followed unless the court orders otherwise: within twenty days of receiving a notice of rescission, the creditor is to return any money or property and reflect termination of the security interest; when the creditor has met these obligations, the borrower is to tender the property.

FN4. Section 1635(b) states in full:

When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.

Section 226.23 of Regulation Z implements § 1635(b). It tracks the statute and states:

(d) Effects of rescission.

(1) When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.

(2) Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

(3) If the creditor has delivered any money or property, the consumer may retain possession until the creditor has ***1171** met its obligation under paragraph (d)(2) of this section. When the creditor has complied with that paragraph, the consumer shall tender the money or property to the creditor....

(4) The procedures outlined in paragraphs (d)(2) and (3) of this section may be modified by court order.

12 C.F.R. § 226.23.

TILA's provision permitting a court to modify procedures was added in 1980 as part of the Truth in Lending Simplification and Reform Act, Pub.L. No. 96-221, tit. VI, § 612(a)(4), 94 Stat. 168, 175 (1980) (codified as amended at 15 U.S.C. § 1635(b) (1988)). *See* *Williams v. Homestake Mortgage Co.*, 968 F.2d 1137, 1139-40 (11th Cir.1992) (explaining background). In turn, subsection (d)(4) was added to Regulation Z in 1981. These changes followed in the wake of decisions by this court and

others which held that the statute need not be interpreted literally as always requiring the creditor to remove its security interest prior to the borrower's tender of proceeds. *See, e.g.,* *Palmer v. Wilson,* 502 F.2d 860, 862-63 (9th Cir.1974) ; *Ljepava v. M.L.S.C. Props., Inc.,* 511 F.2d 935, 944 (9th Cir.1975); *LaGrone v. Johnson,* 534 F.2d 1360, 1361-62 (9th Cir.1976) ; *Rudisell v. Fifth Third Bank,* 622 F.2d 243, 253-54 (6th Cir.1980) ; *Powers v. Sims & Levin,* 542 F.2d 1216, 1220-22 (4th Cir.1976); but see *Gerasta v. Hibernia Nat'l Bank,* 575 F.2d 580, 585 (5th Cir.1978) .

[1] Since *Palmer* we have recognized that in applying TILA, "a trial judge ha[s] the discretion to condition rescission on tender by the borrower of the property he had received from the lender." *Ljepava,* 511 F.2d at 944 (citing *Palmer,* 502 F.2d at 863-64). As we explained, whether a decree of rescission should be conditional depends upon "the equities present in a particular case, as well as consideration of the legislative policy of full disclosure that underlies the Truth in Lending Act and the remedial-penal nature of the private enforcement provisions of the Act." *Palmer,* 502 F.2d at 862. Indeed, in *LaGrone* we held that rescission *should be* conditioned on repayment of the amounts advanced by the lender. *LaGrone,* 534 F.2d at 1362. We noted that the TILA violations there were not egregious (failure to disclose an acceleration clause and amount financed in the broker's statement, and to delineate additional data from mandatory data), and that the equities favored the creditor who would otherwise have been left in an unsecured position in the borrower's intervening bankruptcy. *Id.*

Tampon correctly points out that we made it clear in *Semar v. Platte Valley Federal Savings & Loan Association,* 791 F.2d 699, 705-06 (9th Cir.1986) , that courts have no discretion to alter TILA's *substantive* provisions. However, *Semar* left intact the discretion to alter TILA's *procedural* provisions. In *Semar,* the district court had made the borrowers responsible for interest and other charges listed on the closing statement contrary to § 1635(b), which states that the borrower "is not liable for any finance or other charge." We rejected the creditor's argument, based on *Palmer,* that the court had equitable discretion to alter the statute in this way. In so doing, we distinguished the *Palmer* line of authority on the footing that in those cases, the courts had simply altered TILA's procedures whereas the modification in *Semar* was substantive. *See* *Semar,* 791 F.2d at 706 n. 15.

Trying to fit within *Semar,* Tampon argues that subsection (d)(4) of Regulation Z is a substantive provision that does not allow for modification of (d)(1)-the subsection that provides for automatic voiding of BNY's security interest upon recission-because (d)(4) only permits a court to order modification of the procedures set out in subsections (d)(2) and (d)(3). While ***1172** it is true that (d)(4) confers discretion to modify (d)(2) and (d)(3), not (d)(1), the argument only goes so far as it begs the question of when a transaction is "rescinded." For Tampon to prevail, rescission must be accomplished automatically upon her decision to rescind, communicated by a notice of rescission, without regard to whether the law permits her to rescind on the grounds asserted. We believe this makes no sense when, as here, the lender contests the ground upon which the borrower rescinds.

[2] If BNY had acquiesced in Tampon's notice of rescission, then the transaction would have been rescinded automatically, thereby causing the security interest to become void and triggering the sequence of events laid out in subsections (d)(2) and (d)(3). But here, BNY contested the notice and produced evidence sufficient to create a triable issue of fact about compliance with TILA's disclosure requirements. In these circumstances, it cannot be that the security interest vanishes immediately upon the giving of notice. Otherwise, a borrower could get out from under a secured loan simply by *claiming* TILA violations, whether or not the lender had actually committed any. Rather, under the statute and the regulation, the security interest "becomes void" only when the consumer "rescinds" the transaction. In a contested case, this happens when the right to rescind is determined in the borrower's favor.

