UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MATTHEW FALCONE, :
PLAINTIFF :
VS. : C.A. No.: 06-363T
OPTION ONE MORTGAGE CORP.; and SOUTH COUNTY MORTGAGE CORP., :
DEFENDANTS :

DEFENDANT, SOUTH COUNTY MORTGAGE CORP.'s
PRETRIAL MEMORANDUM

A. PARTIES

1. Plaintiff, Matthew Falcone, is represented by Marty Marran, Esq.

2. Defendant, Option One Mortgage Corp., is represented by Patricia Buckley, Esq.

3. Defendant, South County Mortgage Corp., is represented by Albert E. Medici, Jr., Esq.

B. FACTS

Defendant, South County Mortgage Corp. (hereinafter "South County") accepts as accurate and incorporates by reference the "FACTS" as set forth in Defendant Option One Mortgage Corp.'s Pretrial Memorandum, filed on October 2, 2007, and supplement the same below.

Plaintiff's complaint alleges that South County violated

R.I.G.L. 6-13.1-2, Rhode Island's Unfair and Deceptive Practice Act by accepting a "Yield Spread Premium" fee of $1,805.00. Specifically, the Plaintiff alleges that South County deceived him that the Broker fees would only be $3,300.50. As set forth in Plaintiff's Answer to Defendant Option One's Cross-Claim, Plaintiff asserts the he did not execute the Promissory Note at issue "with full knowledge of the YSP (Yield Spread Premium) fee and its effect on the transaction."

Plaintiff, however, the reason for his lack of full knowledge, as acknowledged at his deposition, is that he did not read the closing documents and disclosures that he signed. See Deposition Transcript of Matthew Falcone, page 101 line 19 through page 102 line 7 below, questioning of Plaintiff by Attorney Buckley, referring to Plaintiff's Answer to Cross-Claim:

Q The second line down.
A Oh the second line from the top, okay.
Q -- it says, "in that the Plaintiff did not execute said note with full knowledge of the YSP fee and its effect on the transaction".
Do you see that?
A Yes.
Q And is the reason why you said that because you didn't read the documents you signed
A Yes, I stated I never read all the, I never read the document in question and what's its effect on the transaction would be that is correct, with full knowledge of, yes.

In fact, Plaintiff repeatedly stated through out his deposition that he did not read and/or insure that he understood the his loan documents before signed them. For example, with respect to

Deposition Exhibit "A", entitled "South County Mortgage Corporation Agreement Concerning The Non-Refundability of Advanced Fees, the Plaintiff testified as follows:

Page 57 Line 21 through Page 58 Line 9:

Q Do you remember signing an Agreement with South County Mortgage for their fees?
A I signed agreements for fees, but to not remember this particular document - excuse me, I signed many documents, I don't remember this particular one.
Q As you look at that document, is there anything on there that you believe is not correct?
A There's no way for me to tell what is correct. Reading this there's no way for me to tell what is correct and what is not correct. I probably did not read this document at the time I signed it.

. . .

Page 60 Line 8 through Page 61 Line 12:

Q Okay. Why would you not have read this document on November 14, 2004?
A Because I'm sure, I believe there were probably other documents that I did not have time to read and in order to expedite the process personally from personal knowledge I know many people who have gone through this process and do not read all the documents. I signed many --
Q I did not ask you about them.
A I probably did not read the documents, no.
Q All I'm talking about is the document in front of you, the South County Mortgage document.
A I don't believe I would have read all these four pages here.
Q You knew by putting your signature on the documents you were creating an obligation for yourself; correct?
A Yes.
Q Okay. You knew these documents were important; correct?
A Yes.
Q But your testimony is that you didn't read them?
A I sign many documents that I don't read a lot of times and I probably did not read this one.

Q And you did not read it because?
A I'm just not in the habit of reading all the documents in a lot of things. That's I believe a lot of people do that and I'm one of them and I know sometimes there important, but I probably did not read it.

Similarly, with respect to the HUD - Settlement Sheet, the Plaintiff testified as follows:

Page 64 Line 7 through Page 67 Line 23

Q Do you recognize the document?
A It looks like a document that may have been - well, I can read at the top it's a HUD document, yes.
Q It says, Settlement Statement, correct?
A Settlement Statement, correct.
Q You received this at the time of the closing?
A I believe - may I look in my package?
Q If you flip to the second page where it says, Matthew Falcone --
A Yeah.
Q -- 12/2/04, do you see that?
A Okay.
Q Is that your signature?
A A good copy.
Q Do you have reason to believe that is not your signature?
A At this point, no.
Q Do you remember receiving this Settlement Statement that identifies how monies were going to be disbursed from the closing?
A I probably did but I don't recall it.
Q Where was there a closing held, by the way?
A I - it was held in an attorney's office.
Q Do you remember the attorney who did the closing?
A Particular name, no. It may be on here.
Q If I said Attorney Gallone, does that sound familiar to you.
A It may have, it sounds familiar, yes.
Q Did you bring an attorney with you to the closing?
A No, I did not.
Q Did Mr. Gallone explain to you the documents that he was having you sign?
A He said they were related to the consummation of the loan.
Q And you signed these documents one at a time, I take

it.
A Yes.

. . .