The First Circuit held as much in *Large v. Conseco Finance Servicing Corporation,* 292 F.3d 49, 54-55 (1st Cir.2002). The Larges made an argument similar to Tampon's, that their letter of rescission had the automatic and immediate effect of voiding a loan transaction. *Id.* at 54. The court observed that "[n]either the statute nor the regulation establishes that a borrower's mere assertion of the right of rescission has the automatic effect of voiding the contract." *Id.* Instead, the "natural reading" of the language of § 1635(b) "is that the security interest becomes void when the obligor exercises a right

to rescind that is available in the particular case, either because the creditor acknowledges that the right of rescission is available, or because the appropriate decision maker has so determined.... Until such decision is made, the [borrowers] have only advanced a claim seeking rescission." *Id.* at 54-55. *Cf.* *Williams,* 968 F.2d at 1141-42 (noting that rescission is automatic but rejecting the argument that § 226.23(d)(4)' s lack of reference to subsection (d)(1) restricts a court's ability to impose conditions that run with the voiding of a creditor's security interest upon terms that are equitable); *see also* *Quenzer v. Advanta Mortgage Corp. USA,* 288 B.R. 884, 888 (D.Kan.2003) ("within the meaning of [TILA], 'rescission' does not mean an annulment that is definitively accomplished by unilateral pronouncement, but rather a remedy that restores the *status quo ante.*") (citing *Ray v. Citifinancial, Inc.,* 228 F.Supp.2d 664 (D.Md.2002) ). FN5 We are persuaded by this reasoning.

FN5. Other courts have also held that rescission may be conditioned on the borrower's repayment of loan proceeds. *See, e.g., FDIC v. Hughes Dev. Co.,* 938 F.2d 889, 890 (8th Cir.1991) (district court did not err in conditioning rescission on tender of $100,000 principal within one year); *Williams,* 968 F.2d at 1141-42 (voiding of creditor's security interest in home may be conditioned on consumer's tender of amount owed to creditor after subtracting all finance charges and penalties); *Bustamante v. First Fed. Sav. & Loan Ass'n,* 619 F.2d 360, 365 (5th Cir.1980) (creditor's TILA obligations were not automatically triggered until obligor tendered repayment); *In re Wepsic,* 231 B.R. 768, 776 (Bankr.S.D.Cal.1998) (conditioning "the benefits of rescission" on the borrower's tender of "her duty of repayment under the statute").

***1173** Thus, a court may impose conditions on rescission that assure that the borrower meets her obligations once the creditor has performed its obligations. Our precedent is consistent with the statutory and regulatory regime of leaving courts free to exercise equitable discretion to modify rescission procedures. This also comports with congressional intent that "the courts, at any time during the rescission process, may impose equitable conditions to insure that the consumer meets his obligations after the creditor has performed his obligations as required by the act." S. Rep. No. 368, 96th Cong., 2d Sess. 29 (1980), *reprinted in* 1980 U.S.C.C.A.N. 236, 265.

[3] As rescission under § 1635(b) is an on-going process consisting of a number of steps, there is no reason why a court that may alter the sequence of procedures *after* deciding that rescission is warranted, may not do so *before* deciding that rescission is warranted when it finds that, assuming grounds for rescission exist, rescission still could not be enforced because the borrower cannot comply with the borrower's rescission obligations no matter what. Such a decision lies within the court's equitable discretion, taking into consideration all the circumstances including the nature of the violations and the borrower's ability to repay the proceeds. If, as was the case here, it is clear from the evidence that the borrower lacks capacity to pay back what she has received (less interest, finance charges, etc.), the court does not lack discretion to do before trial what it could do after.

Whether the call is correct must be determined on a case-by-case basis, in light of the record adduced. Here, for example, at oral argument Tampon pressed upon us the possibility that borrowers could refinance or sell the property between the time a court grants rescission and when pay back is required, yet to do so they must have an order in hand. We express no opinion on this, for there is nothing at all to this effect in the record. We simply decide that in the circumstances of this case, the court did not lack discretion to modify the sequence of rescission events to assure that Tampon could repay the loan proceeds before going through the empty (and expensive) exercise of a trial on the merits.

AFFIRMED.

C.A.9 (Hawai'i),2003.
Yamamoto v. Bank of New York
329 F.3d 1167, 03 Cal. Daily Op. Serv. 4481, 2003 Daily Journal D.A.R. 5722

Briefs and Other Related Documents (Back to top)

• 2002 WL 32123070 (Appellate Brief) Fourth Party Defendant-Appellee U.S. Financial Mortgage Corp.'s Answering Brief (Jun. 19, 2002) Original Image of this Document (PDF)
• 2002 WL 32123071 (Appellate Brief) Third-Party Defendant/Fourth-Party Plaintiff-Appellee BNC Mortgage, Inc.'s Answering Brief; Appendices 1-2; and Certificate of Service (May. 20, 2002) Original Image of this Document with Appendix (PDF)
• 2002 WL 32123069 (Appellate Brief) Answering Brief of Defendant-Appellee Bank of New York (May. 17, 2002) Original Image of this Document (PDF)
• 2002 WL 32124995 (Appellate Brief) Appellant's or Petitioner's Informal Brief (Feb. 26, 2002) Original Image of this Document (PDF)
• 01-16427 (Docket) (Jul. 24, 2001)

END OF DOCUMENT

West Reporter Image (PDF)

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.