Q And as he handled you a document for signature, did he explain to you what the document was?
A He may have, I can't recall.
Q Did you ask him any questions about the documents?
A No, I did not.
Q Why not?
A The same, I just figured something I had to do and not really, did not scrutinize the documents nor did I ask him any questions. It was a very, considering if those are all the documents that I had to sign that day he was probably in a hurry and so was I, so I did not ask him any questions.
Q Did you have any questions about the documents?
A I did not even have time to think about it to be honest with you.
Q As he gave you the documents, did you read them?
A No.
Q Did you read any of the documents that he gave you?
A Probably just when he may have asked for my signature.
Q You didn't read anything else on the documents?
A I don't believe, I mean I knew they were related to a loan and they said, Option One, you know, I saw at the top, but actually reading them as you can see if those are the documents he would have been at this a very long time. I don't think either one [of] us probably would have wanted to stay that long so there was no time there basically to read all these documents.
Q Did he ever indicate to you that he would not answer any questions you had about them?
A I never got that indication.
Q Did he ever indicate to you that you were not allowed to read them before you signed them?
A No.
Q That was a decision you made?
A That was my personal decision.

The Plaintiff alleges that South County violated the Rhode Island Unfair Trade Practices Act by "willfully receiving a Yield Spread Premium fee of $1805 that directly was not related to any

settlement services and willfully participating in deceiving the Plaintiff that the Broker fees would only be $3,300.50". See Second Cause of Action in Plaintiff's Complaint.

The Plaintiff, however, readily admits that he did not read the loan disclosures and closing documents prior to signing them. These documents clearly set forth the fees that the Plaintiff would be charged, as well as the "Yield Spread Premium". For example see the Settlement Statement (HUD) attached hereto as Exhibit "A", which sets forth on Line 1307 "Broker compensation from Option One to SC Mortgage ($1805.00 POC)". Plaintiff's claim with respect to this item fails for a number of reasons. First and foremost, it is clearly disclosed on the Settlement Sheet, which the Plaintiff admits he signed without reading or scrutinizing in any way. The Settlement Sheet also clearly sets forth that this particular compensation is paid to the broker from the lender. It is not a broker fee paid by the Plaintiff.

Moreover, as set forth below, the Plaintiff acknowledges that he "never gave much thought" about how South County would be compensated:

Transcript page 86 line 20 through page 87 line 8.

Q Did you ever have any discussion with anyone at South County Mortgage about what you would be paying them for their services?
A At South County Mortgage - I can't recall any.
Q You don't recall anything as you sit here today about how they were going to be compensated for the services they provided to you?

A At South County Mortgage?
Q Yes.
A No, I don't recall any conversations at all.
Q Did you understand they were going to receive any compensation for their services to you?
A I never gave much thought about it at the time.

The Plaintiff argues that he was deceived "that the Broker fees would only be $3,300.50." This assertion also fails because the Plaintiff simply was not deceived. He was only charged broker fees totaling $3,300.50 (See Lines 808 and 809 of the Settlement Sheet). The broker compensation of $1,805.00 paid by Option One to South County is <u>not</u> a broker fee, and was not paid by the Plaintiff.

Moreover, not only did the Plaintiff admit that he did not read the documents that he signed. The very documents themselves advised the Plaintiff to review the documents and inquire as to the nature of the items and amounts.

For example the document entitled "Itemization of Amount Financed", which sets forth the settlement charges clearly indicates in bold and capital letters that the settlement charges are "**ESTIMATED SETTLEMENT CHARGES**". It also states that "These figures are only estimates and the actual charges due at settlement may be different." and immediately above the signature lines states "This disclosure does not cover all items you will be required to pay in cash at settlement. <u>You my wish to inquire as to the nature of these items and their amounts</u>." (Emphasis Added).

The document entitled "SUMMARY OF THE TERMS OF YOUR LOAN"

indicates as follows:

> For complete details on this transaction, including your interest rate, margin, index and change dates (if an adjustable rate mortgage); as well as your prepayment charge, if any, please review your Note, Deed of Trust/Mortgage/Security Deed, Truth-in-Lending, Itemization of Amount Financed, and HUD-1 Settlement Statement." (Emphasis added).
>
> Should you have any questions regarding any of the terms of this loan, please contact your mortgage broker, SOUTH COUNTY MORTGAGE CORP. (401) 539-0900.
>
> Please see your HUD-1 Settlement Statement for a complete itemization of these fees.
>
> By signing below, Borrower(s) hereby acknowledges reading and understanding the information disclosed above, and having received a copy of this disclosure on the date indicated below.

C. CLAIMS AND DEFENSES

Violation of Rhode Island's Unfair and Deceptive Trade Practices Act

Plaintiff's claims against South County are claims of deception with respect to a $ 1,805.00 broker compensation paid to South County by Option One. Plaintiff, however, readily admits not reading the pertinent closing documents, including but limited to, documents that clearly disclosed the $1,805.00 broker compensation paid by Option One to South County, as well as all broker fee paid by the Plaintiff to South County. Moreover, the total fees paid by the Plaintiff to South County were in fact $ 3,300.50, which is exactly the amount the Plaintiff acknowledges were disclosed to him.

The best case scenario for the Plaintiff, is that he labored

under a lack of understanding regarding the broker compensation paid by Option One to South County and the broker fees paid by him to South County. This understanding, however, was due entirely to the Plaintiff's intentional failure to make even the most minimal effort to understand the transaction at issue.

Clearly, South County did not engage in any deceptive acts whatsoever. The Plaintiff was given clear and numerous disclosures with regard to his loan terms and fees. He chose to ignore these disclosures and execute the closing documents, notwithstanding the fact that he admits to understanding the nature and legally binding effect of said documents. Accordingly, South County did not violate Rhode Island's Unfair and Deceptive Trade Practices Act (R.I.G.L. 6-13.1-2).

Punitive Damages

Plaintiff's claim for punitive damages is completely without merit, and border on frivolous. By his own admission, the Plaintiff was presented with closing documents and disclosures and chose sign them without reading them. To claim the South County should be punished for the Plaintiff's intention failure to read these documents is absolutely and completely void of merit.

D. DAMAGES

South County has not made a claim for damages against the Plaintiff.

E. ISSUES

1. Was the broker compensation paid by Option One to South County disclosed to the Plaintiff?

2. Did South County intentionally withhold the existence of the broker compensation from the Plaintiff?

3. Can the Plaintiff claim deception on the part of South County with respect to broker compensation paid by Option One to South County, in light of the fact the said broker compensation was clear disclosed on the Settlement Sheet (HUD), which the Plaintiff intentionally chose not to read before signing?

4. If the Plaintiff establishes fault on the part of South County, can he satisfy his burden of such willfulness, recklessness or wickedness on the part of South County as amounts to criminality in order to establish a claim for punitive damages?

F. ARGUMENTS AND DISCUSSION

As set forth herein, the Plaintiff claim against South County is that South County deceived the Plaintiff with respect to broker compensation paid from Option One to South County. This broker compensation was expressly set forth in on the Settlement Sheet (HUD), moreover, all broker fees were disclosed to the Plaintiff on various closing documents and disclosure. The Plaintiff, however, intentionally did not read these documents prior to executing them.

The Plaintiff cannot claim deception and failure to disclose information on the part of South County, for his lack of understanding or knowledge of information that was contained within documents that he signed without reading.

G. PENDING MATTERS

None.

H. ESTIMATED TIME OF TRIAL

South County may present two witnesses, Paul J. Byron, President of South County Mortgage, and Gearld Langlois, the loan originator for the Plaintiff's loan. Presentation of South County's case should not take more than one day, and the undersigned agrees with Counsel for co-defendant Option One that this trial should not take more than three to four days.

I. VOIR DIRE QUESTIONS

South County agrees with Option One that this matter should be tried without a jury, and that this case should be conferenced with the Court to determine the issues to be tried and determine whether it will be a bench trial.

In the event this case is tried by s jury, South County, in addition to the Voir Dire Questions requested by Option One, South County only request that prospective jurors be asked whether they are familiar with prospective South County witnesses, Paul J. Byron, and Gearld Langlois.

SOUTH COUNTY MORTGAGE CORP.
By Its Attorneys,
MEDICI & SCIACCA, P.C.

/S/ Albert E. Medici, Jr.
ALBERT E. MEDICI, JR. (4584)
1312 Atwood Avenue
Johnston, Rhode Island 02919
Telephone 401-946-3910
Facsimile 401-942-4918
amedici@medicisciacca.com

CERTIFICATION

I hereby certify that on October 29, 2007, a true copy of the within document was filed electronically and is available for viewing and downloading from the ECF System and that Patricia A. Buckley, Esq. pbuckley@ckmlaw.com and Marty Marran, Esq. jhugostraight@yahoo.com will receive notice through the ECF System.

/S/ Albert E. Medici, Jr.

A. Settlement Statement

EXHIBIT "A"

U.S. Department of Housing and Urban Development

OMB No. 2502-0265

| B. Type of Loan | File Number | Loan Number | Mortgage Insurance Case Number |
|---|---|---|---|
| 1. ☐ FHA 2. ☐ FmHA 3. ☐ Conv. Unins 4. ☐ VA 5. ☐ Conv. Ins. | 500 | | |

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "p.o.c" were paid outside of closing; they are shown here for informational purposes and are not included in the totals.

D. NAME AND ADDRESS OF BORROWER: *Matthew Falcone*
*31 America Street, Providence, RI 02903-1401*

E. NAME AND ADDRESS OF SELLER:

F. NAME AND ADDRESS OF LENDER: *Option One Mortgage Corp*
*301 Metro Center Blvd, Warwick, RI 02886*

G. PROPERTY LOCATION: *31 America Street*
*Providence, RI 02903-1401*

H. SETTLEMENT AGENT: *Law Office of Anthony Gallone*
PLACE OF SETTLEMENT: *530 Greenwich Avenue, Warwick, RI 02886*
TIN: *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*

I. SETTLEMENT DATE: *12/02/2004* RESCISSION DATE:

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER: | | 400. GROSS AMOUNT DUE TO SELLER: | |
| 101. Contract Sales Price | | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal property | |
| 103. Settlements charges to borrower: (from line 1400) | $6,482.75 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE: | | ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE: | |
| 106. City/town taxes to | | 406. City/town Taxes to | |
| 107. County Taxes to | | 407. County Taxes to | |
| 108. Assessments to | | 408. Assessments to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. GROSS AMOUNT DUE FROM BORROWER: | $6,482.75 | 420. GROSS AMOUNT DUE TO SELLER: | |
| 200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER: | | 500. REDUCTIONS IN AMOUNT DUE TO SELLER: | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | $180,500.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| ADJUSTMENTS FOR ITEMS UNPAID BY SELLER: | | ADJUSTMENTS FOR ITEMS UNPAID BY SELLER: | |
| 210. City/town taxes to | | 510. City/town taxes to | |
| 211. County taxes to | | 511. County taxes to | |
| 212. Assessments to | | 512. Assessments to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. TOTAL PAID BY/FOR BORROWER: | $180,500.00 | 520. TOTAL REDUCTIONS IN AMOUNT DUE TO SELLER: | |
| 300. CASH AT SETTLEMENT FROM/TO BORROWER: | | 600. CASH AT SETTLEMENT TO/FROM SELLER | |
| 301. Gross amount due from borrower (line 120) | $6,482.75 | 601. Gross amount due to seller (line 420) | |
| 302. Less amount paid by/for borrower (line 220) | $180,500.00 | 602. Less reductions in amt. due seller (line 520) | |
| 303. CASH ( ☐ FROM ) ( ☒ TO ) BORROWER: | $174,017.25 | 603. CASH ( ☐ FROM ) ( ☐ TO ) SELLER: | |

HUD-1 (3-86) - RESPA, HB 4305.2

L. **SETTLEMENT CHARGES**

| | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|
| 700. TOTAL SALES/BROKER'S COMMISSION BASED ON PRICE @ % = | | |
| DIVISION OF COMMISSION (LINE 700) AS FOLLOWS: | | |
| 701. to | | |
| 702. to | | |
| 703. to | | |
| 704. to | | |
| 705. Commission paid at settlement | | |
| 706. | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN:** | | |
| 801. Loan origination fee % to Option One Mortgage Corp | | |
| 802. Loan discount % to Option One Mortgage Corp | | |
| 803. Appraisal fee to: Option One Mortgage Corp | | |
| 804. Credit report to: Option One Mortgage Corp | | |
| 805. Lender's inspection fee Option One Mortgage Corp | | |
| 806. Mortgage insurance application fee to Option One Mortgage Corp | | |
| 807. Assumption fee Option One Mortgage Corp | | |
| 808. Processing fee to South County Mortgage | $593.00 | |
| 809. Broker fee to South County Mortgage | $2,707.50 | |
| 810. Tax Service Contarct to Fidelity National Tax Service | $70.00 | |
| 811. Funding Fee to Option One Mortgage | $50.00 | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE:** | | |
| 901. Interest from 12/07/2004 to 01/01/2005 @ $34.85 / day | $871.25 | |
| 902. Mortgage insurance premium for mos. to | | |
| 903. Hazard insurance premium for yrs. to | | |
| 904. Flood insurance premium for yrs. to | | |
| 905. | | |
| **1000. RESERVES DEPOSITED WITH LENDER:** | | |
| 1001. Hazard insurance months @ per month | | |
| 1002. Mortgage insurance months @ per month | | |
| 1003. City property taxes months @ per month | | |
| 1004. County property taxes months @ per month | | |
| 1005. Annual assessments months @ per month | | |
| 1006. Flood insurance months @ per month | | |
| 1007. months @ per month | | |
| 1008. months @ per month | | |
| 1009. Aggregate Accounting Escrow Adjustment | | |
| **1100. TITLE CHARGES:** | | |
| 1101. Settlement or closing fee to Attorney Anthony Gallone | $400.00 | |
| 1102. Abstract or title search to | | |
| 1103. Title examination to Anthony Gallone | $250.00 | |
| 1104. Title insurance binder to | | |
| 1105. Document preparation to | | |
| 1106. Notary fees to | | |
| 1107. Attorney's fees to (includes above items Numbers: ) | | |
| 1108. Title insurance to CaTIC (includes above items Numbers: ) | $559.00 | |
| 1109. Lender's coverage ( $180,500.00 ) | | |
| 1110. Owner's coverage | | |
| 1111. Obtain and Record MLC | $60.00 | |
| 1112. | | |
| 1113. | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES:** | | |
| 1201. Recording fees: Deed ; Mortgage $100.00 ; Releases | $100.00 | |
| 1202. City/county tax/stamps: Deed ; Mortgage | | |
| 1203. State tax/stamps: Deed ; Mortgage | | |
| 1204. | | |
| 1205. | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES:** | | |
| 1301. Survey to CaTIC | $75.00 | |
| 1302. Pest inspection to | | |
| 1303. Wire Fee to Anthon y Gallone | $35.00 | |
| 1304. Fed ex fee to Anthon y Gallone | $50.00 | |
| 1305. Underwriting Fee to Option One Mortgage | $650.00 | |
| 1306. Flood search fee to First American Flood Data | $12.00 | |
| 1307. Broker compensation from Option One to SC Mortgage ($1,805.00POC) | | |
| **1400. TOTAL SETTLEMENT CHARGES** | $6,482.75 | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrower: [signature] Matthew Falcone Date: 12-2-04 Seller or Agent: ______ Date: ______

Borrower: ______ Date: ______ Seller or Agent: ______ Date: ______

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

______ Date: ______ Settlement Agent: [signature] Anthony Gallone Date: 12/2/04

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

EXHIBIT "D"



broker role.
Q I'm not asking you to assume.
A Oh I'm sorry.
Q I'm asking you what you remember.
A Well, I went to Option, I went to -- excuse me, actually I never went anywhere. All the documents was from Option One were we signed through correspondence.
Q What I'm asking you about is South County Mortgage Corporation. How did you connect with South County Mortgage Corporation?
A They acted as a broker in the loan.
Q How did you first connect with them?
A Again, I think it was either telephone or Internet like E-mail or something like that.
Q And then South County Mortgage Corporation is the entity that put you together with Option One?
A I believe so.
Q So your earlier testimony that you called Option One directly isn't true; correct, you actually went to them through South County?
A I may have, no, I did not call. I may have gotten information from Option One on that and then as you follow it up they refer you to the specific actual





broker who will do the paper work for you, but I may have contacted Option One.
Q Was there someone specific at South County Mortgage that you dealt with?
A I don't recall the individual's name.
Q Was it a man or a woman?
A I believe it was a man.
Q How long a period of time did it take from when you initially contacted South County before the closing occurred?
A It would seem like probably -- oh I don't know three or four months as best as I can recall it.
Q I'm going to show you what we've marked as Exhibit A. Is that your signature on the bottom, sort of bottom left there where it says, Matthew Falcone?
A I would say it's a copy of my signature.
Q Did you sign this document, Mr. Falcone?
A Given that that's a copy, I probably did.
Q Do you have any reason to believe that copy of your signature is not your signature?
A I will say it's a copy. That's what it appears to me. I didn't sign it right now so I would say it's a copy.
Q Well, you know what your signature looks like; right?





A Well, again I would say it's a copy of my signature.
Q Do you know what your signature looks like, Mr. Falcone?
A Well, it's not the same on any given day. On any given day I may sign differently.
Q Do you have any reason looking at this signature on this document to believe that that is not your signature?
A I would say it looks like a good copy of my signature. So I, that's what it looks like.
Q Do you believe the signature to have been forged? And I'm going to tell you we've got a quite a number of documents to go through, so if we're going to do this on every document it's going to be a very long afternoon.
A I don't believe the signature to be forged.
Q So we can agree that you signed this document on November 14, 2004?
A I probably did.
Q And you're not prepared to say you did today because you can't be sure that's your signature; is that right?
A I'm saying that it's a copy of my signature.
Q And I'm saying the reason why you're using probably





is because you're not prepared to say it is in fact a document that you signed; is that right?
MR. MARRAN: Objection. He's not been shown the document. He's been shown a copy; he's answered you he sees a copy. That is your answer.
Q Why are you using the word 'probably' in your response, Mr. Falcone?
A Because this is a copy and as I did not sign this right now in front of you it is a copy of my signature.
Q How about where the date is 11/14/04, does that look like your writing there?
A Possibly.
Q Do you make your 1's that way?
A Possibly. On any given day I mean I'm sure no one signs their signature exactly the same every time they do it over a lifetime.
Q Do you remember this document?
A No, I do not.
Q You don't remember signing an Agreement with South County Mortgage for their fees?
A I signed agreements for fees, but I don't remember this particular document -- excuse me, I signed many

documents, I don't remember this particular one.
Q As you look at that document, is there anything on there that you believe is not correct?
MR. MARRAN: I will object, but you go ahead and answer.
A There's no way for me to tell what is correct. Reading this there's no way to know what is correct and what is not correct. I probably did not read this document at the time I signed it.
Q Why is that, Mr. Falcone?
A Because between this and this, and as you say a multitude of documents, there was no time to read. It would have taken hours to read all this and I don't believe, I believe it was an attorney that prepared these that would have that much time to spend in the office.
Q What you're referring to is the closing documents; correct, the documents you've been fingering as you've been talking?
A I'm assuming these were all provided. If these were given on separate days, I don't recall. I would assume that all these documents were done on the same day.
Q The date on the South County Mortgage document we've







marked Exhibit A says, 11/14/04. Do you see that?
A 11/14, yes.
Q Your closing was on December 2nd '04?
A Yes.
Q So all the documents that you were just thumbing a minute ago that were closed on December 2nd are an entirely different day from when this was signed on November 14th; correct?
MR. MARRAN: 14.
Q So November 14 is when you signed this document; correct?
A I may have made separate trips. I do not recall making separate trips. To my recollection it was one trip, but it's possible I made two.
Q In other words, you're telling me at the closing you might have used different dates on documents, even though the closing was on December 2nd, 2004, that you might have signed Exhibit A, but you used a different date? Is that what you're telling me?
A You mean a different date than is indicated here?
Q No.
A A different date than is on the closing?
Q Yes.
A No, I probably would not have done that. I probably







used the date. Furthermore, whoever reviewed these documents would probably not have allowed me to put on a different date.
Q All right. So we can assume that because you dated this November 14, 2004 that's when you signed it; correct?
A That is probably when I signed it.
Q Okay. Why would you not have read this document on November 14, 2004?
A Because I'm sure, I believe there were probably other documents that I did not have time to read and in order to expedite the process personally from personal knowledge I know many people who have gone through this process and do not read all the documents. I signed many --
Q I did not ask you about them.
A I probably did not read the documents, no.
Q All I'm talking about is the document in front of you, the South County Mortgage document.
A I don't believe I would have read all these four pages here.
Q You knew by putting your signature on the documents you were creating obligations for yourself; correct?
A Yes.







Q Okay. You knew these documents were important; correct?
A Yes.
Q But your testimony is that you didn't read them?
A I sign many documents that I don't read a lot of times and I probably did not read this one.
Q And you didn't read it because?
A I'm just not in the habit of reading all the documents in a lot of things. That's I believe a lot of people do that and I'm one of them and I know sometimes they're important, but I probably did not read it.
Q Let's look at Page 2 of this document Exhibit A. At the lower left there you see the name Mortgage Loan Originator Gerald Langlois or Langlai -- I'm not sure which -- does that refresh your recollection about who you dealt with at South County?
A I don't recall a Gerald Langlais. I may have spoken to him, but I've never met anyone, I've actually never met anyone in person at all from South County Mortgage unless you include the escrow agent who's an agent for South County Mortgage.
Q On this second page where it says, Matthew J. Falcone, is that your signature?

A Right here?
Q That's the only place I see on the second page where it says, Matthew J. Falcone.
A Oh okay. I'm sorry, it doesn't have -- okay this is Page 2. I would state again it's a copy it looks like a good copy of my signature.
Q Do you have any reason to believe that that's not your signature?
A At this point I don't have any reason to believe that.
Q If you switch to Page 3, do you see where it says, Matthew J. Falcone, in the middle of the page there?
A Yes.
Q Is that your signature?
A I would again state it's a very good copy of my signature.
Q Do you have any reason to believe that's not your signature?
A I have no reason to believe that it's not.
Q If you go to the last page of this grouping, do you see at the bottom there where it says, Matthew J. Falcone, do you see that?
A Yes, I do.
Q Is that your signature?







A It's a very good copy.
Q Do you have any reason to believe that's not your signature?
A At this point I have no reason to believe it's not.
MR. MARRAN: May I interrupt you?
MS. BUCKLEY: Sure.
MR. MARRAN: Are we going to do it with every document you have in your file?
MS. BUCKLEY: Yes.
MR. MARRAN: Stipulation, because I am not going to sit here and go through those documents one by one today. We'll have to continue the matter if we're going to do that. I would suggest that we name the documents, label them as exhibits to this deposition, and he will stipulate that each one is a good copy of his signature since they're all copies and it is most likely his signature.
MS. BUCKLEY: Not good enough. Sorry, Marty, I'll go through them as quickly as I can.







MR. MARRAN: All right.
Q I'm going to show you what we've marked Exhibit B and ask you if you recognize that document, Mr. Falcone. I appreciate the effort.
MR. MARRAN: Right, to move it along.
A I'm sorry. Please repeat.
Q Do you recognize the document?
A It looks like a document that may have been -- well, I can read at the top it's a HUD document, yes.
Q It says, Settlement Statement; correct?
A Settlement Statement, correct.
Q You received this at the time of the closing?
A I believe -- may I look in my package?
MS. BUCKLEY: Sure.
MR. MARRAN: Look at the document she's given you.
THE WITNESS: Yeah.
Q If you flip to the second page where it says, Matthew Falcone --
A Yeah.
Q -- 12/2/04, do you see that?
A Okay.
Q Is that your signature?
A A good copy.







Q Do you have any reason to believe that is not your signature?
A At this point, no.
Q Do you remember receiving this Settlement Statement that identified how monies were going to be disbursed from the closing?
A I probably did, but I don't recall it.
Q Where was the closing held, by the way?
A I -- it was held in an attorney's office.
Q Do you remember the attorney who did the closing?
A Particular name, no. It may be on here.
Q If I said, Anthony Gallone, does that sound familiar to you?
A It may have, it sounds familiar, yes.
Q Did you bring an attorney with you to the closing?
A No, I did not.
Q Did Mr. Gallone explain to you the documents that he was having you sign?
A He said they were related to the consommation of the loan.
Q And you signed these documents one at a time, I take it.
A Yes.
Q And did Mr. Gallone hand them to you for you to sign?

A I know they were, the best I can remember, I mean they were all in a pile and whether he physically, yeah, I mean he more or less administered them to me to sign. Whether he physically handed them to me I don't, I mean they were all there to sign.
Q Are you saying there's a possibility there was a pile and you just took them off the pile?
A No, no, I mean I thought you meant whether he physically had to hand them, yes, he provided them all to me for my signature.
Q And as he handed you a document for signature, did he explain to you what the document was?
A He may have, I can't recall.
Q Did you ask him any questions about the documents?
A No, I did not.
Q Why not?
A The same, I just figured something I had to do and not really, did not scrutinize the documents nor did I ask him any questions. It was a very, considering if those are all the documents that I had to sign that day he was probably in a hurry and so was I, so I did not ask him any questions.
Q Did you have any questions about the documents?
A I did not even have time to think about it to be





honest with you.
Q As he gave you the documents, did you read them?
A No.
Q Did you read any of the documents that he gave you?
A Probably just when he may have asked for my signature.
Q You didn't read anything else on the documents?
A I don't believe, I mean I knew they were related to a loan and they said, Option One, you know, I saw at the top, but actually reading them as you can see if those are the documents he would have been in his office a very long time. I don't think either one us probably would have wanted to stay that long so there was no time there basically to read all these documents.
Q Did he ever indicate to you that he would not answer any questions you had about them?
A I never got that indication.
Q Did he ever indicate to you that you were not allowed to read them before you signed them?
A No.
Q That was a decision you made?
A That was my personal decision.
Q I'm going to show you what we've marked Exhibit C and





ask you if you recognize that.
A It seems to be something that would have been in the mortgage package, the pack, paper work that I received.
Q It says at the top of it, Adjustable Rate Note. Do you see that?
A Yes.
Q That's your Note for this transaction; correct?
A If you say so.
Q You've never seen this document before?
A I probably have seen it, but I don't recall. As I said, I did not scrutinize the papers so I probably didn't have time to look at the top.
Q And Mr. Gallone didn't say to you this is a copy of your note?
A He may have briefly gave me the package and said, the best I can recall, here sign this, here sign this.
Q He didn't say anything to you like here's a copy of your note?
A He may have. I can't recall.
Q If you turn to Page 3, you see Matthew Falcone there?
A Yes.
Q Is that your signature?
A It seems like a good copy.





Q Do you have any reason to believe you did not sign this?
A No.
Q I'm going to show you what we've marked as Exhibit D and ask you if you recognize that document.
A It appears to say, Adjustable Rate Rider.
Q If you flip to the last page there where it says, Matthew Falcone, is that your signature?
A Again, it appears to be a good copy.
Q Do you have any reason to believe that is not your signature on that document?
A No, I do not.
Q I'm going to show you what's been marked as Exhibit E and ask you if you recognize that.
A It appears to be -- well, it says Mortgage on the top, but I don't know what you would call this document legally.
Q We will call it a Mortgage, since that's what it says.
A Okay.
Q If you flip to the last page --
A Yes.
Q Do you see Matthew Falcone there?
A Yes, I do.

*SHEET 23 PAGE 86

86

A On this document it says that a Yield Spread Premium is a broker's fee paid by, that means the broker, that means that the lender is paying the broker on your behalf.
Q And by signing this you authorized that Yield Spread Premium payment to be made; correct?
A I don't know whether I authorized it. I may have signed this document, but I don't know whether I authorized it or not. I don't, I don't, I don't know the necessity, Yield Spread Premiums are necessary, are legal so the fact that I authorized it is a question. I may have signed this document, but I don't know that I authorized it.
Q Why do you believe they're not legal?
A Because I believe they raise interest rates beyond what the stated interest rate is and that a broker should be working for a borrower and not vice versa and they may not direct you to necessarily the best rate. That's what my belief is.
Q Did you have any discussions with anyone at South County Mortgage about what you would be paying them for their services?
A At South County Mortgage -- I can't recall any.
Q You don't recall anything as you sit here today about



PAGE 87

87

how they were going to be compensated for the services they provided to you?
A At South County Mortgage?
Q Yes.
A No, I don't recall any conversations at all.
Q Did you understand they were going to receive any compensation for their services to you?
A I never gave much thought about it at the time.
Q Your Complaint that you filed in this action raises as a claim, I guess we will call it, an issue regarding a $95 finance amount.
A May I look at my claim? I don't know.
MS. BUCKLEY: Sure, go ahead. Hold on I'll give it to you.
Q I'm going to give you what's been marked as Exhibit II. Do you recognize that document, Mr. Falcone?
A That appears to be my, my Complaint, that I, yes.
Q This is the Complaint that you filed in this case?
A Yes.
Q And this contains the information that you said you gleaned off the Internet; is that right?
A Yes, it does.
MR. MARRAN: Paragraph 8, I believe.
THE WITNESS: Yeah.



PAGE 88

88

Q If you look at the last few words of that paragraph it says, 'And the amount finance (sic) was understated by more the $95.00'.
Do you see that?
A Yes, I do.
Q I don't understand what your claim is relative to that. Can you explain it to me?
A Basically, that the amount financed was understated and that the amount paid back would be more, would be $95 more than the amount.
Q How did you figure that out?
A That was, that I personally did not figure that out.
Q Who did?
A A mortgage auditing company.
Q Who is that?
A PMA Number One Mortgage Auditing.
Q How did you --
A Internet.
Q That's how you learned about PMA Number One Mortgage Auditing?
A Yes, because I, yes. They're not in the phone book.
Q Where are they located?
A I believe they're located in -- I'm trying to remember, I believe it's probably out of state in



PAGE 89

89

Arkansas, but I'm not sure. I'm not positive.
Q Did you engage PMA Number One Mortgage Auditing to perform some services on your behalf?
A Yes.
Q What were those services you asked them to perform?
A Audit, audit my mortgage documents.
Q And what is it that they indicated that they would do for you in auditing those documents?
A They indicated that they would find any inaccurate or any otherwise quote unquote "problems" with any aspects of the mortgage documents or the loan itself.
Q Do you have correspondence that you exchanged with PMA Number One Mortgage?
A Yes.
Q Where is that correspondence?
A It's Internet correspondence.
Q Do you have copies of your correspondence with them?
A I have some copies. I don't know if I have all the copies.
Q Would that be on your computer?
A It -- well -- it may be, it may be on the computer. I can't say yes because then if I do and it's not.
Q Well, I'm going to instruct you right now, Mr. Falcone, that if there is any electronic data on

when I may have signed them, but did not read them.
Q And what are you claiming somebody should have done to make you aware of those aside from giving you documents asking for your signature, what should someone have done to make you aware of that?
A That's not my -- that's beyond my purview to say what someone should claim they have to do. I have never really given any thought to what they needed to do.
Q Well, if somebody gives you a document that contains information on it and you sign receipt of it, what more is someone required to do to make sure you understand what's in that document or you have read what's in that document?
A I don't, I personally don't know what someone could do, but nevertheless, I still haven't read them. I don't know what someone could do.
Q And you believe that not reading them excuses you from the effect of the documents?
A I never said that.
Q So you understand that even though you didn't read them by signing them you're still bound by them?
A I'm bound to sign agreements that were legally made.
Q If you look at the last page in your Complaint there, it says, 'an Affidavit Of Lis Pendens'". Do you see







that?
A Yes.
Q Where did you get this form from?
A Internet.
Q Where on the Internet, was that from PMA Number One Mortgage too?
A It may have been. I don't, it may have been.
Q What did you do with this Affidavit Of Lis Pendens?
A I attached it to my Complaint.
Q Did you also record it?
A Yes.
Q How did you know to record it?
A I was given information to.
Q From the Internet?
A From the Internet. There are many law sites on the Internet.
MS. BUCKLEY: I'm sure there are, Mr. Falcone.
Q That signature at the bottom of the Affidavit Of Lis Pendens; is that yours?
A It appears to be a copy of my signature, yes.
Q Do you have any reason to believe you didn't sign this document?
A No reason to believe I didn't sign it.







Q If you flip to the Verification page which is just before the Lis Pendens.
A Yes.
Q Do you see your signature there?
A Yes.
Q Is that your signature?
A It appears to be a good copy of my signature.
Q Do you have any reason to believe that's not your signature?
A No, I do not.
Q If you flip back one more page, do you see your signature on that Prayer For Relief?
A Yes, I do.
Q Is that your signature?
A It appears to be a good copy, yes.
Q Any reason to believe that that's not your signature or that you did not sign this document?
A No.
Q While we're doing pleadings, I will have you identify Exhibit JJ, please. Do you recognize that document?
A Yes, I do.
Q Do you see in the second line it says, well, it begins, "Now comes the Plaintiff, Matthew Falcone, by and through his unsigned attorney".







Do you see that?
A Yes.
Q Who are you referring to?
A There is really no -- an unsigned attorney which I may have called, but didn't have anyone to represent me.
Q So what did you mean by putting his unsigned attorney on this document?
A I assumed that I would have someone to represent me at that point. I intended on having representation.
Q At the time you filed this document you did not have an attorney advising you; correct?
A No, I had no that's why it says unsigned, that's right, there was no attorney representing me.
Q If you turn to the second page --
A Yes.
Q -- the second line down there says --
A Paragraph, please.
Q The second line down.
A Oh the second line from the top, okay.
Q -- it says, "in that the Plaintiff did not execute said note with full knowledge of the YSP fee and its effect on the transaction".
Do you see that?

A Yes.
Q And is the reason why you said that because you didn't read the documents you signed?
A Yes, I stated I never read all the, I never read the document in question and what's its effect on the transaction would be that is correct, with full knowledge of, yes.
Q In Paragraph 3 you indicate that, 'the Plaintiff denies that the Defendant complied with all State and Federal law'.
Do you see that?
A Plaintiff denies -- yes, I do.
Q What State and Federal law are you claiming that the defendant did not comply with?
A TILA and there was another one at the time, Fair Debt Practices Act I believe also, but on that I'm not positive.
Q You believe that applies to mortgage holders?
A I believe TILA applies to mortgage holders.
Q Do you believe the Fair Debt Collection Practices Act applies to mortgage holders?
A I do believe that, yes.
Q And that's something you learned from the Internet?
A Yes, I did.







Q And that's a good reason why you need to be careful about using the Internet, Mr. Falcone.
MR. MARRAN: Objection. Move to strike.
Q If you go down to Paragraph 4 it says about half way down, 'the Defendant failed to give all required disclosures'.
What disclosures are you referring to?
A The two Rights Of Recision.
Q Anything else?
A That's what I believe at this point. That's all I can recall at the time I wrote this, the two Rights Of Recision, that's all I can recall.
Q If you flip to the last two pages, those pages both contain your signature; correct?
A Yes, I believe it's a good copy of my signature.
Q Do you have any reason to believe you did not sign those two pages?
A No.
Q I'm going to show you what we've marked as Exhibit BB and ask you to take a look at that.
Do you recognize that document?
A Yes.
Q Where did you get the information that's contained in this document?







A Internet.
Q This is a form from the Internet?
A I can't recall. It may or may not have been.
Q How did you determine that this document applied in some way to your mortgage transaction?
A I believe it states clearly there that I have conducted a reasonable investigation and inquiry into this matter and consulted Federal Reserve publications and that Option One may have breached the original Promissory Note agreement by failing to provide adequate and valuable consideration and full disclosure of the original terms and conditions of the alleged original agreement.
Q Is this more stuff you got off the Internet?
A Probably.
Q Well, did you have any other source of information about this?
A Again, it could of been, it could of been anyone, it could of been talking to someone in chat rooms, or I would say mostly from the Internet or law, law web sites and things like that.
Q If you look down at your signature there at the bottom of the sheet --
A Yes.







Q -- is that your signature?
A Yes, it is.
Q There's a little c with a circle around it.
A Yes.
Q What is that intended to mean?
A That does mean my signature is copyrighted.
Q Okay. If you turn to Page 2, the Affidavit --
A Yes.
Q -- where did you get that from?
A Internet, with perhaps some modifications.
Q And the modifications coming from your own knowledge?
A Yes.
Q Knowledge gleaned from your trips through Internet chat rooms and sites?
A Law sites, yes, probably.
Q I'm going to show you what we've marked as Exhibit DD.
MR. MARRAN: May the record reflect that the last document is unsigned by Falcone.
MS. BUCKLEY: I'm sorry?
MR. MARRAN: The last document in that exhibit is unsigned.
THE WITNESS: No, this was supposed to be